UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    - v -

MISSION SETTLEMENT AGENCY and
MICHAEL LEVITIS,

        Defendants.

                                         13 Cr. 327 (PGG)

:
:
:
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# THE GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Nicole Friedlander
Edward A. Imperatore
Assistant United States Attorneys
    – Of Counsel –

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA
                                                    :
    - v -                                                    13 Cr. 327 (PGG)
                                                    :
MISSION SETTLEMENT AGENCY and
MICHAEL LEVITIS,                                    :

                    Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the

sentencings of the defendants Michael Levitis and Mission Settlement Agency ("Mission"),

which are currently scheduled for Wednesday, November 19, 2014 at 2:30 p.m.[1]  In its

Presentence Investigation Report ("PSR"), the United States Probation Office correctly

calculates that Levitis's applicable United States Sentencing Guidelines range ("Guidelines" or

"U.S.S.G.") is 87 to 108 months' imprisonment.  The Probation Department recommends that

the Court impose a sentence of 108 months, the top of the Guidelines range.

Levitis seeks a substantially lower sentence of just 60 months based on claims regarding

his upbringing and family commitment, recent good works in the community, ███████████

████████████████████████████████████████████████.  None of these

claims merits a departure from the Guidelines range in this case.

Contrary to the picture he paints of himself as an otherwise upstanding member of his

community, Levitis brazenly preyed on financially struggling people in that community and

across the country to commit this fraud.   Further, while Levitis asks the Court to consider the

---

[1] Sentencing issues related to Mission are addressed at the conclusion of this memorandum.

collateral effects of the loss of his law license in connection with his conviction, as set forth below, Levitis abused his status as a lawyer to reap additional benefits from the fraud, conduct that demonstrated particular contempt for the law in light of the fact that Levitis was also on probation in the Eastern District of New York while he committed these crimes. And while Levitis suggests, in his sentencing submission, that he deserves a below-Guidelines sentence because he experienced challenging personal circumstances as an immigrant, there can be no serious dispute that he knowingly victimized many people in the same circumstances in the course of his fraud. Finally, while he suggests that he was raised feeling pressure to succeed, there is just a single, straightforward reason why Levitis committed this crime: greed.

He does not mention it anywhere in his sentencing submission or in his letter to the Court, but Levitis reaped approximately $2.2 million in profits from the fraud, which was at its height when the Government took overt investigative steps that caused it to shut down. Levitis did not spend his profits on good works, but on luxury items including lease payments for two Mercedes cars, the operating expenses of a high-profile nightclub within his community, and parties and other events featured on the short-lived reality show in which Levitis starred while committing this fraud, where he flaunted his wealth and high living.

Levitis's fraud has been devastating for many of his victims, over 700 of whom have written letters to the Court. In addition to the loss of the money they paid to Mission, because the company, at Levitis's direction, knowingly advised them not to pay their credit card bills - and to pay Mission instead - while Mission was supposedly working on their behalf, many victims incurred large amounts of interest and penalties, and had their credit ruined, resulting in serious and long-lasting effects on their financial ability to support themselves and their families.

Consistent with the Probation Department's recommendation and for the reasons set forth below, given the nature and circumstances of Levitis's reprehensible fraud, his history and characteristics, including his recidivism, and the great need in this case to promote respect for the law and ensure just punishment, the Government respectfully submits that the Court should sentence Levitis within the applicable Guidelines range of 87 to 108 months' imprisonment.

## I.    The Offense Conduct

### A.    Overview of the Fraud

From its inception in 2009, Mission offered "debt settlement" services to financially disadvantaged individuals who were struggling or unable to pay their credit card debts.  (PSR ¶ 10.)  Like other purported debt settlement providers, Mission held itself out as a company that could successfully negotiate to lower the overall debt its customers owed to credit card companies and banks.  (*Id.*)   At all times, Mission, which had offices variously in Brooklyn and Manhattan, was operated and controlled by Levitis.  (*Id.* ¶ 11.)   Although Levitis's mother was listed as Mission's owner on certain corporate documents, it was Levitis who was responsible for managing Mission's day-to-day operations, its finances, its hiring and termination of employees, and its advertising and solicitation of customers.  (*Id.* ¶ 11.)

At Levitis's direction, Mission systematically defrauded more than 1,200 financially disadvantaged people across the country.  (*Id.* ¶ 15.)  Mission falsely and fraudulently tricked them into becoming Mission's customers by making materially false and misleading statements about Mission's ability to settle their debts and about the fees Mission would charge for its services.  (*Id.* ¶¶ 15-17.)  Levitis instructed Mission employees to lie about and conceal Mission's fees.  Employees falsely stated, both verbally and in their written solicitations, that Mission would charge a mere $49 per month and/or that there would be no up-front fees.  (*Id.*) In fact, Mission took thousands of dollars in up-front fees from funds that its customers had set

aside because they had been told the funds would be held in escrow and used to pay creditors. (*Id.* ¶ 16.) At Levitis's direction, Mission employees deceived prospective customers by fraudulently promising that Mission could help reduce their debts – typically by 45% – when, for many customers, Mission actually did little or no work, and failed to achieve any reduction in debt whatsoever. On top of that, employees deceptively created an air of legitimacy for Mission's business by falsely suggesting that Mission had affiliations with the federal government, and with one of the three leading credit bureaus in the United States. (*Id.* ¶ 16.)

Overall, Mission had approximately 2,200 customers who paid a total of nearly $14 million in connection with its purported debt settlement services. (*Id.* ¶ 17.) Of these funds, Mission took over $6.6 million in fees, while paying only approximately $4.4 million to customers' creditors. For more than 1,200 of its customers, Mission took fees totaling nearly $2.2 million, but never paid a single penny to the customers' creditors as payment for any negotiated debt. (*Id.*)[2] Levitis used the money that Mission took from its customers to pay for, among other things, the operating expenses of a restaurant/nightclub he controlled, lease payments for two different luxury Mercedes cars, and credit card bills for his mother (*id.*), as well as expenses for parties and other events featured in the short-lived reality television show in which he starred during the course of the fraud.

As described in many of the victim impact statements received by the Court in connection with Levitis's sentencing, because Mission representatives advised customers not to pay their credit card bills or communicate with their creditors while Mission was (supposedly) working to settle their debts, many victims had their credit ruined, and some fell into bankruptcy,

---

[2] For the balance of the customers, while Mission paid some amount of money to the customers' creditors, it often, at best, settled only the smallest (and often easiest to settle) of multiple debts owed by the customer.

as a result of the scheme.  Furthermore, before his law license was suspended (as discussed below), and at the same time Mission was advising customers not to pay their credit card bills, Levitis instructed his employees to advise clients that Levitis's law firm would represent them in court in the event they were sued by their creditors.

### B.    Mechanics of the Fraud

Levitis and Mission preyed upon financially struggling people believed to be behind on their credit card payments, and solicited them through deceptive telemarketing and mail solicitations. (*Id.* ¶ 20.)  Using a sales script that Levitis drafted, Mission's sales representatives then typically spoke to the prospective customers on the telephone, describing Mission's work and its ability to renegotiate debt.  (*Id.* ¶¶ 20-21.)  Where an individual ultimately expressed an interest in engaging Mission, Mission then had the individual enter into a contract.  (*Id.*)

#### 1.    Lies About Mission's Fees

At Levitis's direction, in conversations with prospective customers, Mission's employees falsely represented that customers would be asked to make monthly payments for a set period of time, that these payments would be held in "escrow" by a third-party payment processor (the "Payment Processor") until Mission had negotiated down the customers' debt obligations, and that Mission would then use the money held in escrow to pay the creditors. (*Id.*)  Employees further falsely promised that Mission would charge only a nominal monthly fee of $49 in exchange for its efforts, and they often explained that Mission would charge an additional fee only if it succeeded at obtaining a greater reduction in debt than what had been promised. (*Id.*) They also falsely claimed in both their written solicitations and in scripted phone calls that there were no up-front fees.  (*Id.*)

In reality, in addition to the $49 monthly fee, Mission also charged an up-front fee equal to as much as 18% of the debt the customer owed. (*Id.*) Levitis arranged for Mission to deduct these funds from the monies that customers paid to a third party payment processor, in accordance with a monthly payment plan it established, and that customers understood would be held in their escrow accounts and used to pay their creditors. (*Id.*) Instead, Mission regularly took as fees for itself, among other things, all of the funds that its customers paid to the payment processor during the first three months of their contracts with Mission. This was done in order to ensure that the company would receive up-front fees before any of the customers' debt was even paid down. (*Id.*)

By way of example, in 2010, a Mission customer ("Victim-1"), an immigrant who lives in the western United States, was contacted telephonically by an individual who identified herself as an employee of Mission, and who claimed that Victim-1 "qualified" for a reduction of Victim-1's debts from approximately $26,000 to approximately $12,000. Victim-1 informed the Mission representative that this claim sounded "too good to be true" but, in a series of persistent calls to Victim-1, the Mission employee assured Victim-1 that Mission would achieve such a result. The Mission employee further claimed that Mission's fee for this service would be just $1000; that Mission would handle all communications with Victim-1's creditors; and that Victim-1 should not communicate with those creditors or make any payments directly to those creditors. The employee instructed Victim-1 to begin making monthly payments of approximately $400 to a particular account, and claimed that after Victim-1 made two such payments, Mission would use the money in that account to settle a particular small debt of Victim-1.

Victim-1 made the first two monthly payments as instructed, but she continued to receive calls from her creditors claiming that she owed the entire amount of her debts. Victim-1 tried contacting the Mission employee, who never returned her calls or contacted her again.

Victim-1 frantically contacted her other creditors, each of which stated that it had never been contacted by Mission or anyone on behalf of Victim-1 to negotiate a settlement of Victim-1's debts. Further, unbeknownst to Victim-1, Mission's payment processor automatically debited two additional monthly payments from Victim-1's account before her bank, at her request, blocked any further automatic withdrawals from Mission's payment processor.

Victim-1's daughter, more fluent in English than her mother, contacted Mission on her mother's behalf and demanded a refund for her mother. In a series of phone calls, a different Mission employee refused to return any of the money, which totaled over $1600. Ultimately, this employee said that Mission would return approximately just $200 of Victim-1's money, but Mission never did return any of that money. Nor did Mission ever settle any of Victim-1's credit card debts.

As the Court is aware, over 700 hundred of Levitis's victims have submitted letters to the Court recounting similar experiences with Mission and losses from Levitis's scheme.

### 2. Lies About Mission's Results

Levitis instructed Mission's employees to promise prospective customers that they would have to pay only 55% of the amount owed to creditors. (*Id.* ¶ 22.) In reality, as Levitis admits in his sentencing submission, Mission did little or no meaningful work to negotiate reductions in debt for many of its customers, and the sort of result Mission was promising prospective customers was substantially more favorable than the results Mission typically achieved for prior customers. (*Id.*)

### 3.    Lies About Mission's Affiliations

At Levitis's direction, Mission employees also made material misrepresentations to prospective customers about Mission's relationships and affiliations in a deceptive effort to make Mission seem more credible and trustworthy.  (*Id.* ¶ 23.)  For example, in an effort to attract business, Mission sent a solicitation letter drafted by Levitis to prospective customers that falsely suggested that it was acting on behalf of or in connection with a federal governmental program.  (*Id.*)  The letter included an image of the Great Seal of the United States and indicated that it was coming from the "Reduction Plan Administrator" of the purported "Office of Disbursement."  (*Id.*)  However, the only phone number and address provided in the letter belonged to Mission, and Mission did not have any relationship with any federal agency, nor was it operating in connection with any federal program.  (*Id.*)

In the same way that Mission falsely suggested an affiliation with the federal government, Mission falsely suggested that it had a close relationship with one of the three leading credit bureaus in the United States ("Credit Bureau").  (*Id.* ¶ 24.)  Specifically, as set forth in a sales script recovered from Levitis's desk when the Government executed search warrants in its investigation -  a sales script that Levitis drafted and reflects Levitis's handwritten edits -  Mission's sales representatives were instructed to tell prospective customers that Mission "works in direct correspondence with [the Credit Bureau]" and that Mission had received the prospective customer's contact information and other data directly from the Credit Bureau.  (Exhibit A).  To the contrary, as Levitis plainly knew, Mission did not have any relationship with the Credit Bureau, nor did Mission obtain any contact information from the Credit Bureau.

## II.   The Indictment, Levitis's Guilty Plea, and the Guidelines Calculation

On or about May 1, 2013, a grand jury sitting in this District returned a three-count Indictment charging Levitis, Mission, and Mission employees Denis Kurlyand, Boris Shulman and Manuel Cruz with one count of conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349, wire fraud, in violation of 18 U.S.C. § 1343, and mail fraud, in violation of 18 U.S.C. § 1341.   At or about that time, the Government also announced that two additional employees, Felix Lemberskiy and Zakhir Shirinov, had previously been charged and had pleaded guilty to charges stemming from their role as Mission sales representatives.

On April 8, 2014, Levitis pled guilty to superseding information S1 13 Cr. 327 (PGG), which charges Levitis with one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371, in connection with the fraud he perpetrated at Mission, and one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371, in connection with the fraud he perpetrated at Alpha Debt Settlement, which functioned at all relevant times as a Mission affiliate.[3]   The remaining defendants, Kurlyand, Shulman, Cruz and Mission Settlement Agency, also pleaded guilty in the case.

The Probation Department has correctly calculated Levitis's offense level and criminal history category under the Guidelines, resulting in an adjusted total offense level of 28 and a criminal history category of II.   Accordingly, Levitis's applicable Guidelines range is 87 to 108 months' imprisonment, which is consistent with the parties' calculation in the plea agreement. (PSR p. 27).   The Probation Department recommends a sentence of 108 months' imprisonment, at the top of the Guidelines, based upon Levitis's role "as supervisor of a serious fraud and . . . [for his] role in deceiving hundreds of victims," the manner in which Levitis "displayed no

---

[3]   For purposes of this sentencing memorandum, Mission Settlement Agency and Alpha Debt Settlement are referred to collectively as "Mission."

mercy to his victims, preying and living off of individuals who were desperate to get their financial affairs in order," and the fact that he was on federal parole at the time that he committed the instant offense. (*Id.* p. 29-30).

## ARGUMENT

A substantial sentence is warranted in this case. Levitis committed a brazen and callous fraud, victimizing financially vulnerable people across the country in order to commit the crime. In doing so, Levitis, a lawyer, showed particular contempt for the law, using his ability to provide legal services in furtherance in the scheme, and engaging in the fraud at the same time he pleaded guilty to a felony and was serving a federal probationary sentence for lying to FBI agents investigating a prior, unrelated crime. Further, and contrary to his suggestion that he is an otherwise upstanding member of the community, Levitis actively engaged in this fraud over a sustained period of time, instructing his employees to lie to people day in, and day out, for years. For all of these reasons, as well as for the importance of specific and general deterrence, promoting respect for the law, and providing just punishment in this case, the Government respectfully submits that a sentence within the applicable Guidelines range of 87 to 108 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

## I.     The Sentencing Factors

In imposing sentence, this Court must consider the factors set forth in Title 18, United States Code, Section 3553(a). Section 3553(a) requires the sentencing Court to consider, *inter alia*, the Sentencing Guidelines and the sentencing range recommended by application of those Guidelines, 18 U.S.C. § 3553(a)(4-5); "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "the need for the sentence imposed to reflect the seriousness of the offense," and provide just punishment, 18 U.S.C.

§ 3553(a)(2)(A), to provide general and specific deterrence, 18 U.S.C. § 3553(a)(2)(B-C), and to provide any treatment or training the defendant may need, 18 U.S.C. § 3553(a)(2)(D); and "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The statute further requires that the sentence imposed be "sufficient, but not greater than necessary," to comply with the foregoing purposes of sentencing. 18 U.S.C. § 3553(a).

An analysis of these factors demonstrates that a Guidelines sentence is warranted.

### A. The Nature and Circumstances of the Offense

Mission and Levitis perpetrated a wide-ranging fraud against financially disadvantaged people in New York and around the country. Some of these people were in serious financial distress; all of them wanted to settle their debts fairly, and were looking to Mission for help. Levitis, in particular, preyed on their desperation. On a daily basis, Levitis supervised nearly a dozen employees who, at his direction, lured in customers by lying about quick, affordable, and guaranteed solutions to their serious financial problems. After further tricking customers into believing that their up-front payments to Mission would be held in "escrow," at Levitis's direction, the employees provided additional false comfort that these payments were affordable by advising customers to stop paying their credit card bills during the months they were dealing with Mission. As a result, customers lost significant amounts of money they could not afford to lose, and additionally – and contrary to Levitis's claim that the harm to customers was limited to the amount of money Mission took from them – customers frequently incurred substantial interest and penalties. Ultimately, some fell into bankruptcy, and many others have experienced long-lasting effects on their credit that persist to this day.

Levitis suggests that he did not intend, at the outset, to perpetrate a fraud. Whether he did or did not is of no consequence, because there is no question that Mission lied to customers, at his direction, essentially from its inception. Mission's small offices were inundated with written complaints, many dozens of which were recovered by the Government during the execution of search warrants in this case. In addition to these written complaints, customers complained regularly by phone, by email, and in person at Mission's offices. Customers also complained to various state Attorney General offices, each of which forwarded all complaints to Mission and requested responses from the company. Levitis remained utterly undeterred by his customers' pleas. He agreed to refund customers' money only in the most limited circumstances, particularly when state Attorney General offices asked for responses to particular customer complaints, and he continued to direct employees to recruit new customers with the same lies about Mission's fees, results, and affiliations. Indeed, as the fraud continued, Levitis designed a fraudulent mail solicitation that bore the Great Seal of the United States and purported to come from the "Reduction Plan Administrator," tricking people into believing that Mission was affiliated with the United States Government and the Treasury Department's Trouble Asset Relief Program.

Levitis suggests that he felt some remorse as his fraud continued, and scaled it back to some extent. The evidence belies that claim. To begin with, Levitis operated the scheme on a daily basis for years and, only after it was ongoing for many months, Levitis began distributing the fraudulent mail solicitation designed to trick people into thinking Mission was affiliated with the U.S. Government. In addition, after the Consumer Financial Protection Bureau passed a regulation that made it more difficult to accept up-front fees from customers, during the latter part of the scheme, Levitis expanded his business to target Canadian customers in the hopes that

he could easily continue collecting substantial up-front fees from them in the fraud. Levitis instructed his Brooklyn-based employees to use fake Canadian accents when speaking with these customers, in order to trick them into thinking Mission was a legitimate Canadian company.

Finally, and significantly, Levitis did not commit this crime out of any financial need. He used victims' money to pay the operating expenses of Rasputin, a Brooklyn-based nightclub that he purchased in part, if not entirely, in the hopes of increasing his public profile due to the club's notoriety in his community. Levitis further used victims' money to make lease payments for two different luxury Mercedes cars, and to pay credit card bills for his mother, who drove a leased Bentley automobile. Furthermore, at the same time that he was ignoring victims' pleas to refund their money, Levitis flaunted his wealth and privilege on a short-lived reality television show in which he starred.

**B.**     **The History and Characteristics of the Defendant**

Levitis's history and characteristics also counsel strongly in favor of a Guidelines sentence. While Levitis suggests he experienced challenges as an immigrant, and felt pressure from his family to succeed, there is no question that he enjoyed the benefits of a close and devoted family, a stable upbringing, education, immigration status, and ultimately a high-paying career as an attorney.[4] In sum, Levitis enjoyed a life of deep emotional and financial stability, filled with benefits that many people never receive. But none of that was enough for him. Motivated by a strong sense of greed and entitlement, Levitis satisfied his craving for publicity and ostentatious displays a wealth by enriching himself through fraud on financially struggling and often unsophisticated people.

---

[4] In fact, as set forth in the PSR, Levitis's law office earned more than a million dollars annually in gross receipts, and Levitis himself earned as much as $566,606 in one year through his legal practice alone. (PSR ¶ 89).

In addition, Levitis's status as a lawyer makes his crimes even more egregious. As the scheme progressed, Levitis used clever legal writing in furtherance of the fraud, incorporating into his written contracts with customers certain "fine print" from which Mission's true fees could be deduced. That way, when customers complained that Mission's representatives had lied to them orally, in person and by phone, about Mission's fees, Levitis could (through his "customer service" department) point to the fine print in an effort to avoid giving them back any of their money. In addition, as set forth above, Levitis offered legal services to customers in the event they were sued by creditors at the same time as he caused them, through Mission's bad advice that customers should stop paying their credit card bills, to get sued in the first place.

Finally, and as noted below regarding the need for specific deterrence in this case, Levitis committed this crime while servicing a below-Guidelines, three-year probationary sentence imposed by the United States District Court for the Eastern District of New York. Notably, he was convicted of lying to federal agents, a crime which reflects Levitis's contempt for the law. Indeed, at the very moment he pleaded guilty before a United States District Court judge in that case, Levitis was actively operating this scheme.

Each of these facts – Levitis's greed, his manipulation of his status as a lawyer, and the contempt he showed for the law and legal process by committing this crime while on probation in another case – shows powerfully that Levitis is, as he admits, a narcissist. His history shows, again and again, that he will say anything he has to say to get what he wants in the moment, and that he is driven by vanity and greed. Thus, while he may be a devoted father and family member, as he claims, Levitis showed no regard for his victims at any time.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████

## C.    Just Punishment and Deterrence

A Guidelines sentence would provide just punishment for Levitis's participation in this significant fraud.  The Court has received hundreds of victim impact statements submitted by defrauded Mission customers.  These statements set forth in personal and poignant terms the ways in which Levitis's scheme hurt vulnerable and struggling people.  For example, one victim, ████████,[5] describes in her letter how she was solicited by phone by a Mission employee who stated that Mission was "backed by the Obama Relief Program and "helping millions of American people consolidate all their debts into one small monthly payment."  (Attachment B, at 14).  Mission, however, withdrew thousands of dollars from ██████ bank and did nothing to settle her debts.  Although she once had an excellent credit history, ██████ declared bankruptcy as a result of Mission's fraud.  In her letter, ██████ described how she "became medically ill from all the stress the situation has caused" and that "it was a disgrace for both my husband and I knowing how much we tried to provide for our children."  (*Id.* at 15).  She

---

[5]  Victims' names will be redacted from the publicly filed version of this memorandum.

articulates her fears that "things will never get back to normal" after her bankruptcy and that she is "always getting turned down when applying for credit and it wasn't our fault."

Another victim, ███████, described how she struggled as a single mother to provide for her two children after Mission stole her life savings. (*Id.* at 29-30). In moving terms, ███ ███ explains the physical and psychological strain that she and her family endured as a result of Mission's fraud: "I feel a numbness that does not go away, and I do not know what to do about that; some parts of my life have become frozen in time and I have had to stop feeling in order to continue with my shattered life." (*Id.* at 30). ███████ describes how she and her husband, a Vietnam veteran, were forced to declare bankruptcy and must now continue working and forego retirement because of Mission's fraud. (*Id.* at 6). ███████, another victim, describes how he "was taken advantage of and cannot provide for his family," going "from a bad situation to an irreparable one." (*Id.* at 4). Other victims describe sleepless nights, loss of self-esteem, physical strain, and emotional pain they have suffered as a result of the scheme.[6]

In addition, there is a compelling need in this case for specific deterrence and to protect the public from future crimes of the defendant. At noted above, Levitis committed this crime while on probation in the Eastern District of New York following his conviction for making a false statement to federal officials in connection with an investigation of a public official performing official acts in exchange for campaign contributions. (PSR ¶¶ 44-49). Clearly, Levitis was undeterred by the below-Guidelines, non-incarceratory sentence that he received for that offense.

The need for general deterrence is also significant in this case. Mission is one of a number of debt settlement companies that have preyed upon financially disadvantaged and

---

[6] For ease of reference, the Government has attached as Exhibit B these and certain other short selections from the vast set of victim impact statements.

unsophisticated customers in the wake of the recession in this country. Fraud by certain of these companies has victimized many thousands of poor, struggling people from across the country, and these frauds continue in earnest to this day. A Guidelines sentence would help deter others who would otherwise victimize financially struggling people in the same way that Levitis has.

## III.    Forfeiture and Restitution

On April 8, 2014, the Court entered a preliminary consent order of forfeiture in which Levitis agreed to forfeit $2,196,522, representing the proceeds obtained a result of the offenses of which Levitis was convicted.   The Government requests that, at sentencing, the Court order forfeiture as set forth in the preliminary consent order, and that the Court also order restitution in the amount of $2,196,522 pursuant to 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1.

## IV.    Mission's Sentence

On April 8, 2014, Mission, through its principal, Eva Levitis, pled guilty pursuant to a plea agreement to Count One of the Indictment, which charges Mission with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349. The Probation Department has correctly calculated Mission's offense level under the Guidelines, resulting in an adjusted total offense level of 28 based upon a loss amount of approximately $2,196,522, a Guidelines term of probation of one to five years, and a minimum Guidelines fine of $8,100,000. (Mission PSR, at 5). However, as set forth in the parties' plea agreement and the PSR, because the maximum pecuniary gain to Mission and loss to persons other than Mission as a result of Mission's offense is $2,196,522, the maximum statutory fine that may be imposed is $4,393,044. (*Id.*) The Government therefore requests that the Court sentence Mission, which has ceased operating, to a Guidelines term of one to five years' probation and a $4,393,044 fine.

**Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a

Guidelines sentence of imprisonment on Levitis, and a Guidelines fine and term of probation on

Mission, in this case.

Dated: New York, New York
November 13, 2014

Respectfully submitted,

PREET BHARARA
United States Attorney

By: ____/s/_____
Nicole Friedlander
Edward A. Imperatore
Assistant United States Attorneys
Tel.: (212) 637-2211/2327