**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**UNITED STATES OF AMERICA**          :
                                      :
                                      :
                                      :
              **-v-**                 :
                                      :   **Case No.: 13 Cr. 327 (PGG)**
                                      :
                                      :
**MISSION SETTLEMENT AGENCY, ET. AL,**   :
                                      :
              **Defendants.**          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**REPLY SENTENCING MEMORANDUM**
**ON BEHALF OF MICHAEL LEVITIS**

**CHARLES A. ROSS & ASSOCIATES LLC**
Trinity Centre
111 Broadway, Suite 1401
New York, NY 10006

*Attorneys for Michael Levitis and*
*Mission Settlement Agency*

# **Table of Contents**

Page

INTRODUCTION ................................................................................................... 1

I.      The Government Wrongly Conflates Mr. Levitis' Crimes with
        the Noncriminal Practices of the Debt Settlement Model ........................... 2
a.      The Debt Management/Credit Counseling Model ....................................... 2
b.      The Debt Settlement Model ......................................................................... 3
c.      Criticisms of the Debt Settlement Model .................................................... 5
d.      Mr. Levitis Should Be Sentenced Only In Accordance With His Actual Crimes
        And Should Not Be Penalized For His Noncriminal Participation In The
        Debt Settlement Industry ............................................................................. 7

II.     REDACTED CONTENT ............................................................................... 9

CONCLUSION .................................................................................................... 11

**INTRODUCTION**

This Reply Memorandum is respectfully submitted in anticipation of Michael Levitis'

sentencing, scheduled for November 19, 2014, in order to address certain points raised in the

Government's sentencing memorandum.  First, the Government points to conduct by Mr. Levitis

that was in no way criminal.  In doing this, the Government fails to distinguish between the

criminal conduct for which Mr. Levitis has accepted responsibility and the standard, noncriminal

practices of the debt settlement industry.  Mr. Levitis should be punished for his criminal

conduct alone, and not for the noncriminal failings of a debt reduction model. REDACTED

CONTENT.

As discussed in depth in the sentencing memorandum submitted on behalf of Mr. Levitis

and Mission Settlement Agency, Mr. Levitis has accepted responsibility for his crimes and he

understands that a substantial term of incarceration is an appropriate punishment.  The defense

asks the Court to consider the many positive aspects of Mr. Levitis, such as his devotion to his

family and his long involvement with charitable service, and respectfully submits that Mr.

Levitis should be sentenced to a five year term of incarceration and three years of supervised

release with strict conditions that include one year of halfway house placement and one year of

home confinement.  This sentence would be sufficient but not greater than necessary to achieve

the overall goals of sentencing set forth in 18 U.S.C. § 3553(a).

I.    **The Government Wrongly Conflates Mr. Levitis' Crimes with the Noncriminal Practices of the Debt Settlement Model**

Mr. Levitis fully acknowledges that he committed the crimes to which he pleaded guilty. He allowed and encouraged salespeople to lie to prospective customers during initial telephone conversations about Mission's fees.  Specifically, he allowed salespeople not to disclose that the quoted monthly payment amount included an 18 percent service fee.  He also allowed salespeople to state that there were no upfront fees. Mr. Levitis allowed and encouraged Mission's salespeople to lie about Mission's success rate.  In addition, Mr. Levitis created and authorized marketing materials that falsely implied that Mission was affiliated with a government agency and that falsely represented that customers would not be charged upfront fees.  This conduct was criminal, and Mr. Levitis accepts responsibility for it.

However, the Government's recitation of Mr. Levitis' wrongdoing reveals a startling lack of comprehension of the mechanics of debt settlement.  The Government repeatedly appears to confuse the practice of debt settlement with the wholly different practice of debt management (also known as credit counseling), and then condemns Mr. Levitis and Mission for not providing services that were in fact never promised.

In order to understand the Government's apparent misconception, it is important to distinguish between the different models used to reduce consumers' unsecured debts.

   a.   _The Debt Management/Credit Counseling Model_

The Consumer Finance Protection Bureau (CFPB) describes the debt management model, which is administered by credit counselors, as follows: "under a debt management plan you make a single payment to the credit counselor each month or pay period. The credit counselor then makes monthly payments to each of your creditors."

http://www.consumerfinance.gov/askcfpb/1449/whats-difference-between-credit-counselor-and-debt-settlement-company.html (last accessed November 17, 2014).   Credit counselors reach up-front agreements with creditors to ensure that the creditors will not pursue collection efforts while the consumer is in the debt management program. *Id.*  Usually, no reduction of the principal amounts owed is negotiated; instead, credit counselors negotiate a lower monthly payment, typically by a reduction in interest rate or an extension of the repayment term.  *Id.*

However, debt management plans are only available to consumers who are able to make a monthly payment  equal to or greater than the monthly minimum.  Accordingly, these plans are generally not available to consumers experiencing serious financial hardship.  *See* Hemming Morse LLP, O*ptions for Consumers in Crisis: An Economic Analysis of the Debt Settlement Industry*, available at http://www.americanfaircreditcouncil.org/wp-content/uploads/2014/08/Options-for-Consumers-in-Crisis-as-of-Dec-12.pdf (last accessed November 17, 2014) (hereinafter, the "Regan Report") (annexed as Exhibit A).

   b.  <u>The Debt Settlement Model</u>

Debt settlement companies obtain settlements of debts with creditors or debt collectors by making lump sum payments that are less than the full amounts owed. http://www.consumerfinance.gov/askcfpb/1449/whats-difference-between-credit-counselor-and-debt-settlement-company.html (last accessed November 17, 2014).  Debt settlement is premised on the theory that creditors are incentivized to accept a lump sum settlement for significantly less than the amount owed, where the creditor is convinced that the debtor will not otherwise pay off the debt.  As one district court has noted "[c]reditors have no reason to settle debt at a discount if the debtor is current on his or her payments." *FTC v. Financial Freedom Processing, Inc*., *et al*.,

No. 3:10-CV-2446-N (N.D. Tex. Mar. 12, 2012), aff'd, 2013 U.S. App. LEXIS 16766 (5th Cir. Aug. 12, 2013) (Annexed as Exhibit B).   For this reason, the debt settlement model explicitly requires that consumers stop making payments on their debt and therefore default.  Center for Responsible Lending, *A Roll of the Dice: Debt Settlement Still a Risky Strategy for Debt-Burdened Households* (2013), available at http://www.responsiblelending.org/other-consumer-loans/debt-settlement/research-analysis/CRL-Debt-Settlement-Research-Paper-and-Appendix.pdf (last accessed November 17, 2014) (hereinafter, the "CRL Report") (Annexed as Exhibit C). It is widely understood that "creditors will not reduce the principal balances of customers whose debts are current, even if the customer is only making minimum payments." *Id.*

The longer a debt has aged, the more likely the creditor is to agree to settlement at a significant discount.  *See id.*  Debts that have gone to a collection agency or sold to a debt buyer can be settled at even lower amounts.  *See* Liz Pulliam Weston, *'Zombie' Debt is Hard to Kill*, EDUC. CTR. 2000, http://educationcenter2000.com/debt_collectors/zombie.htm (last accessed November 17, 2014 ("The oldest debt is by far the cheapest, sometimes costing the collector 25 cents for every $100 in face value. If the collector can convince the borrower to cough up even $1, the company has made back its costs.")

The consumer makes  monthly payments to the debt settlement company rather than the creditors. The funds accumulate in a third-party escrow account until sufficient money is available to offer a lump sum settlement payment to one of the customer's  creditors.  As the monthly payments accumulate, the debt settlement company settles with additional  creditors. *Financial Freedom Processing, Inc., et al.*, No. 3:10-CV-2446-N, at 4; Regan Report, at 12 ("our analysis found a persuasive relationship between program tenure and Debt Reduction. This

relationship is consistent with our understanding that debt settlement providers generally inform Clients that Debt Reduction begins with the first settlement, which commonly occurs within the first six months of program participation, and continues to materialize thereafter throughout the lifecycle of the program"). The smaller debts are almost always settled first because settlement negotiations begin when the customer has accumulated sufficient funds to make an offer of a lump sum payment. Negotiations do not begin until the customer is in a position to offer a lump sum settlement. *See* CRL Report, at 5.

The consequences of defaulting on payments are significant. Creditors will begin collection efforts and customers may incur penalties. Creditors may sue the customers. For these reasons, "debt settlement generally serves those who cannot qualify for or afford other debt relief options, such as consumer credit counseling, or who are unable to satisfy the means test required as a prerequisite to personal bankruptcy…" Regan Report, at 3.

c.   *Criticisms of the Debt Settlement Model*

As noted in the defense's sentencing memorandum, there are many criticisms of the debt settlement model. (Def. Mem. at 20.)

These criticisms fall into two discrete categories. One category is the deceptive practices that many debt settlement companies engage in, such as lying to customers about fees or making misrepresentations about the company's affiliations and success rates. *See, e.g.*, United States Government Accountability Office, *Debt Settlement: Fraudulent, Abusive, and Deceptive Practices Pose Risk to Consumers* (2010), available at http://www.gao.gov/assets/130/124498.pdf (last accessed November 17, 2014) (hereinafter, the "GAO Report"). This conduct, of course, is criminal.

The second category concerns the flaws inherent in the debt settlement model.  Critics argue that the customers realize little benefit from debt settlement programs and suffer significant hardships. Defaulting on payments usually results in collection efforts by the creditors.  Late fees and penalties are often incurred.  Credit scores fall significantly.  CRL Report, at 5.  In addition, although debt settlement customers typically need to remain in the program for three to four years in order to settle most or all of their debts, these programs have a high rate of attrition. There are several reasons for the high attrition rate.  CRL Report, at 6.  One cause is a change in the customer's financial circumstances.  Because these customers are in financially precarious circumstances to begin with, a financial shock such as terminated employment can easily lead the customer to stop making payments. *Id*. Some customers may choose to terminate their debt settlement program and settle debts on their own. *Id*.  But the primary reason that customers do not complete the program is creditors' escalated collection efforts, which frighten customers into terminating their debt settlement programs before accounts can be successfully settled. A district court in Texas described this phenomenon:

> The difficulty with this strategy [requiring that customers default on their debt] is that the [debt settlement company defendants] typically did not settle any of the clients' debt until the client had been in the program for about six months.  In the interim, the client was subject to creditors' collection efforts, including phone calls, dunning letters, and lawsuits. For this reason, as well as others, a large number of clients dropped out of the programs before completion; many dropped out before any debts were settled.  The primary source of client dissatisfaction with the [debt settlement company defendants] was that clients who dropped out usually did not receive a refund of fees paid; this dissatisfaction had nothing to do with the representations [about success rate and program length] at issue in this case.

*Financial Freedom Processing, Inc*., *et al*., No. 3:10-CV-2446-N, at 4.

Another problem with debt settlement programs is that it can be difficult for debt settlement companies to negotiate debt due to the policies of the creditor of debt collector, which

are not static.  A creditor may be initially willing to negotiate with a debt settlement company, but then "change its policies or sell the debt to a debt buyer that refuses to negotiate and instead immediately initiates a lawsuit.  Thus…at least two critical factors affecting whether the consumer will experience a benefit or loss are completely outside of the control of the consumer and even the debt settlement company." CRL Report, at 16

The cited reports and district court case make clear that many of the hardships suffered by the victims in this case are virtually universal: even where debt settlement companies make no misrepresentations, the majority of their customers have only a few of their debts settled and often experience additional financial hardships resulting from aggressive debt collection practices.  *See id*.

There is a strong argument that the debt settlement model is inherently flawed and that it does not benefit many consumers.  However, that does not mean that debt settlement per se is a scam or fraud.

> d.  *Mr. Levitis Should Be Sentenced Only In Accordance With His Actual Crimes And Should Not Be Penalized For His Noncriminal Participation In The Debt Settlement Industry*

The debt settlement model may be flawed—certainly, it is widely derided—but it absolutely is not inherently criminal.  Yet, at three discrete points in their response, the Government argues that Mission, at Mr. Levitis' direction, "knowingly advised [customers] not to pay their credit card bills" and that this direction resulted in great losses and hardships to the customers. (Resp. at 2, 4, 11.)   As discussed above, instructing customers to cease payments to creditors was not only a standard debt settlement practice, but one that was <u>integral</u> to achieving settlements for customers.  The Government's condemnation of this instruction reveals that the

Government does not distinguish between its pronounced distaste for the debt settlement

industry, as reflected in such statements as "like other *purported* debt settlement companies" (*Id.*

at 3 (emphasis added)), and Mr. Levitis' actual criminal conduct.

The Government also states that "while Mission paid some amount of money to the

customers' creditors, it often, at best, settled only the smallest (and often easiest to settle) of

multiple debts owed by the customer." (Resp. at 4, n2.)  As discussed above, it was a standard

and necessary practice under the debt settlement model to settle debts as accumulated sufficient

funds to offer a lump sum settlement.  Obviously the smallest debts are settled first.  Absent

information about how far along the customer was in his or her debt settlement program (as

noted in Mr. Levitis' sentencing memorandum, many customers were still active when Mission

was closed (Def. Mem. at 20)), the assertion that only the smallest debt was settled does not lead

to a conclusion of wrongdoing.

Mr. Levitis should be punished for the crimes he actually committed and not for the

noncriminal failings of the debt settlement industry.  It is obvious that the Government does not

care to parse the distinction, and is unconcerned that Mr. Levitis may receive a disproportionate

punishment.  For example, the Government argues for a Guidelines sentence because

> [t]he need for general deterrence is also significant in this case.
> Mission is one of a number of debt settlement companies that have
> preyed upon financially disadvantaged and unsophisticated customers
> in the wake of the recession in this country.  Fraud by certain of these
> companies has victimized many thousands of poor, struggling people
> from across the country, and these frauds continue in earnest to this
> day.  A Guidelines sentence would help deter others who would
> otherwise victimize financially struggling people in the same way that
> Levitis has.

(Resp. at 16-17.)  The Government improperly condemns Mr. Levitis for consequences not of his making, and asks the Court to do the same.  Since the Government apparently seeks to attack the debt settlement industry as a whole, it is not surprising that this case was the first referred by the Consumer Finance Protection Bureau for criminal prosecution.  Mr. Levitis, a suspended lawyer with a prior conviction for making false statements, is an easily demonized defendant who can be made to bear the blame for all of the failings of the debt settlement industry – irrespective of whether those failings are criminal or noncriminal.  The defense respectfully urges the Court to consider Mr. Levitis' actual criminal conduct as opposed to the fact of his participation in an industry that the Government disapproves of.

**II.     REDACTED CONTENT.**

REDACTED CONTENT.

**CONCLUSION**

As noted above and in the sentencing memorandum, Mr. Levitis has taken responsibility

for his criminal conduct.  Further Mr. Levitis fully understands that his criminal conduct,

especially in light of his prior conviction, warrants a substantial term of incarceration.  We

respectfully submit that 60 months of incarceration is a substantial term, and, when followed by

three years supervised release that includes a year in a halfway house and another year of home

confinement, would provide punishment that is "sufficient but not greater than necessary" to promote the objectives of sentencing.

Respectfully submitted,

CHARLES A. ROSS & ASSOCIATES, LLC

_____
Charles A. Ross
Dorea Silverman
111 Broadway, Suite 1401
New York, NY 10006
*Attorneys for Defendants Michael Levitis*
*and Mission Settlement Agency*

DATED:      New York, New York
            November 18, 2014

# EXHIBIT "A"

**Options for Consumers in Crisis:**

**An Economic Analysis of**

**The Debt Settlement Industry**

(Data as of December 31, 2012)

*February 28, 2013*

This publication was prepared by:

**Hemming Morse LLP**

Greg J. Regan, CPA/CFF, Partner
Hemming Morse LLP
101 Montgomery Street, Suite 1400
San Francisco, CA 94104
415-836-4000

For further information about this publication, please contact:

American Fair Credit Council
100 W. Cypress Creek Road – Suite 700
Fort Lauderdale, FL  33309
ATTN: President
(888) 657-8272
www.americanfaircreditcouncil.org

## Table of Contents

1.  **Executive Summary** ............................................................................................ 1

2.  **Glossary of Terms Used in this Report** ......................................................... 2

3.  **Introduction and Background** ........................................................................ 3

   a.  Debt Settlement ........................................................................................... 3

   b.  The American Fair Credit Council ............................................................... 4

   c.  The FTC & the Evolution of the Debt Settlement Business Model ............... 4

   d.  A Paradigm Shift: The Client-Side Risks of Debt Settlement Have Been Absorbed by the Service Providers ......................................................... 4

4.  **Scope of Engagement and Data Considered** ................................................ 6

   a.  Version 1.0 v. Version 2.0 Data .................................................................. 6

   b.  Critical Client and Account Attributes ....................................................... 8

   c.  Vintage Analysis ........................................................................................ 8

5.  **The Benefits of Participation in Debt Settlement Programs** ....................... 11

   a.  The Aggregate Economic Benefits of Debt Settlement Programs ............... 11

   b.  Benefits as Measured at the Client and Account Levels ............................. 16

   c.  The Debt Reduction Experienced By the Typical Client ............................. 19

6.  **The Economic Benefits From Debt Settlement Are Demonstrably Superior To Other Alternatives** ...................................................................... 21

   a.  Minimum Credit Card Payments ................................................................ 21

   b.  Credit Counseling Programs ...................................................................... 21

   c.  Chapter 13 Bankruptcy Statistics .............................................................. 24

   d.  Other Investment Alternatives ................................................................... 25

## 1. Executive Summary

The objective of this report is to provide an independent analysis of the economic consequences of participation in a debt settlement program. The analysis presented below addresses the outcomes of more than 1 million individual Accounts that were enrolled in debt settlement programs from January 1, 2006 through December 31, 2012. These Accounts were associated with approximately 170,000 individual Clients.

As described in greater detail below, the following conclusions are evident (see §2 for a Glossary):

- Debt settlement Clients as a group (including all Active, Terminated or Completed) have realized $3.15 in Debt Reduction for every $1.00 of Fees (i.e., $2.15 of Savings). Completed Clients have realized $4.40 in Debt Reduction for every $1.00 of Fees ($3.40 of Savings) (see Charts 5.1, 5.8, 5.9, 5.10, and 5.11).[1]

- Across the entire data set, Clients with at least four months of program tenure realized Debt Reduction greater than their Fees (*i.e.*, a Savings, see Chart 5.2).

- Version 1.0 Clients (including Terminated Clients) that achieved at least seven months of program tenure realized Debt Reduction greater than their Fees (*i.e.*, a Savings, see Charts 5.3 and 5.6).

- Since Version 2.0 Clients do not pay Fees until a settlement is reached, these Clients have experienced, and will continue to experience, Savings irrespective of program tenure (see Chart 5.4). Further, since Version 2.0 Clients can reject any offered settlement for any reason or no reason at all, it is unlikely that any Version 2.0 Client will experience a lack of Savings in connection with any given settlement. Accordingly, Version 2.0 Clients are virtually assured of realizing Savings with respect to all settlements, as compared with Version 1.0 Clients (compare Charts 5.3 and 5.4).

- Clients across all vintages are achieving substantial reductions to their account balances (see Charts 5.9. 5.10, and 5.11).  This finding indicates that, for all vintages (even the earliest), debt settlement is a very effective debt relief option.

In addition to the above conclusions, the data indicates that the economic benefits from debt settlement programs are demonstrably superior to other debt relief (or investment) alternatives. See §6 of this report.

---

[1]      The charts in this report are numbered by the section in which they appear and sequentially within those sections.

### 2. Glossary of Terms Used in this Report

As used in this report, unless the context otherwise requires, the following terms have the meanings given below.

**Account**.  A record of an obligation owed by a Client to a creditor.

**AFCC**.  The American Fair Credit Council.  The American Fair Credit Council (formerly known as "TASC," the acronym for The Association of Settlement Companies), is the industry trade association representing virtually all of the national debt settlement companies operating in compliance with the FTC Rule.

**Client**.  A consumer who has enrolled in a debt settlement program.

**Debt**.  An unsecured obligation, represented by an Account, owed by a Client to a creditor.  An "**Enrolled Debt**" is a Debt that has been enrolled by a Client in a debt settlement program.  Debts eligible for enrollment in a debt settlement program are predominately credit card obligations and other forms of unsecured indebtedness (including medical debt and non-Federally guaranteed student loan obligations).

**Debt Reduction**.  The difference between the amount owed by a Client to a creditor at the time of settlement and the amount for which that Debt is actually settled.  By way of example, if a Client owes $10,000 at the time of settlement and the Debt is settled for $4,000, the Debt Reduction would be $6,000.[2]

**Fees**. The compensation charged by a debt settlement services provider.  Note that fees charged by both debt settlement enterprises and credit counseling organizations are very different from each other and vary widely by state. See Exhibit A for further discussion.

**FTC**.  The Federal Trade Commission, the United States governmental agency responsible for oversight of certain aspects of the debt relief industry.

---

[2]      The FTC Rule mandates that, for purposes of marketing material, "savings" claims must be based upon the difference between the amount paid and the original (i.e., enrolled) balance of a Debt.  Using enrolled balance, however, distorts the economic benefit realized by a Client because, by ignoring accretion, actual savings is understated.  Accordingly, for analytic purposes, the analyses presented in this report generally use actual savings, meaning savings measured against the amount owed at time of settlement.

**FTC Rule**.   The Amended Telemarketing Sales Rules (16 C.F.R. Part 310 et seq.), as issued by the FTC on July 29, 2010, which rule implemented the "advance fee" ban, effective on October 27, 2010.

**Savings**.   The net economic value of a settlement to a Client.   "Savings" is the difference between Debt Reduction and Fees.   By way of example, the settlement of a $10,000 Debt for $4,000 with a 20% Fee yields a Savings of $4,000 ($6,000 of Debt Reduction minus the $2,000 Fee).

**Version 1.0/Version 2.0**.   The terms used to denote pre- and post-FTC Rule debt settlement programs.   "Version 1.0" programs are debt settlement programs that were entered into on or prior to October 26, 2010; "Version 2.0" programs are debt settlement programs that were entered into on or after October 27, 2010, the effective date of the FTC Rule.

## 3.  Introduction and Background

### a.  Debt Settlement

Debt settlement is the process by which a service provider, working on behalf of a Client (a financially distressed consumer enrolled in the service provider's debt relief program), negotiates the settlement and final discharge of the Client's unsecured indebtedness.   Debt settlement generally serves those who cannot qualify for or afford other debt relief options, such as consumer credit counseling, or who are unable to satisfy the means test required as a prerequisite to personal bankruptcy.   A comparison of debt settlement and credit counseling has been appended as Exhibit A.

Although the debt settlement process involves functioning as the intermediary between the debtor and the creditor, debt settlement service providers do not provide legal representation, nor do they provide bankruptcy advice or counseling services.   Similarly, debt settlement service providers do not provide assistance with secured indebtedness, such as  mortgages (with the attendant issues surrounding loan modifications and foreclosures) or any other type of secured indebtedness (a creditor holding secured debt has little or no incentive or willingness to accept a settlement of less than the value of the underlying security).

Debt settlement has been available to commercial enterprises for many years, although it only became widely available as an option for consumers in 2003 and took off, as an industry, following the passage of the Bankruptcy Reform Act of 2005.   The Bankruptcy Reform Act of 2005 made it more difficult and expensive for consumers to seek discharge of their debts.

b.   The American Fair Credit Council

The AFCC's predecessor, TASC, was formed in 2005 for the purposes of articulating clear and fair operating standards for the debt settlement industry and promoting strong legislation that protects consumers from both real and perceived abusive practices.  TASC changed its name to the American Fair Credit Council following the October 2010 adoption of the FTC's advance-fee ban, discussed below, to reflect a new and expanded mission. The AFCC also works to establish fair and transparent regulatory frameworks for the industry.

The AFCC's standards, along with industry "best practices" and the association's mission statement, may be found on its website at www.americanfaircreditcouncil.org.

c.   The FTC & the Evolution of the Debt Settlement Business Model

Historically, a majority of the debt settlement industry charged fees based on a percentage of the amount of Debt a Client enrolled into the program (commonly around 15% of enrolled debt)[3].  Fees were collected in installments over the first half of a program's term, often with the result that a Client paid a substantial amount of fees in advance of receiving settlements; this business model became known as the "advance fee" model.

Although AFCC members have historically delivered what the data demonstrates are significant results (i.e., the delivery of Debt Reduction substantially in excess of Fees), the experience of some consumers who paid Fees but received little or no Debt Reduction colored the public perception of the industry.   In October 2008, in response to this perception, the FTC opened an inquiry into the business practices of the debt settlement industry, focusing specifically on the advance-fee model.   In July 2009 the FTC issued a draft rule that prohibited the advance-fee model. The FTC Rule took effect in October 2010.

d.   A Paradigm Shift: The Client-Side Risks of Debt Settlement Have Been Absorbed by the Service Providers

The FTC Rule set in place a pay-for-performance model for debt relief service providers subject to FTC jurisdiction.[4] That model effected a paradigm shift in terms of risk assignment, that is, the FTC Rule shifted the economic risk of program success from the consumer to the debt settlement service providers. Providers incur considerable costs

---

[3]     A small percentage of the industry charged Fees based on a percentage of the Debt Reduction realized by the Client (commonly between 20-40% of the amount of the Debt Reduction), often in combination with a monthly fee.

[4]     The FTC's jurisdiction extends only to certain persons who use an instrumentality of interstate commerce in the sale of service, with certain exceptions, including but not necessarily limited to those whose sales process occurs in face-to-face interactions and persons operating under the provisions of Section 501(c)(3) and 501(q) of the Internal Revenue Code.

prior to obtaining a settlement; now, per the FTC Rule, before the provider is entitled to recoup any of those costs, three contingencies must be satisfied: (1) the provider must negotiate the terms of settlement for at least one debt; (2) the Client must agree to the terms of the negotiated settlement; and (3) the Client must ratify that acceptance by making at least one payment to the creditor. If the Client fails to do any of these things, the provider will experience a financial loss because Fee revenue may only be realized when the Client agrees to a settlement.[5] Moreover, the Fee for the provision of debt settlement services may only be charged on a per-debt basis (i.e., the provider may only collect the Fee attributable to the specific Debt being settled).

Unsurprisingly, according to the AFCC as a direct result of the FTC Rule's prohibition on the collection of fees in advance of delivery of settlements, an estimated 70-80% of the industry has either stopped accepting new clients or gone out of business entirely.[6]

Prior to the implementation of the FTC Rule's pay-for-performance model, consumers largely bore the risk of program participation. If the Client withdrew from the program, for

---

[5]     While the timing of the obligation to pay Fees now depends upon the negotiation of a settlement that is actually accepted by the client, Fees have generally increased to compensate the providers for assuming both the delay in revenue and the increased risk of Client rejection.  However, any negative impact on Savings resulting from higher fees has been more than offset by the improvement in timing of settlements (since funds accumulate more swiftly when Fees are not deducted), see Chart 5.7, and an improvement in the overall risk profile of Clients who no longer have to make an economic investment prior to obtaining Savings.

[6]     A proxy for industry attrition may be found in the membership roster of TASC/AFCC: prior to the adoption of the FTC Rule, TASC had approximately 265 members; following the adoption of the FTC Rule, membership has shrunk to about 55 members, an almost 80% reduction.  A companion trade association, the United States Organization for Bankruptcy Alternatives (USOBA), which at one point had more than 200 members, has ceased operations entirely.

The exodus from the marketplace of many debt settlement service providers following the adoption of the FTC Rule was accompanied by the reactive – and temporary - rise of the so-called "legal model," which was touted as a way to avoid the reach of the FTC Rule.  Under the legal model, a law firm serves as the interface for a debtor, enrolling the client in a face-to-face transaction while outsourcing the functions of marketing, customer service and negotiation to a third-party debt settlement services provider.  Advocates of the legal model contend that, because a lawyer is actually enrolling the Client, the charging of advance fees is permissible.  Both the FTC and certain state regulators and Attorneys General have sued different attorney model providers, with mixed results.

In addition to coming under fire from regulators, legal models have not proven to be either overly durable or overly efficient.  By adding a law firm to the payment chain, consumers utilizing legal models may end up paying more for debt settlement services than they otherwise would have paid for similar results from a traditional debt settlement services provider.  Moreover, by paying advance fees it is the consumer, not the law firm or the provider, that bears the economic risk of program success.

Results from legal-model service providers are not included in the analysis presented in this report.  Legal model service providers are not eligible for membership in the AFCC based on their charging consumers fees in advance of the provision of debt settlement services.

whatever reason, Fees paid were generally nonrefundable (or refundable only in part). Although 37% percent of Version 1.0 Clients that withdrew had received one or more settlements with a corresponding economic benefit (see §5), there is no dispute that some consumers were disadvantaged by this structure. Accordingly, the FTC Rule has resulted in a model that has a stronger correlation with the consumer's program success.

A quick reference to the Fee-related provisions of the FTC Rule may be found in Exhibit B.

## 4. Scope of Engagement and Data Considered

The objective of this report is to provide an independent analysis of the economic consequences of participation in a debt settlement program. It is premised on data provided by debt settlement service providers that adhere to the AFCC's Code of Conduct. More specifically, the statistical data presented herein is representative of and consistent with entities that comply with the FTC Rule that Fees may only be charged at such time as the underlying Debt has actually been settled. The data sets that form the basis of the analysis presented in this report were obtained from several of the nation's largest debt settlement service providers. The analysis includes approximately 170,000 Clients, with approximately 1,050,000 Accounts, residing in most of the 50 states as well as the District of Columbia and Puerto Rico.

Ultimately, this analysis measures whether and to what extent a Client is economically advantaged by debt settlement.[7]

    a.  <u>Version 1.0 v. Version 2.0 Data</u>

The volume of available data for Version 1.0 Clients and Accounts is substantially greater than for Version 2.0. This relationship will invert over time because the FTC Rule only permits the Version 2.0 model for new Clients. For example, the average Client program tenure for Version 2.0 Clients is currently only 8.5 months, which, as time progresses, is likely to approach or exceed the average Client program tenure for Version 1.0 Clients. Table 4.1 summarizes the distribution of Version 1.0 and Version 2.0 Clients included in the data sets analyzed in this report.

---

[7]    This report has not excluded any Clients or Accounts based on their respective outcomes (*e.g.*, whether the Client terminated within one month of enrollment) despite the fact that valid reasons exist to consider such exclusions. Further, it was deemed to be beyond the scope of this report to address or attempt to monetize either the "soft" benefits (*i.e.*, the value to a Client of improved cash flow when the Client chooses to stop making minimum monthly credit card payments and substitutes a substantially reduced periodic deposit requirement) or the "soft" costs (the detriments of various debt relief alternatives, such as damage to one's credit report, the social costs of bankruptcy, etc.).

**Table 4.1**

| Fee Model | Version 1.0 | Version 2.0 |
|---|---|---|
| Enrolled Clients | 113,000 | 56,000 |
| Total Enrolled Debt | $3.3 billion | $1.7 billion |
| Average Client Tenure | 21.5 months | 8.5 months |
| Average Account Tenure[8] | 12.8 months | 5.9 months |

Chart 4.2 below summarizes the Accounts included in the analysis herein based upon the date of enrollment as of December 31, 2012:

**Chart 4.2**



The number of Account enrollments decreased precipitously in late 2010 as the industry contracted following the adoption of the FTC Rule (*i.e.*, the Version 2.0 fee model).[9] As entities have adapted their businesses to accommodate this new model and consumers increasingly recognize the decreased risk of the "pay for performance" model versus the "advance fee" model, the number of enrolled Accounts has grown significantly, starting in late 2011 and continuing throughout 2012. Notwithstanding the advent of Version 2.0, the economic outcomes of Clients and Accounts have many similarities. As a result, in many instances, this analysis has consolidated Client or Account data.

---

[8]     Average Client tenure measures the total time that the Client (has) participated in the program based upon the longest-lived Account. Therefore, average Client tenure is greater than average Account tenure, which measures all Accounts irrespective of the related Client's total tenure in a debt settlement program.

[9]     Participants in this study have indicated that they initially chose to limit enrollments due to negative cash flow considerations flowing from the adoption of the FTC Rule.

b.   Critical Client and Account Attributes

The data included in this report has been segmented into three principal categories:

- Completed: Clients and Accounts that have reached settlements;

- Terminated: Clients and Accounts that have withdrawn prior to completion and/or settlement; and

- Active: Clients and Accounts continuing to participate as of December 31, 2012.

Table 4.3 summarizes the status of the Accounts included in this analysis:

**Table 4.3**

| Type | Version 1.0 | Version 2.0 |
|------|-------------|-------------|
| Completed | 304,000 | 83,000 |
| Terminated | 357,000 | 91,000 |
| Active | 33,000 | 180,000 |
| Total | 694,000 | 354,000 |

Although these segmentations may be applied literally at the Account level, at any point in time an Active Client is likely to have multiple Accounts, each with a different status. The typical Client enrolled six Accounts, and Debt Reduction can be generated from the settlement (*i.e.*, completion) of any one or more of these Accounts. In fact, there are many Clients that have settled one or more Accounts but have other Accounts that continue to be Active. At the Client level, this Client would be considered Active. It is notable that many Terminated or Active Clients have experienced Savings (see §5 below).

As described above, in the Version 1.0 fee model Fees were assessed irrespective of outcomes at the Account level. For this reason, Savings is generally measured at the aggregate Client level. In the Version 2.0 fee model, Clients do not incur an obligation to pay Fees until they receive Debt Reduction via settlements at the Account level. Thus, for Version 2.0 Clients, it is more relevant to analyze Debt Reduction and Savings at the Account level. For comparability purposes though, at times, this analysis will also present Client-level summaries for Version 2.0 Clients.

c.   Vintage Analysis

The data in this report was analyzed and is presented on a vintage basis.  A vintage analysis examines the performance of a group of Clients that have been segmented by dates of enrollment. In this way, Clients that enrolled Debt in a given month may be compared more readily to Clients enrolling at different times. For example, the outcomes of Clients enrolling in December 2008 can be compared to the outcomes of Clients that enrolled in

January 2011 after the same number of months has passed (*i.e.*, how much Debt Reduction was generated within 12 months of enrollment?).

Vintage analyses are the only way to achieve an accurate analysis of performance when time is relevant to Client outcomes.  By way of illustration, colleges report graduation rates as a percentage of students eligible for graduation. The graduation percentage is typically calculated by dividing the number of graduating seniors by the number of freshmen that entered the same class four years earlier. Stated differently, the graduation rate is not computed by dividing the number of graduating seniors by the total number students at the college because most college students have not completed enough coursework to be eligible for graduation at that time.

A concept similar to a graduation rate applies in the debt settlement industry (*i.e.*, a completion rate). That is, a Client that enrolled in January 2012 is less likely to have completed the program by December 2012 than a Client that enrolled in January 2010 or earlier. This is why vintage analysis is both relevant and necessary to an accurate presentation of outcomes.

Chart 4.4 illustrates how Accounts move from Active status to either Completed or Terminated over time:

**Chart 4.4**



Chart 4.4 demonstrates that Terminated Accounts frequently materialize quite quickly after enrollment in the program. While Chart 4.4 includes all Terminated Clients, it is noteworthy that Version 2.0 Clients did not pay any Fees for Accounts that were not settled. Therefore, a strong argument can be made that classifying Version 2.0 Clients who have withdrawn prior to settlement of all Enrolled Debt as "Terminated" inappropriately inflates the termination statistics. Adopting this position would result in increased completion rates. Nevertheless, to be conservative, this analysis includes all Accounts.

Chart 4.4 also illustrates that activity in vintages from 2006 through 2008 is substantially over (*i.e.*, there are relatively few Active Accounts remaining). In these vintages, the completion rate (which is measured at the Account level) is approximately 40%. Over time, as the debt settlement service providers continue to refine settlement approaches and strategies, improved settlement trends are to be expected. This is demonstrated by the data. For example, the 2009 vintages currently reflect completion rates of 40% or higher but these vintages still contain a substantial number of Active Accounts, constituting approximately 10% of all Accounts from those vintages. As indicated clearly in the trend lines, these remaining Active Accounts are far more likely to be settled (i.e., completed) than to terminate.

To date, the completion rates for Version 2.0 Accounts have been higher. Although the Version 2.0 model had, at the time of this data pull, only been in place for approximately 26 months, which is considerably less than the expected normal program life of 36 to 48 months, completion rates are already in excess of 40% (see Chart 4.5). In all Version 2.0 vintages, approximately 20% of Accounts continue to be Active. Thus, it is likely that completion rates will stabilize above 50%. Notably, termination rates are currently below 40%, which if that trend continues, will also yield higher completion rates.

**Chart 4.5**



## 5. The Benefits of Participation in Debt Settlement Programs

### a. The Aggregate Economic Benefits of Debt Settlement Programs

Chart 5.1 summarizes the total Debt Reduction and Fees experienced across all Client outcomes:

**Chart 5.1**



Chart 5.1 illustrates that Clients included in this analysis have realized more than $1.2 billion in Debt Reduction (*i.e.*, the difference between the Debt at the time of settlement and

the amount actually paid to settle that Debt) while incurring Fees of $0.4 billion. In the aggregate, each segment of Clients has experienced Savings.

In numerous ways, our analysis found a persuasive relationship between program tenure and Debt Reduction. This relationship is consistent with our understanding that debt settlement providers generally inform Clients that Debt Reduction begins with the first settlement, which commonly occurs within the first six months of program participation, and continues to materialize thereafter throughout the lifecycle of the program. For Version 2.0 Clients, the trend is for Debt Reduction to occur even earlier (see Chart 5.7).

Chart 5.2 illustrates the correlation between Savings (*i.e.*, Debt Reduction minus Fees) and program tenure even more directly:

**Chart 5.2**



It is noteworthy that Chart 5.2 understates total portfolio Savings because it does not include an estimate of the Debt Reduction that will be experienced by the more than 21,000 existing Active Version 1.0 Clients that have already paid Fees. This subset of Active Clients has an average tenure of 40 months, which means that these Clients are no longer paying Fees and are virtually certain to achieve additional Debt Reduction in the near future.

Charts 5.3 and 5.4 deconstruct Chart 5.2 to compare the Debt Reduction profile for Clients in Version 1.0 and Version 2.0 Fee models.

**Chart 5.3**



**Chart 5.4**



Chart 5.3 illustrates that Version 1.0 Clients typically achieve breakeven (that point where Debt Reduction equals Fees) after approximately six months. The economic outcomes of Version 2.0 Clients are even more clearly positive: because no Fees are paid by Version 2.0 Clients until such time as they realize a settlement, with Fees strictly proportionate to the Debts settled, Clients experience Savings in **_all_** periods. Since almost all settlements result

in Debt Reduction that is greater than the Fees associated with the respective settlement, Version 2.0 Clients experience Savings with each settlement.

In aggregate, all vintages of Completed Version 1.0 Clients have experienced Savings. Similarly, all vintages of Active Clients (Version 1.0 and Version 2.0) have experienced aggregate Savings (see Chart 5.5).[10] Chart 5.6 illustrates that even Terminated Clients achieve Savings between approximately seven to nine months of tenure.

**Chart 5.5**



---

[10]    There have been no new Version 1.0 Clients since October 26, 2010. As a result, there are no Active Version 1.0 Clients with program tenure less than 26 months as of December 31, 2012.

**Chart 5.6**



Version 2.0 Clients do not pay Fees until the time a settlement is reached, which for Completed or Active Clients occurs at least once within 4.3 months of enrollment (see Chart 5.7). However, even a Terminated Version 2.0 Client is not exposed to the risk that Fees could be incurred without the realization of Savings.

**Chart 5.7**



As a result, the only Client categories that did not experience Savings are those 1.0 Clients that did not, or could not, remain in the program for more than six months. The shift to 2.0 Clients leads to the conclusion that going forward all Clients will experience Savings irrespective of tenure.

b.  Benefits as Measured at the Client and Account Levels

A useful measure of Client success in a debt settlement program is Debt Reduction per dollar ($) of Fees (*i.e.*, Debt Reduction ÷ Fees). Stated another way, if Debt Reduction is greater than $1.00, the client has realized Savings but if Debt Reduction is less than $1.00, the client has not realized Savings. Figure 5.8 summarizes Debt Reduction per dollar of Fees across all Version 1.0 Client types:

**Table 5.8**

| Client Type | Version 1.0 |
|---|---|
| Completed | $4.47 |
| Active | $3.62 |
| Terminated | $1.92 |

While all Version 1.0 Client types experienced Savings in the aggregate, because all Clients also paid Fees, Savings were greater for those Clients that achieved more settlements (*i.e.*, remain Active or Completed). For Version 2.0 Clients, Savings are consistently in the range of $2.60 to $2.70 per dollar of Fees for all Client types (Active, Completed *and* Terminated). Once again, this is because Fees are only paid at the Account level once the Client approves a settlement, which eliminates the sensitivity of Savings to Client type. This reduction in the ratio for of Debt Reduction ÷ Fees for Completed Clients from Version 2.0 to Version 1.0 reflects the economic effect of the FTC Rule to consumers: while there is increased certainty that Clients will obtain Savings, the lengthening of the term of the providers' revenue stream (with the attendant effects on cash flow), coupled with an increased risk of receiving Fees at all, has resulted in Version 2.0 Fee levels that are above those found in Version 1.0 programs.

The following series of charts examine this measure further across the Client tenure spectrum. Chart 5.9 summarizes the outcomes of Completed Clients.[11]

---

[11]     For Version 1.0 Clients, each of the data series on the Client tenure axis contains all Accounts of Clients in that discrete segment. For the Version 2.0 Clients, each of the data series contains all Accounts that meet the criteria presented in the accompanying chart. A proportionally small number of Clients completed in less than nine months; notwithstanding the short tenure, however, those Clients also achieved Debt Reduction per dollar of Fees comparable to other Completed Clients.

**Chart 5.9**



Chart 5.10 presents the same analysis for Active Clients. All segments of Active Clients have also received at least $2.00 in Debt Reduction for every $1.00 in Fees.

**Chart 5.10**



Chart 5.11 illustrates that Terminated Clients exhibit the same relationship between tenure and Debt Reduction. Chart 5.11 is consistent with Chart 5.6 in that the only segment of Clients that have not experienced Savings are, on the average, those Version 1.0 Clients that would not, or could not, commit to a debt settlement program for more than six months. In fact, Chart 5.11 illustrates that all vintages of Terminated Clients with a tenure greater than two years experienced at least $2.00 of Debt Reduction for every $1.00 in Fees (i.e., $1.00 of Savings), and essentially all vintages of Version 2.0 Terminated Clients experienced at least $2.50 of Debt Reduction for every $1.00 in Fees, *regardless of tenure*. This analysis explains why an examination of Client Savings is more meaningful than Client-level completion rates.

**Chart 5.11**



c.  The Debt Reduction Experienced By the Typical Client

The typical Completed Client enrolled total Debt of approximately $26,000. While in the program, that Debt increased by ~20% ($5,200) (*i.e.*, to a current balance of about $31,200). The typical Client, however, settled those Debts for approximately 48% of current balance ($15,000), which equates to Debt Reduction of around $16,200.

Chart 5.12 summarizes the weighted-average outcomes for Completed Clients of all tenures included in this analysis. Once again, Chart 5.12 illustrates the correlation between the amount of Debt, Debt Reduction, and tenure.

**Chart 5.12**



Chart 5.13 compares the Completed Client performance at that level for each Fee model:

**Chart 5.13**



Collectively, Charts 5.12 and 5.13 illustrate that the typical Savings realized for Completed Clients is approximately 52% of the balance owed at time of settlement (exclusive of Fees) whether the analysis is conducted at the Client-level or Account-level.

## 6. The Economic Benefits From Debt Settlement Are Demonstrably Superior To Other Alternatives

At the time of enrollment, Clients may have had other alternatives available to them for debt relief, including, filing for bankruptcy, entrance into a debt management plan (DMP) through a credit counselor, securing a home equity loan for debt consolidation purposes or continued attempts at self-management of accounts. Each of these alternatives has different risks and costs as well as different potential benefits. The following section of this report compares the likely outcomes of participation in debt settlement programs with the anticipated outcomes associated with these other possible alternatives.

### a. Minimum Credit Card Payments

The average Client (all statuses) enrolled Debt totaling $28,942, substantially all of which was credit card-related. Most of these Clients were either only able to make the minimum monthly payment or were unable even to pay that amount. If a Client were able to pay the minimum monthly payments, the total cost to settle this Debt (i.e., principal plus interest) would be $50,578 over 263 months (approximately 22 years).[12] Stated differently, by making only the required minimum monthly payments, the Client would have incurred a cost of approximately $21,589 *over and above the principal amount owed.* As described more fully below in the presented hypothetical, debt settlement programs compare favorably to this and other available alternatives.

### b. Credit Counseling Programs

Another available alternative might have been a consumer Credit Counseling Agency (CCA) offering a DMP. A DMP is available to consumers who are able to make a monthly payment substantially in excess of that required for a debt settlement program but involves only concessions on the interest rate charged on outstanding balances, not a reduction in principal.  However, because DMPs have costs that are comparable to, if not slightly greater than, the minimum monthly payments that would otherwise be required by the creditors, DMPs are generally not available to those in situations of serious financial hardship (there is little overlap between CCA and debt settlement constituencies).

---

[12]     Assumes (1) a minimum monthly payment of 3% of the outstanding principal balance remaining on the credit card obligation, (2) a static interest rate of 15.5% on a declining principal balance, (3) no additional card usage and (4) no additional charges or fees, such as over-limit fees, late fees, etc.

We understand that less than 15% of individuals that contact a CCA qualify for a DMP. Further, it has been reported that persons who qualify for a DMP actually complete the program only at about a 20% rate. [13]

Table 6.1 compares the results of a hypothetical debt settlement client with the anticipated outcomes of enrollment in a DMP, obtaining a home equity loan for debt consolidation purposes and simply continuing to amortize the existing debt on a monthly basis by making only the minimum monthly payments required by the creditors.  The comparison analysis assumes the availability of all described options (although, practically speaking, not all options would be available to a consumers in varying states of financial distress) to a consumer with $30,000 of credit card debt under market conditions prevailing as of the date of this report (i.e., as of February 28, 2013).

---

[13]     "The Truth About The Success Rates, Failure Rates and Completion Rates of Credit Counseling, Debt Settlement, and Bankruptcy," by Steve Rhode, June 17, 2009(a) at 5 http://getoutofdebt.org/7233/the-truth-about-the-failure-rates-and-completion-rates-ofcredit-counseling-debt-settlement-and-bankruptcy

**Table 6.1**

| $30,000 of Debt At Enrollment | Debt Settlement | Credit Counseling | Minimum Monthly Payments[1] | Home Equity Consolidation Loan[2] |
|---|---|---|---|---|
| Months to Pay Off or Settle All Debt | 42[3] (3 years, 6 months) | 60 (5 years) | 263 (21 years, 11 months) | 120 (10 years) |
| Monthly Payment/ Program Deposit | $554.29 | $672.75 | $900.00[4] | $307.31[4] |
| Interest Rate On Outstanding Balance | n/a | 9%[5] | 15.5% | 4.25%[6] |
| Total Program Interest | n/a | $7,365.04 | $22,389.71 | $6,877.20 |
| Program Fees | $6,000.00[7] | $3,000.00[8] | n/a | $1,500.00[9] |
| Amount to be Paid to Pay off Enrolled Debt | $17,280.00[10] | $30,000.00 | $30,000.00 | $30,000.00 |
| **Total Program Cost Paid By Consumer** | **$23,280.00** | **$40,365.04** | **$52,389.71** | **$38,377.20** |
| Fair Share Payments by Creditor to nonprofit CCCS | n/a | $1,868.25[11] | n/a | n/a |

[1]   Assumes (1) minimum payment of the greater of (A) 3.0% of principal balance or (B) $20, (2) static interest rate of 15.5% on declining principal balance, (3) no additional card usage and (4) no additional charges or fees, such as over-limit fees, late fees, etc.

[2]   Assumes good credit, sufficient home equity and no change in interest rate over the term. See http://www.bankrate.com/calculators/mortgages/mortgage-calculator.aspx?MSA=4472.

[3]   Program term depends upon such factors as creditor composition, rate of funds accumulation, account accretion, etc. Debt settlement programs generally require between 24-48 months to complete.

[4]   Initial payment.  Payment amount will decline as principal is reduced (or increase if interest rates rise).

[5]   Estimate, based on inquiries with three separate credit counseling organizations.

[6]   HELOC rate quoted by Wells Fargo Bank, NA, as of November 25, 2012.

[7]   Assumes a Fee of 20% of enrolled Debt.

[8]   Assumes a fee of the lesser of (1) $50 per month or (B) 15% of client payment.

[9]   Assumes 10-year term loan with fees and costs of 5% of loan value.

[10]   Assumes (1) average account accretion of 20% from time of enrollment to time of settlement and (2) average settlement percentage of 48% of amount owed at time of settlement.

[11]   Assumes 5% of client payments, see page 16 of Wilson, "Meeting the Demand for Debt Relief," Federal Reserve Bank of Philadelphia (August 2011). Fair share payments are returned to the credit counselor by the creditor as a portion of the principal/interest payment made by the debtor.

Thus financially, a Client's outcome from debt settlement is significantly superior to all other available forms of debt relief.

> c. Chapter 13 Bankruptcy Statistics

Some clients may have had the alternative to declare bankruptcy. The chapter of the United States Bankruptcy Code that provides for adjustment of debts of an individual with regular income is Chapter 13.[14] This type of bankruptcy is similar to debt settlement programs in that it enables individuals to establish a plan to repay part or all of their debts, and similar to credit counseling, in that it requires participants to pay a monthly amount to the bankruptcy court for distribution, after fees, to approved creditors. Table 6.2 displays statistics on the completion rates of Chapter 13 bankruptcy matters in the three most recent twelve-month periods for which data is available (years ending December 31st):

**Table 6.2**

| Year | Cases Closed | Plans Completed | Completed/Cases (%) |
|------|-------------|-----------------|---------------------|
| 2009 | 156,494     | 9,937           | 6.4%                |
| 2010 | 206,984     | 28,751          | 13. 9%              |
| 2011 | 239,793     | 53,577          | 22.3%               |

Over this timeframe, the bankruptcy completion rate has increased principally due to the tracking methodology. Since Chapter 13 plans require approximately three-to-five years to complete, and relevant data has been monitored since October 17, 2006, the 2011 data is the first year to include a complete vintage of participants. As a result, the completion rates may continue to improve in subsequent years.[15] Nevertheless, the completion rates appear unlikely to match the equivalent for debt settlement clients (compare Table 6.2 with Charts 4.4 and 4.5). Moreover, individuals typically incur upfront costs to enroll in a Chapter 13 bankruptcy plan, such as filing fees and attorney costs.[16] Those fees are not refundable if the individual does not ultimate complete the plan. As such, the client risk in bankruptcy exceeds the comparable situation in the Version 2.0 of the debt settlement programs.

---

[14]     http://www.uscourts.gov/FederalCourts/Bankruptcy/BankruptcyBasics/Chapter13.aspx

[15]     2011 Report of Statistics Required by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, p. 13.

[16]     These costs average approximately $3,000. See, *e.g.*, http://www.nationalbankruptcyforum.com/bankruptcy-myths/how-much-does-it-cost-to-file-bankruptcy/

d.   Other Investment Alternatives

Enrollment in a debt settlement program involves costs and benefits similar to an investment in an asset. Specifically, Clients accept a level of uncertainty or risk with a hope to generate Savings that exceed Fees, much as an investor accepts risk on an investment in the expectation of return. On a long-term basis, an investment in the United States stock markets has yielded an average annual return of approximately 8% to 9%%.[17] All segments of Clients experience returns through debt settlement programs that far exceed the returns possible from an investment in an S&P 500 index fund (compare this return to Charts 5.9, 5.10, and 5.11).

Greg J. Regan, CPA/CFF

March 11, 2013

---

[17]     Ibbotson SBBI Valuation Yearbook, 2012.

**EXHIBIT A**
**A Descriptive Comparison of Debt Settlement with Consumer Credit Counseling**

Consumer debt settlement grew significantly as an industry following the 2005 passage of the Bankruptcy Reform Act.  The Bankruptcy Reform Act made it substantially more difficult and expensive for a consumer to qualify for bankruptcy.  Debt settlement arose to provide an option for consumers who sought a solution as a last resort before bankruptcy. On the spectrum of debt relief services, debt adjusting, commonly referred to as credit counseling using debt management plans (DMP's), is the least severe form of debt relief and generally <u>involves, as a concession, only a reduction in interest</u>.  Debt settlement is more severe in that it contemplates <u>negotiation of a reduction in principal</u>.  Lastly, bankruptcy is for those in the most severe financial hardship.

<u>**Credit Counseling**</u>.  A consumer in a credit counseling program will pay the entire amount of the debt owed plus interest; participants in a DMP typically receive from creditors a concession in the form of a reduced interest rate in exchange for a commitment to repay the debt within a fixed time period, commonly five years.  The amount of the concession varies; based on information available, the average concession rate currently offered by creditors is approximately 9%.  The debt is amortized over five years and the consumer makes equal monthly payments over the term of the program to the credit counselor who receives the money from the consumer, deposits it in a trust account and then, after deducting a fee, distributes the funds *pro rata* to the consumer's creditors.  Nonprofit debt adjusters also receive compensation from creditors in the form of a "fair share" rebate, currently about 5% of the monthly payment made to the creditor.

<u>**Debt Settlement**</u>.  Unlike credit counseling, debt settlement is an option only for consumers who cannot afford to repay their debts in full or meet the monthly obligations of their debt payments.  In a debt settlement program a consumer unable to afford his minimum monthly payments will save a lesser amount on a regular basis.  Unlike credit counseling, where funds are held by the credit counselor, in a debt settlement program funds are accumulated by the consumer in a bank account separate from his or her home bank account – the debt settlement services provider will never receive or control consumer funds.  These separate bank accounts (called "dedicated accounts" by the FTC, to distinguish them from "trust accounts") are established by the consumer, are FDIC-insured and are administered by a third-party payment agent, unaffiliated with the debt settlement provider who, as mandated by the FTC, receives no financial compensation, incentive or benefit from them.  The fees associated with these bank accounts are very similar to those charged by large financial institutions.  The consumer maintains control over the accounts at all times and may close them and withdraw the money at any time.

The following chart summarizes the major differences between credit counseling and debt settlement:

| Debt Adjusting/Credit Counseling/Debt Management Plans (DMP) | Debt Settlement |
|---|---|
| • Concession in lower interest rate | • Negotiated reductions in debt principal |
| • Terms and concessions preset by creditors | • Individually negotiated agreements with creditors |
| • Agreements fixed at time of enrollment | • Settlements negotiated throughout program |
| • Amortized repayment plan in equal monthly installment payments | • Lump sum or short-term settlements individually negotiated and paid at various times during program |
| • Fees paid by consumer and creditor | • No compensation from creditor |
| • Provider acts on behalf of creditor and consumer | • Provider acts only on behalf of the consumer - |
| • Fees paid monthly | • Fees paid only upon settlement authorized and accepted by consumer |
| • Monies received from consumer, held and disbursed to creditor | • Monies deposited in an account owned by and in the consumer's name |
| • Provider controls funds | • Consumer controls funds |
| • Often offered by nonprofit credit counselors | • Offered by for-profit providers |
| • For consumers s who need minor or no payment relief | • For consumers who need more significant payment relief |
| • Forbearance by creditors of collections actions | • Potential exposure to more aggressive collections activity |
| • No impact on credit score during program participation | • Credit score deterioration when accounts become delinquent |

**Exhibit B**
**Summary Description of the FTC Rule**

**The FTC Rule provides significant protections for consumers.**

\*      Fees must be clearly and conspicuously disclosed prior to the consumer entering into an agreement with the provider.

\*      No fees may be charged or collected until:

1. A settlement of a debt is negotiated on behalf of, and presented to, the consumer.
2. The consumer must approve the settlement;
3. The consumer must re-affirm his approval by making at least one payment towards the settlement to the creditor.

\*      Fees may not be "front loaded" - fees may only be proportionately collected, in other words only the fees associated with a specific debt may be charged and collected, and then only when those debts are actually settled.

\*      Fees should be set by the market.  The FTC in the release of its Rule stated that the fee amount itself should be determined by the market.  See pages 114-115 of the adopting release of the FTC Rule.

1. Concerns about fees are eliminated by the fact that the consumer always gets to choose whether to pay the fee.
2. Consumers have complete discretion to reject settlement offers (in which case they pay no fee)
3. All program contracts are terminable by the consumer at any time without penalty.

The FTC Rule also mandates clear and extensive disclosure around all program features, including risks specific to debt settlement programs.  The FTC Rule also regulates the use of dedicated accounts, including requirements that accounts be FDIC-insured, that consumers control such accounts, that such accounts may be closed at any time and that providers not receive any financial benefit or compensation from providers of dedicated accounts.

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-2446-N |
| | § | |
| FINANCIAL FREEDOM PROCESSING, | § | |
| INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was called to trial before the Court. All parties appeared through counsel and announced ready. The case proceeded to trial. Based on the evidence at trial, the briefs, and the arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I. FINDINGS OF FACT

1. Plaintiff Federal Trade Commission ("FTC") is an independent agency of the United States government created by statute and charged with enforcing Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

2. Defendant Financial Freedom Processing, Inc., d/b/a Financial Freedom of America ("FFA") engaged in assisting consumers to negotiate debt obligations. Defendants Corey Butcher ("Butcher") and Brent Butcher were involved in the operations of FFA. Defendants Debt Consultants of America, Inc. ("DCA") and Debt Professionals of America, Inc. ("DPA") engaged in assisting consumers to negotiate debt obligations. Defendants

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 1

Butcher and Robert Creel were involved in the operations of DCA. Defendant Nikki Vrla (formerly Nikki Creel) was Secretary of DCA, though she never performed any duties in that capacity.

3.  It is not unusual for consumers to incur more debt than they can service. In that circumstance, there are various alternatives for the consumer, other than simply paying the debt as due. These alternatives include bankruptcy, credit counseling, and debt negotiation. In debt negotiation, consumers pay a fee to a third party, such as FFA or DCA, to negotiate on their behalf a reduced payment with their creditors.

4.  In the fall of 2005, Butcher became interested in the debt negotiation industry. In the course of his research, he spoke with Debra Rojas, Kevin Watts, and Johnny Robles, who were then employees of Debt Relief of America, Inc. ("DRA"). They advised Butcher regarding industry practices and DRA's business model and results. Eventually Rojas, Watts, and Robles agreed with Butcher to start FFA, which was formed in December 2005. FFA used the same business model and negotiation process as DRA.

5.  Butcher initially approached Creel about investing in FFA. Creel declined. FFA became successful in 2006, causing Creel to reconsider his earlier decision. In Augist 2006, Butcher and Creel formed DCA, which was essentially a clone of FFA and copied its scripts, forms, and business model. By July 2008, DCA was outgrowing its office space. Rather than expanding DCA into new space, Butcher and Creel formed another company,

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 2

DPA, which was likewise a clone of DCA.[1]  The Court will refer to FFA, DCA, and DPA collectively as the "Companies."

6.      Butcher attempted to ensure that his business practices were legitimate and complied with all applicable rules and regulations.  Before starting FFA, he spoke with others in the industry, he investigated FTC policies and publications, he spoke with representatives of the industry trade association, and he consulted legal counsel.  Butcher and the other individual defendants acted in good faith in the operation of the Companies.

7.      The Companies obtained customers primarily through radio advertisements. They also operated substantially similar web sites, though less than 1% of their clients came from the web sites.  The radio ads and web sites encouraged prospective clients to call the respective company's toll-free phone lines.  Following some initial screening, the callers were forwarded to sales staff.  The Companies instructed the sales staff to follow scripts with the prospective clients.  The Companies monitored calls to ensure the scripts were followed. FFA terminated sales staff who materially varied from the scripts.  The Companies' sales staff followed the scripts in the vast majority of instances.

8.      If the prospective clients were still interested after the initial phone call, the Companies sent them an enrollment package, including a written agreement to review and sign.  The actual moment a consumer decided to enroll as a client was when the consumer mailed the agreement back to the company.  Thus the contents of the agreement were

---

[1]While the Court finds this explanation of the formation of DPA curious, it was undisputed at trial.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 3

conveyed to the potential client to review in the privacy of his or her home before that person decided to become a customer. The contents of the enrollment package should be considered as part of the information disclosed to the consumer during the sales process.

9. Creditors have no reason to settle debt at a discount if the debtor is current on his or her payments. Thus the program of debt negotiation used by the Companies called for the client first to quit paying his or her creditors. The client would then begin to make monthly payments to the company. The monthly payments would first go to the company's fees. Once the fees were paid, the company would accumulate the payments until there was sufficient money available to offer a lump sum settlement payment to one of the client's creditors. As the monthly payments accumulated, the company would settle with additional creditors.

10. The difficulty with this strategy is that the Companies typically did not settle any of the clients' debt until the client had been in the program for about six months. In the interim, the client was subject to creditors' collection efforts, including phone calls, dunning letters, and lawsuits. For this reason, as well as others, a large number of clients dropped out of the programs before completion; many dropped out before any debts were settled. The primary source of client dissatisfaction with the Companies was that clients who dropped out usually did not receive a refund of fees paid; this dissatisfaction had nothing to do with the representations at issue in this case.

11. The FTC complains of two types of representations. The FTC claims that FFA made representations regarding saving 30 to 60% of debt, and DCA and DPA made

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 4

representations regarding saving 40 to 60% of debt (the "Savings Claims"). The FTC also claims that the Companies represented consumers could complete the program in 18 to 36 months (the "Timing Claim"). The FTC complains that the Savings Claims and the Timing Claim are both false and unsubstantiated. This turns in large part on how the claims are interpreted.

12. The initial point of dispute is whether the Savings Claims and the Timing Claims include dropouts. A reasonable consumer would interpret both the Savings Claims and the Timing Claim not to include dropouts.

13. The second point of dispute is whether the Savings Claims include or exclude fees paid to the Companies. In determining the percentage of debt saved, one must determine the percentage of debt paid. If the percentage paid computation includes the fees paid to the Companies as well as the amount paid to creditors to settle debts, that has the effect of increasing the percentage paid and reducing the percentage saved. A reasonable consumer would interpret the Savings Claims to exclude fees paid to the Companies.

14. The third point of dispute is whether the Savings Claims are based on amount of debt at time of enrollment or amount of debt at time of settlement (which would include interest and penalties that accrued between enrollment and settlement). A reasonable consumer would interpret the Savings Claims to be based on the amount of debt at time of settlement.

15. The Savings Claims and the Timing Claim were true for a majority of the customers of the Companies who completed the program.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 5

16.     FFA initially based its Savings Claim and Timing Claim on the experience of its founders at DRA, as well as industry results.  DCA initially based its Savings Claim and Timing Claim on the experience of FFA's founders at DRA, the experience of FFA, as well as industry results.   DPA initially based its Savings Claim and Timing Claim on the experience of FFA's founders at DRA, the experience of FFA, the experience of DCA, as well as industry results.  The Companies had a reasonable basis for their respective Savings Claims and Timing Claim at the time those representations were initially made.

17.     The parties have some ancillary disputes regarding slight variations on the representations and when various permutations were made.  In view of the Court's main findings, these ancillary disputes are immaterial and it is unnecessary for the Court to address them.

18.     Any of the foregoing findings of fact that are more properly viewed as conclusions of law are also adopted by the Court as conclusions of law.

## II. CONCLUSIONS OF LAW

1.     The FTC seeks relief from the Companies pursuant to sections 5(a) and 13(b) of the FTC Act.  15 U.S.C. §§ 45(a), 53(b).  The Court has jurisdiction over the parties and subject matter of this dispute.  28 U.S.C. §§ 1331.

2.     The FTC originally brought two separate cases: *Federal Trade Commission v. Financial Freedom Processing, Inc., et al.*, Civil Action No. 3:10-CV-2446-N, and *Federal Trade Commission v. Debt Consultants of America, Inc., et al.*, Civil Action No. 3:10-CV-

2447-N.  By Order dated April 1, 2011, the Court consolidated both actions under the 2446 cause number.

3.      The Savings Claims and Timing Claim were true with respect to a majority of the clients of the Companies who completed the program.  *See FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 529 (S.D.N.Y. 2000).  The Savings Claims and Timing Claim were not likely to mislead consumers acting reasonably under the circumstances.  The Savings Claims and Timing Claim do not violate section 5 of the FTC Act.  The FTC failed to establish by a preponderance of the evidence that any Defendant violated section 5(a) of the FTC Act by making a misleading representation.

4.      The Companies each had a reasonable basis for the Savings Claims and Timing Claim at the time those representations were made.  The Savings Claims and Timing Claim were substantiated.  The FTC failed to establish by a preponderance of the evidence that any Defendant violated Section 5(a) of the FTC Act by making a representation that was not substantiated.

5.      Any of the foregoing conclusions of law that are more properly considered findings of fact are also adopted by the Court as findings of fact.

Signed March 12, 2012.

David C. Godbey
United States District Judge

# EXHIBIT "C"



# A Roll of the Dice:
## Debt Settlement Still a Risky Strategy
## for Debt-Burdened Households

Ellen Harnick and Leslie Parrish

November 2013



www.responsiblelending.org

## ACKNOWLEDGEMENTS

The authors would like to thank the American Fair Credit Council, and particularly Robert Linderman and Greg Regan, for generously sharing their time to help the Center for Responsible Lending (CRL) better understand the data and findings included in AFCC's study of debt settlement outcomes. This policy paper is the work of CRL alone, and CRL takes full and sole responsibility for its content.

## *TABLE OF CONTENTS*

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Overview of Debt Settlement and Regulatory Environment . . . . . . 5

Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Alternative Options Available to Consumers . . . . . . . . . . . . . . . 16

Policy Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## EXECUTIVE SUMMARY

Debt settlement companies purport to offer debt-burdened consumers a way to become debt-free while paying substantially less than what they owe, particularly on their credit cards. But debt settlement can be risky; for many consumers, it is not the solution it is marketed to be. All too often, far from becoming debt-free, debt settlement clients are in fact left in a worse financial position than where they started.

This study analyzes recent data published by the debt settlement trade association to determine whether debt settlement services are on balance beneficial to consumers. The data point to two key findings:

(1) **Consumers must settle at least two-thirds of their debts to improve their financial position through debt settlement.** Using conservative assumptions, on average, consumers must settle at least two-thirds (four of six) of their debts to be in a better financial position than they were at the time of enrollment in the debt settlement program. Consumers who incur tax liability or other costs, are unable to complete all installment payments on their settlements, or are sued by one or more of their creditors may not benefit even if they settle nearly all of their debts.

(2) **It is difficult (if not impossible) for consumers to predict their likelihood of completion ahead of time.** Consumers are unable to fully evaluate the risk factors that affect the number of debts that can be settled (if any). Thus, an individual considering a debt settlement program cannot accurately gauge whether debt settlement services will leave her debt-free, result in some benefit while still leaving some debts unsettled, or leave her worse off than she was at the time she began the debt settlement program.

In the past, investigations of the debt settlement industry revealed dismal settlement rates, with many consumers having few, if any, of their debts settled. Recent federal rule changes restricting debt settlement companies from charging up-front fees before settling any debts have helped to curb some of the worst industry abuses. However, debt settlement programs can take three years or longer to complete and only three years have passed since this rule change took effect. Debt settlement companies have not yet publicly released completion rates, or even partial completion rates, of consumers enrolled over this period. Therefore, it is unknown whether the ban on charging advance fees will result in significantly better completion rates for consumers than under the previous regime. Regardless, even if a larger proportion of consumers end up experiencing a positive outcome as a result of the advance fee ban than before the ban, individual consumers are unlikely to be able to assess their chances for success prior to entering into a debt settlement agreement, making the model itself problematic.

*States that have not authorized or that strongly restrict debt settlement should keep in place the protections they have.*

Other options may be more suitable for many consumers overwhelmed by debt, such as engaging directly with their creditors, getting help from a nonprofit credit counseling agency in setting up a debt management plan, or filing for bankruptcy.

States that have not authorized or that strongly restrict debt settlement should keep in place the protections they have, at least until the data demonstrate a dramatic improvement on the consumer outcomes of recent years. States that have authorized debt settlement should: (1) require screening before enrollment to comprehensively assess the consumer's likelihood of success; (2) include a "not worse off" provision that provides consumers with some form of refund or concession if they end up worse off after enrollment; (3) establish meaningful limitations on fees and allow fees to only be assessed as settlements are completed; (4) require detailed data reporting; and (5) ensure broad coverage of the law over all debt settlement providers. State attorneys general and regulators should continue to ensure compliance with all applicable laws and regulations.

At the federal level, the Consumer Financial Protection Bureau (CFPB) should apply rules and restrictions uniformly to all debt settlement providers and transactions, and supervise larger debt settlement providers to assess compliance. Like states, the CFPB should also require screening before enrollment, establish a "not worse off" provision, allow fees to be assessed only as settlements are completed, and require detailed data reporting. Finally, where violations of existing law are present, the CFPB and Federal Trade Commission (FTC) should continue to undertake enforcement actions.

## What is Debt Settlement?

Debt settlement companies promise debt relief to families in financial distress with claims that they can settle debts for less than the amounts owed.

To enroll in a debt settlement program, consumers must stop paying their debts and are encouraged to cease contact with creditors. Consumers often grant a power of attorney to the debt settlement company to communicate with creditors on their behalf.

Companies typically calculate the fees consumers pay based on a percentage of their debt at the time of enrollment, not on any savings achieved through settlements.

Clients typically need to remain in the program for three to four years to settle all or most of their debts.

## BACKGROUND

Although consumer debt levels have declined in recent years, many American households remain highly indebted. With nearly $850 billion in total credit card debt outstanding, the average household carrying a credit card balance owes $15,159 across all of their credit cards.[1] One-in-five credit card users who carries a balance pays only the minimum each month, thereby accruing significant interest and prolonging the amount of time they will remain indebted.[2]

As a result of carrying these debt loads and having little—if any—household savings, many households are vulnerable to shocks such as divorce, layoffs, or unexpected medical expenses, resulting in a risk of default on outstanding loans.[3] When households experience an untenable financial situation that leaves them unable to pay their debts, they might decide to file for bankruptcy or negotiate a plan to pay down debts, either working directly with creditors or having a credit counseling agency do so on their behalf.

For-profit debt settlement companies claim to offer an alternative mechanism for reducing unsecured consumer debt, most frequently debt from credit cards. "Be debt free in 36 months!!" and "We can reduce your debt load by up to 50 percent!!" are common claims in the industry.[4]

Debt settlement companies offer to negotiate reductions in debt balances with a consumer's creditors in exchange for a fee. To do so, however, debt settlement companies require consumers to first default on their debts.[5] Consumers also must grant the debt settlement company, typically through a power of attorney, the authority to negotiate on their behalf and are generally counseled by the debt settlement company to cease contact with their creditors. As a result, consumers enrolling in debt settlement typically put themselves at risk of lawsuits from their creditors; see their debt loads increase because of higher interest rates, late fees and default charges; and damage their credit before any debts are settled.

This gamble may pay off for consumers if the debt settlement company is successful in settling the consumer's debts at a discount that exceeds the costs incurred. However, far from becoming "debt free," many debt settlement clients end up in worse financial straits. Recognizing this problem, a 2010 Federal Trade Commission (FTC) rulemaking restricted the charging of fees in advance of negotiating settlements.[6] This advance fee ban has improved industry practices, and new industry data demonstrate somewhat better outcomes for consumers.[7] However, even with this progress, the inherent dangers of debt settlement make it a risky proposition and often an inferior choice to other options available.

> *Far from becoming "debt free," many debt settlement clients end up in worse financial straits.*

After providing a brief description of how debt settlement works as well as the current regulatory environment, we offer evidence that debt settlement only results in an improved financial position for consumers who are successful in settling at least two-thirds (four of six) debts, and that consumers cannot accurately predict at the outset whether their financial position will improve or worsen through the debt settlement process. We then provide examples of potentially more suitable options, and close with policy recommendations for legislators and regulators at the state and federal level.

## OVERVIEW OF DEBT SETTLEMENT AND REGULATORY ENVIRONMENT

### The debt settlement business model

Debt settlement companies market themselves as providing a way to "get out of debt," become "debt free," or reduce debt.[8] Many companies market their services as a favorable alternative to making minimum monthly payments on credit cards.[9] They present debt settlement as a faster and less-costly option.[10]

In order to enroll in a debt settlement program, consumers must stop paying their debts[11] and are encouraged to cease contact with creditors. Consumers often must grant a power of attorney to the debt settlement company to communicate with creditors on their behalf, which prevents a creditor from negotiating directly with the consumer.

There are at least two reasons under the debt settlement model that consumers must stop paying their debts and thus default. First, rather than making debt payments, consumers are required by most debt settlement programs to fund a dedicated account held by a third-party that eventually can be used to pay settled debts and the associated fees to the debt settlement company. Second, debt settlement companies note that creditors will not reduce the principal balances of customers whose debts are current, even if the customer is only making minimum payments.

Although some consumers enter debt settlement having already defaulted on one or more debts, they must default on all debts they plan to enroll in order to enter a debt settlement program. A recent analysis prepared on behalf of a debt settlement industry trade association, the American Fair Credit Council (AFCC), points to "the value to a Client of improved cash flow when the Client chooses to stop making minimum monthly credit card payments and substitutes a substantially reduced periodic deposit requirement" as a benefit of debt settlement.[12]

Although consumers may experience the short-term benefit of more disposable income when they stop paying their debts, they also may experience longer-term negative financial impacts. Once a debt becomes delinquent under the debt contract, creditors can and generally do impose higher default interest rates, late fees, and instigate collection efforts. Creditors can file lawsuits for payment, which could result in wage garnishment. In addition, defaults can hurt borrowers' credit reports and scores for about seven years.[13] The impact will vary depending on the consumer's credit score before the delinquency or defaults, but the score may fall 60-100 points.[14] A lawsuit or unpaid judgment will remain on a consumer's credit report for seven years or until the statute of limitations runs out, whichever is longer.[15]

The AFCC report analyzed data from large national debt settlement companies within its member-ship, finding that the typical client enrolls six debts in the debt settlement program and that the first settlement is typically negotiated four months after enrollment.[16] Settlement agreements are often structured so that the consumer pays her creditor over a series of installments, although a lump sum settlement payment may also be an option. CRL has reviewed settlement agreements that extend from a few months to over a year.[17] While making payments on current settlement agreements, consumers also continue to fund a dedicated account for potential future settlement agreements on other debts.

Once the consumer enters a settlement agreement with her creditor and makes a first payment on a particular debt under the settlement, the debt settlement company is able to collect the full fee associated with that particular debt. This is the case even when the agreement calls for the consumer to make installment payments over an extended period of time to the creditor. Often, debt settlement companies calculate their fee as a percentage of the debt at the time of enrollment, rather than as a percentage of the savings achieved as a result of the settlement. For example, if fees are set at 20% of the enrolled debt, the fee remains the same regardless of the amount by which the debt is reduced.[18]

Debt settlement clients typically need to remain in the program for three to four years in order to settle most or all of their debts.[19] However, as discussed in more detail later, there is considerable evidence that, historically, only a minority of consumers have completed their debt settlement programs. There are a variety of reasons why a consumer may not have all her debts settled. First, certain creditors are simply unwilling to deal with debt settlement companies. Second, some creditors may expedite collection efforts and pursue lawsuits against consumers who default on their debts and enroll in debt settlement, causing some consumers to drop out of the program. Third, because many clients are financially fragile, a financial shock such as a job loss or unanticipated expense may make it impossible to keep current on the monthly payments to their dedicated savings account or to make installment payments under a settlement agreement, thereby decreasing the likelihood of completion. Finally, some consumers may choose to terminate their debt settlement program and settle debts on their own.

*There is considerable evidence that, historically, only a minority of consumers have completed their debt settlement programs.*

Consumers who continue to have unsettled debts may see their debt loads increase further after enrolling in debt settlement as a result of late fees, default interest rates, and possible litigation expenses. When this happens, filing for bankruptcy might be the only way to avoid further damage.

## Regulatory overview

Debt settlement firms are regulated at both the state and federal level. Some states ban for-profit debt settlement entirely,[20] or limit the fees to 10% to 15% of the actual savings that debt settlement companies can charge.[21] State attorneys general also have successfully sued debt settlement companies under state laws prohibiting fraudulent or deceptive acts and practices.[22]

In 2008 and 2009, the FTC hosted public meetings on the debt settlement industry, and the Government Accountability Office (GAO) issued a report outlining its concerns about the industry in 2010. This culminated in the promulgation of new FTC rules in July 2010, which became effective in October 2010.[23] Among the most significant provisions is an "advance fee" ban, which only allows firms to collect fees when a settlement agreement has been reached and at least one payment related to the settlement has been made by the consumer to the creditor. Prior to the rule, many firms charged substantial up-front fees, which delayed the accumulation of funds for settlements, leading to high dropout rates, large financial losses for consumers, and extremely low rates of completion.

The Consumer Financial Protection Bureau (CFPB) also has jurisdiction over all debt settlement firms for rule writing and larger firms for supervision, and their affiliated service providers.[24]

### Evasions of federal and state debt settlement regulations

Although this brief focuses on debt settlement programs that are compliant with the FTC's advance fee ban, some debt settlement firms have chosen to not comply with this regulation. Because the FTC's jurisdiction is limited by the scope of the Telemarketing Sales Rule, the rules do not apply to all players or all situations. For example, debt settlement programs that provide for certain face-to-face transactions are excluded, as are any programs in which all activity is conducted online.[25]

Some companies have attempted to evade the FTC's rule as well as state laws that often exempt attorneys from their debt settlement regulations by associating with attorneys, even though these attorneys do not actually perform much, if any, debt settlement work.[26] The business practices of Legal Helpers Debt Resolution and Morgan Drexen provide examples of this approach. Legal Helpers Debt Resolution is a company that includes attorneys, but which contracts out the debt settlement work to third-party non-lawyers, to the extent any work is performed. Morgan Drexen is a company of non-lawyers that contracts with attorneys who charge up-front fees in return for minimal work on debt settlement cases, while Morgan Drexen's own non-lawyer employees actually provide the bulk of the work and consumer communication.

State attorneys general and the CFPB have brought increased scrutiny to these business models.[27]

## FINDINGS

Although the FTC's advance fee ban appears to have reduced the potential financial harm to consumers enrolled in debt settlement programs, it remains unclear whether a substantial share of consumers will be better off after pursuing debt settlement than they were when they enrolled Also, consumers cannot accurately judge the likelihood of completion at the time of enrollment. Other alternatives—pursuing hardship programs or otherwise negotiating directly with credit card companies, setting up a debt management plan through a non-profit credit counseling agency, or even filing for Chapter 7 bankruptcy—carry fewer risks and may ultimately be preferable for consumers with unmanageable debt.

The AFCC report, released in February 2013, examined outcomes at several AFCC-member debt settlement firms that comply with the FTC's advance fee ban.[28] The report concludes that debt settlement—especially after the advance fee ban—is always beneficial for consumers regardless of how much debt is settled, since clients pay fees only if and when settlement agreements are reached. Data in the report also provide evidence that consumers are better off with the advance fee ban in place than they were without it, as some clients in the past paid hefty fees without any debts being settled. These data also suggest that companies complying with the ban have implemented changes in the business model that result in settlements occurring more rapidly under the new rule.

However, although the report goes into detail about the proportion of total debts in the data set for which settlement agreements have been reached, and the terms and costs of those settlements, it does not examine outcomes at the consumer level to determine what share of consumers settle all, some, or none of their debts. Further, the report does not consider the impact to the consumer of debts that remain unsettled, including the growth of balances on those debts and the potential for lawsuits, or other consequences such as state and federal tax liability.

To fill these information gaps, CRL has constructed a model that more fully evaluates consumer outcomes 36 months after enrollment in a debt settlement program using publicly available data from the AFCC report.

Finding 1: Consumers must settle at least two-thirds of their debts to improve their financial position through debt settlement.

With our model, we seek to evaluate what share of debts must be settled in order for a consumer to realize a positive change in financial position relative to when she enrolled in debt settlement. We focus our analysis on consumers who enrolled in debt settlement after the advance fee ban took effect on October 27, 2010.

The report notes that 56,000 consumers in the AFCC data set enrolled a total of $1.7 billion in debt in debt settlement programs after the advance fee ban.[29] This equates to an average total enrolled debt of $30,357 per consumer. Additionally, each consumer enrolled six debts on average.[30] For simplicity, we assume each of the six debts is of equal size, roughly $5,060.

**Table 1: An average consumer's debt at enrollment in a debt settlement plan**

| | |
|---|---|
| Total debt enrolled post advance fee ban | $1,700,000,000 |
| Average number of debts enrolled per consumer | 6 |
| Total consumers enrolled post advance fee ban | 56,000 |
| Average total debt enrolled per consumer ($1.7B/56K) | $30,357 |
| Average size of each debt enrolled per consumer ($30,357/6) | $5,060 |

Each of these debts experience "accretion," or growth, as interest, late fees, and other penalties accrue over time while the consumer waits for the debt settlement company to reach settlement agreements with her creditors. The AFCC report notes a consumer's total enrolled balance will grow by 20% before all debts are settled.[31] However, because settlement agreements are reached sequentially, one debt may settle relatively soon after enrollment and thus incur less total accretion than another debt that remains in default longer (or never settles). According to AFCC, the first debt settles just a little after four months from enrolling in the program, and—assuming all creditors are willing to settle—a debt settlement program should complete within 36 to 48 months.[32]

We therefore construct a model, shown in Chart 1 below, which estimates the amount by which each of the 6 debts enrolled would grow before settlement. This ranges from 10% growth in debt balance for the first debt to 30% growth for the final debt. While the growth of each individual debt varies by the time it takes to settle, the consumer's total debt grows by 20% overall from $30,357 to $36,429, consistent with the finding in the AFCC report.

**Chart 1: Projected accretion of each account from time of enrollment until settlement (assuming all accounts settled within 36 months)**



Note: This chart assumes all debts are eventually settled; however, if any unsettled debts remain outstanding, they will grow from $5,060 to $6,577 at the 36 month mark.

If a settlement agreement is reached on a given debt, the AFCC report finds that this settlement typically reduces the outstanding balance on that debt (which includes accretion from the time of enrollment to settlement) by 48%.[33] In exchange for reaching a settlement, the consumer owes a fee, which varies by debt settlement company. Because fees often range from 20-25% of the debt balance at the time of enrollment, we use the midpoint: 22.5%.[34]

Table 2 below provides an illustration of these calculations on the settlement of the first account, which generally happens after four months in a debt settlement program:

**Table 2: Illustration of first debt settled**

| | |
|---|---|
| Balance at enrollment | $5,060 |
| Growth ("accretion") in balance by 10% | $505 |
| Balance at settlement ($5,060+$505) | $5,565 |
| Debt owed to creditor per settlement agreement (48% of $5,565 outstanding balance) | $2,671 |
| Fee owed to debt settlement company (22.5% of $5,060 balance at enrollment) | $1,138 |

Note: numbers do not add up exactly due to rounding

With these findings from the AFCC report and resulting assumptions outlined above, we can now measure what share of debts must be settled for a consumer to experience a positive financial change relative to her position at enrollment in a debt settlement program. As noted above, our model shows what share of debts must settle for a **typical** debt settlement client—that is, a consumer who (according to AFCC's data) enrolls with the average level of debt and experiences the average rate of accretion.

As Table 3 summarizes below, a consumer must settle at least two-thirds (four of six) debts to have a positive change in financial position after 36 months. A consumer that can do this will still be in default on two of six debts—risking lawsuits from creditors—but will experience a positive change in financial position of over $1,350 (relative to the amount of debt when she enrolled).

**Table 3: Change in financial position 36 months after enrollment**

| | Unable to settle any debts | Settle 1 debt (unable to settle 5 of 6 debts) | Settle 2 debts (unable to settle 4 of 6 debts) | Settle 3 debts (unable to settle 3 of 6 debts) | Settle 4 debts (unable to settle 2 of 6 debts) | Settle 5 debts (unable to settle 1 of 6 debts) | Settle all debts |
|---|---|---|---|---|---|---|---|
| (A) Total debt enrolled | $30,357 | $30,357 | $30,357 | $30,357 | $30,357 | $30,357 | $30,357 |
| *Costs associated with settled debt(s)* | | | | | | | |
| (B)   Total due to creditor on settled debts | N/A | $2,671 | $5,464 | $8,379 | $11,293 | $14,329 | $17,486 |
| (C)   Total debt settlement fees due | N/A | $1,138 | $2,277 | $3,415 | $4,554 | $5,692 | $6,830 |
| *Costs associated with unsettled debt(s) and outstanding balance* | | | | | | | |
| (D)   Original balance of total unsettled debt remaining | $30,357 | $25,298 | $20,238 | $15,179 | $10,119 | $5,060 | N/A |
| (E)   Accretion on unsettled debt, over 36 months | $9,107 | $7,589 | $6,071 | $4,554 | $3,036 | $1,518 | N/A |
| *Total costs and financial position 36 months after enrollment* | | | | | | | |
| (F)   Total debt balance plus costs (B+C+D+E) | $39,464 | $36,697 | $34,051 | $31,526 | $29,001 | $26,598 | $24,316 |
| **Change in financial position 36 months after enrollment** (A-F) | ($9,107) | ($6,340) | ($3,693) | ($1,169) | **$1,356** | **$3,759** | **$6,041** |
| **# debts that remain in default** | **6** | **5** | **4** | **3** | **2** | **1** | **0** |

For more information on the calculations in this table, see the Appendix.

For example, a consumer who settles half (three of six) of her debts within a 36 month timeframe would owe her three creditors a total of $8,379 and the debt settlement company a total of $3,415 for negotiating those settlements. These funds would be paid from the consumer's dedicated account, in which she regularly deposits funds over time. She would have three remaining unsettled debts, which originally totaled $15,179 when she began her debt settlement program but grew over 36 months by $4,554. Ultimately, this consumer would end up with $31,526 in total obligations to creditors and debt settlement companies, an increase from her original $30,357 debt at the beginning of the debt settlement program of $1,169. Had she instead been able to settle four of six debts, she would achieve a positive change in financial position of $1,356 at the 36 month mark.

The analysis in Table 3 above assumes that the client did not file for bankruptcy or negotiate settlements directly with creditors herself during these 36 months. Thus, any unsettled debts continued to grow over time.

It is worth noting that our model was designed in a way that may understate the harm and overstate the benefits associated with participation in a debt settlement program. This is because we chose to resolve all ambiguities in favor of debt settlement. These assumptions are detailed below:

**Conservative assumptions of our analysis that may understate harm and overstate benefits of debt settlement:**

1. All debts enrolled are equal in size.

2. Consumer is able to fully pay all settlement installment plans as agreed.

3. There is no cost of maintaining dedicated third party account.

4. There is no tax liability for cancelled debt.

5. Creditors do not bring any lawsuits on defaulted debts enrolled in debt settlement.

6. There are no financial impacts for unsettled debts beyond the 36-month period analyzed.

1. *All debts are of equal size.* We assumed that the consumer's debts are all equal in size. In practice, debt settlement companies may settle a somewhat smaller debt first to enable the consumer to experience a faster initial settlement agreement, leaving the larger debts to be settled later. In general, the larger the debts left unsettled, the greater the accretion that will accrue. Accordingly, our assumption likely understates the accretion that accrues on unsettled debts.[35]

2. *All settlement installment plans paid as agreed.* For the purposes of our analysis, we assume all settlements are successfully repaid as stipulated in the agreement. However, increasingly, settlement agreements are structured to be repaid in installments over time. In a survey of creditors dealing with term settlements, approximately 40% of respondents reported that 20% or less of term settlements fail; however, another 29% of respondents reported a breakage rate of 40% or higher.[36] A broken settlement agreement will result in the debt returning to a default status.

3. *No costs for dedicated account.* We also did not include the costs of maintaining the dedicated account, which is typically required for participation in a debt settlement program. The third-party companies that manage these accounts charge debt settlement clients monthly, annual and/or transaction-based fees to process regular debits from their bank account to the dedicated account and disbursements from the dedicated account to creditors for settlement payments. Typical fees include a $9 set up fee plus $10 per month in continuing fees—$369 in total fees for a client who spends 36 months in a debt settlement program.[37]

4. **No tax liability.** Our model further assumes that the client does not incur any income tax liability in connection with the settled debts. Under federal tax law, when a creditor cancels some or all of a debt owed, the amount of the debt reduction is generally counted as taxable income.[38] State tax laws are generally similar. The debt settlement industry claims that most clients do not face this liability because they can successfully qualify for a tax exemption available to people who are insolvent at the time the debt is reduced, meaning that they fill out the correct tax form and can demonstrate that their debts exceed the value of their assets. However, a quick glance at online reviews of debt settlement companies reveals testimonials from customers who say they incurred tax liability on their settled debts.[39] Moreover, qualifying for such an exemption may require hiring and paying for a tax advisor, if the consumer is even aware of the exemption. Thus, at least some debt settlement clients do face the additional costs of the tax liability and tax advisor fees.

5. **No creditor lawsuits.** Additionally, debt settlement clients are sometimes sued by their creditors while participating in a debt settlement program. The difficulty in estimating the proportion of clients that is likely to be sued, and the variability of the costs involved,[40] led us to exclude these costs from our calculation.

6. **No additional impacts after 36 months.** Finally, Table 3 shows the change in financial position at 36 months from enrollment, although any unsettled debts may continue to grow past this point until the consumer reaches an agreement with her creditors, files for bankruptcy, or dies. Therefore, our model may further understate the extent of a client's negative change in financial position if debts are left unsettled past the three year time period.

Taking some of these additional factors into account would result in consumers needing to settle nearly all debts to experience a positive change in financial position relative to the time of enrollment, as shown in Table 4. Although Table 3 shows that consumers must settle four of six debts for a positive change in financial position (leaving two debts unsettled), this threshold increases to five of six debts for those consumers who incur tax liability and dedicated account fees.

A consumer who settles four of six debts over 36 months would have had total debt reduction of $8,945. Conservatively assuming a combined federal and state income tax rate of 15%, this consumer, if not "insolvent" as defined by tax law, would owe taxes of $1,342 on the debt reduction. If we also include the $369 in dedicated account fees, this consumer would experience a negative change in financial position of $355 instead of the positive change of $1,356 reported in Table 3.

While Table 4 shows a positive change in financial position after settling five of six debts, this outcome could also be wiped away if that last outstanding debt results in a lawsuit.

**Table 4: Impacts of additional factors such as tax liability and dedicated account fees**

| | Settle 1 of 6 debts (unable to settle 5 debts) | Settle 2 of 6 debts (unable to settle 4 debts) | Settle 3 of 6 debts (unable to settle 3 debts) | Settle 4 of 6 debts (unable to settle 2 debts) | Settle 5 of 6 debts (unable to settle 1 debt) | Settle all debts |
|---|---|---|---|---|---|---|
| (A)  Change in financial position 36 months after enrollment (from Table 3) | ($6,340) | ($3,693) | ($1,169) | $1,356 | $3,759 | $6,041 |
| (B)  Cumulative debt reduction | $2,388 | $4,655 | $6,800 | $8,945 | $10,969 | $12,871 |
| (C)  Potential tax liability (assuming 15% rate) | $358 | $698 | $1,020 | $1,342 | $1,645 | $1,931 |
| (D)  Dedicated account fees if enrolled for 36 months | $369 | $369 | $369 | $369 | $369 | $369 |
| **Revised change in financial position, taking these costs into account** (A-C-D) | ($7,067) | ($4,761) | ($2,558) | ($355) | **$1,745** | **$3,741** |

For more information on the calculations in this table, see the Appendix.

## A substantial share of debt settlement clients are unlikely to settle two-thirds of their enrolled debts

If the six assumptions most favorable to the debt settlement companies apply, a positive change in financial position does not occur unless at least two-thirds of debts are settled. It is therefore important to know whether debt settlement clients are likely to achieve these results.

Prior to the FTC's advance fee ban, AFCC estimated—based upon a survey of its members— that approximately two-thirds of clients failed to have 70% or more of their debt settled.[41] Investigations revealed even lower completion rates. The GAO concluded that debt settlement companies are overly optimistic in reporting their success rates, noting "[t]he success rates we heard [from debt settlement companies] are significantly higher than is suggested by the evidence obtained by federal and state agencies. When these agencies have obtained documentation on debt settlement success rates, the figures have often been in the single digits."[42] Data obtained through litigation by states' attorneys general similarly found completion rates in the low single-digits before the advance fee ban took effect.[43]

Notwithstanding the industry's poor performance record for the period up to October 2010, the AFCC report posits that the data will demonstrate much better completion rates for those clients who enrolled in debt settlement after the advance fee ban went into effect. No data is yet publicly available from which to evaluate this claim. Neither the AFCC report nor any subsequent industry statements have disclosed completion rates (or even partial completion rates) for clients enrolled after the advance fee ban took effect. Nothing in the report or subsequent disclosures reveals, for example, the proportion of clients who have had at least two-thirds of their debts settled.

AFCC's report does indicate a higher percentage of settlements in the first two years after the advance fee ban took effect than occurred over the same period of time prior to this reform. For example, approximately 35-40% of debts enrolled in 2011 had been settled by the end of 2012, and an additional 20-25% remained active, which might result in additional settlements in the future.[44] However, it is unclear how these settlements are distributed among consumers (because each consumer typically enrolls multiple debts) and what percentage of a given consumer's debts will eventually settle.

Only the consumers remaining in the program have a chance of completing the program or settling enough of their debt to have a positive change in their financial position. However, the AFCC and a state regulator have observed that a significant share of consumers continue to terminate their debt settlement programs early in their tenure even after the advance fee ban, suggesting that—at least for this segment of consumers—few if any settlements were reached. AFCC data show that about one-quarter of debts enrolled after the advance fee ban took effect have been terminated.[45] The Colorado regulator reports that over a third of consumers (37%) enrolled in 2011 ended up terminating by the end of that year.[46]

### Finding 2: It is difficult (if not impossible) for consumers to predict their likelihood of completion ahead of time.

Another important question is whether consumers can readily assess at the outset whether they are likely to succeed in a debt settlement program. As outlined below, several uncertainties affect a consumer's likelihood for success, and these uncertainties are not transparent to the consumer at the time of enrollment. This is not an issue that can be resolved by adding disclosures; rather, it is in the very nature of debt settlement that consumers cannot know ahead of time whether they will be better or worse off as a result of the debt settlement process.

**Inability of debt settlement companies to negotiated with creditors.** First, certain creditors are unwilling to work with debt settlement companies. A 2012 survey of credit card issuers, debt buyers, and debt collectors, for example, found that only half of respondents will engage with debt settlement firms.[47] The responses vary by creditor type, with 63% of credit card company respondents reporting that they will work with debt settlement companies, compared with 40% of collection agencies and 59% of debt buyers.[48] Given that a significant portion of creditors are not willing to negotiate with debt settlement companies, consumers may have no chance of settling all of their debts regardless of a debt settlement company's efforts.

**Potential for lawsuits on defaulted debts.** Second, when a consumer defaults on her debt and cuts off communications with a creditor, the creditor may respond with escalated collection efforts, including lawsuits that can carry added expense and, often, garnishment of wages. AFCC has noted that one of the primary reasons that clients terminate their debt settlement programs before accounts can be successfully settled is because of creditor lawsuits.

The possibility that some or all of the consumer's creditors will not deal with debt settlement firms and that the creditor may sue the borrower are both troubling, as the consumer has no way to assess these risks when making a decision to enroll in debt settlement rather than pursue other options. Even a disclosure of the likelihood of successful negotiation with a consumer's creditors by the debt settlement company may be ineffective. For example, a consumer's creditor may be willing to work with a debt settlement company at the start of the process, but the creditor could soon thereafter

change its policies or sell the debt to a debt buyer that refuses to negotiate and instead immediately initiates a lawsuit. Thus, unlike the alternative options we outline in the next section, at least two critical factors affecting whether the consumer will experience a benefit or loss are completely outside of the control of the consumer and even the debt settlement company.

**Inability of consumer to continue to make contributions to dedicated account or installment payments on settlements.** In addition, the consumer must ensure that she is able to fulfill her settlement agreements with creditors (increasingly installment agreements paid over time) and also continue regular contributions to her account for debts not yet settled for years into the future, since completion of a debt settlement program may take three years or more. If the consumer faces another financial shock, such as loss of income, she may be unable to complete payments on any existing debt settlement agreements where installment payments are still due or to continue contributions into her debt settlement account for future debt settlement. Breaking a settlement agreement carries the risk of landing the consumer back into default with her creditor, potentially facing re-imposed late fees and other penalties.

## ALTERNATIVE OPTIONS ARE AVAILABLE TO CONSUMERS WITH UNMANAGEABLE DEBT

A consumer overwhelmed by excessive debt has several potential options other than debt settlement. In this section, we describe these alternatives and discuss the benefits and drawbacks of each.

1. **Repay debts slowly over time.** For consumers who can afford to do so, making at least the minimum monthly payments on their credit cards is one option—although perhaps an ultimately slow and costly one. The minimum payments will cover monthly interest charges plus a small part of the outstanding principal balance. Accordingly, the debt will decrease over time until it is eliminated. If the consumer can supplement the minimum payments from time to time with additional principal payments, she can speed the rate at which the debt is eliminated and reduce the overall cost of repayment.

*A consumer overwhelmed by excessive debt has several potential options other than debt settlement.*

Although it may take years for her to become debt-free, remaining current means she will avoid all of the negative consequences of default. These consequences include a lower credit score; high late fees and other charges; the imposition of default interest rates; and the possibility of lawsuits, wage garnishment, and other debt collection efforts.

2. **Negotiate directly with creditors for hardship repayment or other assistance before or after default.** Many credit card companies offer hardship programs to customers in severe financial distress. Features may include a waiver of late fees and other penalty charges, reduced interest rates, and payment plans.[49] The creditor will not pursue collections efforts or lawsuits against customers in the hardship program. Accordingly, the consumer can minimize or prevent a growth in debt.

Unlike reductions in principal balances, the waiver of late fees and other penalty charges and reductions in interest rates are not taxable under either federal or state laws. In addition, participation in at least some creditors' hardship programs will not adversely impact a consumer's credit.

In conversations with creditors, CRL has learned that some will offer these hardship programs even if a consumer is not yet delinquent on her debt, so long as the consumer can appropriately document her financial hardship. However, the creditor would likely close the consumer's account (something that would obviously also happen with debt settlement).

In addition, whether the debt collection is in the hands of a credit card company, debt buyer, or collections agency, if the consumer has defaulted on a debt, these parties may be willing to offer a concession such as an interest rate or principal reduction.[50] For example, a debt buyer who has purchased a consumer's debt at a heavily discounted rate may be able to offer a substantial savings and still profit from the settlement. Staying in contact with creditors may also reduce the risk of a lawsuit.

**3. Non-profit credit counseling/debt management plan.** Debt management plans, which are offered by non-profit credit counseling agencies, generally require consumers to repay unsecured debts in full with modified terms such as significantly reduced interest rates and the elimination of late and other penalty fees, all of which significantly limit the accretion of debt. Debt management plans are available to consumers who have sufficient income to pay down their debt under these terms within three to five years. These plans do not require participants to default on their debts as a condition of enrollment. Upon completion, the consumer's accounts are reported as "closed-paid in full" to credit bureaus, which can provide an immediate improvement in credit score. However, if a consumer is unable to complete a debt management plan, the credit card companies generally treat the debts as in default.

Debt management plan completion rates are generally not reported and—when data are available—vary widely by source from about one-quarter to one-half of plan participants.[51] Those who terminate their plans before completion face the consequences of default. However, unlike debt settlement programs, debt management plans are agreed to by the creditors up-front. As a result, while complying with the plan, the consumer will not face lawsuits or collections activities over the enrolled debts.

Consumers entering a debt management plan typically pay a modest up-front fee, as well as a monthly fee while making payments.[52] Because debt management plans typically do not entail reductions in outstanding balances, there is no tax liability for the concessions made by creditors in connection with such plans.

**4. Consumer bankruptcy.** The legally sanctioned way for consumers and businesses to obtain relief from unmanageable debts is through the bankruptcy courts. Bankruptcy provides relief from almost all of the consumer's debts—not just the unsecured debts eligible for a debt settlement program. A key advantage of bankruptcy is that once the consumer files, all collection activities are halted, and no new late fees or default interest rates can be imposed. When consumers complete the bankruptcy process, their debts are extinguished, whether paid in full, in part, or not at all. Consumers whose debts are discharged in bankruptcy incur no tax liability for the reduction in their debts.

Bankruptcy generally offers two options for consumers: a Chapter 7 liquidation or a Chapter 13 repayment plan. In Chapter 7, a qualified consumer's[53] "non-exempt" assets are sold and the proceeds used to repay creditors. Chapter 7 bankruptcy typically takes three to four months to complete. About 90% of Chapter 7 cases are "no asset" cases in which the consumer does not lose property because her assets are sufficiently protected by the state or federal asset exemptions.[54]

Consumers who do not qualify for Chapter 7 or who wish to keep non-exempt assets can file under Chapter 13. In Chapter 13, the consumer pays all disposable income beyond court-approved living expenses into a court-supervised fund to repay debts over a three to five year period.

Nearly all consumers (approximately 97%) who file Chapter 7 bankruptcy complete the process.[55] Taking into account both the consumers who complete Chapter 13 bankruptcy (approximately one-third of filers) and the initial Chapter 13 filers who convert to Chapter 7, approximately 50% of Chapter 13 filers succeed in achieving a discharge of their unsecured debts.[56]

The total cost of a Chapter 7 no-asset bankruptcy averages about $1,309, including attorney's fees, filing fees, and other associated costs.[57] In Chapter 13 cases, typical attorney fees are higher, at around $3,700.[58]

A bankruptcy leaves a negative mark on the consumer's credit report for seven to ten years from the date of filing,[59] which is somewhat similar to the duration of debt settlement's impact on credit scores. Although consumers associate bankruptcy with stigma, it still may be the most cost-effective, direct, and successful way to deal with significant debt, and provides much greater certainty than debt settlement.[60]

## POLICY RECOMMENDATIONS

Only three years have passed since the advance fee ban took effect, and debt settlement companies have not yet publicly disclosed the completion rates, or partial completion rates, of consumers enrolled over this period. The data released to date do not reveal whether debt settlement companies that comply with the advance fee ban are settling a sufficient percentage of debts to allow a substantial share of enrolled consumers to realize a positive change in financial position. In addition, even if many consumers do experience a positive outcome, it is difficult or impossible for consumers to predict whether they will be successful. Legislators and regulators at the state and federal level can help to mitigate the risks currently created by debt settlement by implementing the following recommendations:

### States

- **States that have not authorized for-profit debt settlement or that strongly restrict debt settlement activities should keep in place the protections they currently have.** Because it is unclear whether the advance fee ban alone will result in substantially better outcomes for consumers—and given that a consumer's success remains highly unpredictable—states that currently do not authorize debt settlement should retain those limits. Existing bans provide state officials with sufficient authority and basis to pursue debt settlement companies that may operate in violation of the ban. Legalizing debt settlement in these states will increase the likelihood of consumers being ensnared in programs that can leave them worse off.

- States that currently authorize debt settlement should implement the following reforms:

  o **Require screening before enrolling consumers.** As discussed in this paper, there is a substantial risk that consumers may not complete debt settlement programs due to factors both in and beyond their control. As a result, states should require debt settlement providers to conduct a personalized evaluation of a prospective client that concludes that the debt settlement program is likely to provide a net benefit and is affordable, given the prospective client's current income, expenses, assets, and liabilities. The written analysis should also review whether the creditors are likely to settle, and whether the consumer's particular circumstances, such as whether her income is protected from garnishment or lawsuits (as is the case with Social Security income) make debt settlement an unsuitable option.

  o **Include a "not worse off" provision.** To encourage debt settlement companies to not enroll people who have a significant chance of ending up worse off, states should enact provisions that provide consumers with some form of refund or concession if they end up worse off after enrolling in a debt settlement program.

  o **Establish meaningful limitations on fees.** Debt settlement fees should be calculated based on the amount of savings achieved comparing the settlement amount with the amount of the debt at enrollment. The fee limit should be set at a rate that ensures that the majority of clients will achieve a substantial reduction in debt load (taking fees into account) compared with the debt balance at enrollment. For example, states such as Connecticut, Illinois and Maine limit fees to 10-15% of savings to achieve this result.

  Fees should be owed only after the settlement is negotiated and fully paid and released or, in the case of installment settlements, payable in *pro-rata* shares that correspond to the size of

the installment payments. This reform would better align the interests of consumers with the interests of debt settlement companies, leading to programs that consumers have a greater chance of completing.

o **Require detailed data reporting.** States should require debt settlement companies to report on the outcomes achieved for their clients, indicating at a minimum for each consumer the number and amount of enrolled debts and—for each such debt—the date and amount of settlement (if any), the structure of each settlement (and whether term settlements are completed), the fees charged, and whether any of these debts is the subject of a creditor lawsuit.

o **Ensure broad coverage of the law.** States should ensure that their debt settlement laws include all debt settlement providers, including attorneys and others whose activities are not covered by the FTC rule.

- **Enforce existing laws pertaining to debt settlement.** State attorneys general and regulators should continue efforts to ensure compliance with existing laws and regulations, whether the state allows debt settlement in some form or does not authorize the practice.

## Consumer Financial Protection Bureau (CFPB)

- **Apply rules and restrictions to all debt settlement transactions.** Because some companies seek to evade the FTC rule banning advance fees by arguing that they do not fall within its scope, the CFPB should extend this protection—and all additional rules—to all debt settlement providers and transactions.

- **Supervise larger debt settlement providers.** The CFPB should ensure compliance by undertaking a rulemaking to supervise larger debt settlement providers.

- **As recommended for states, CFPB should also require screening before enrollment, establish a "not worse off" provision, allow debt settlement fees to be assessed only as settlements are completed, and require detailed data reporting.**

## Consumer Financial Protection Bureau (CFPB) and Federal Trade Commission (FTC)

- **Ensure compliance with existing regulations and guard against unfair, deceptive, or abusive acts and practices.** The CFPB and FTC should continue to monitor the practices of debt settlement firms and, where violations exist, undertake enforcement actions.

## END NOTES

1 Total outstanding revolving consumer credit as of October 2013, seasonally adjusted, Federal Reserve Board. Estimates of average credit card debt among indebted households. Tim Chen, *American Household Credit Card Debt Statistics: 2013,* NERDWALLET.COM, http://www.nerdwallet.com/blog/credit-card-data/average-credit-card-debt-household/ (last visited Oct. 27, 2013).

2 David Morrison, *Study Quantifies How Credit Card Repayment Affects Risk,* Credit Union Times, Aug. 20, 2013.

3 For example, a June 2013 Bankrate.com survey finding that three-quarters of Americans do not have enough savings to cover six months of expenses. *June 2013 Financial Security Index charts,* BANKRATE.COM, http://www.bankrate.com/finance/consumer-index/financial-security-charts-0613.aspx (last visited Oct. 1, 2013).

4 Examples include the following: *Achieve Financial Freedom in 12-36 Months!* PRESTIGEFINANCIALSOLUTIONS.COM, http://www.prestigefinancialsolutions.com/debt-options.php (Last visited Oct. 1, 2013); *Be Debt Free in 12-48 Months,* LEVELTHIRTYTHREE.COM, http://www.levelthirtythree.com/ (Last visited Oct. 18, 2013); "DMB Financial's typical client has seen over 50% of their unsecured debt negotiated away and is debt free in as little as 36 months. For many, DMB's debt settlement services are a viable alternative to bankruptcy, credit counseling, and credit card and debt consolidation." *Be debt free in as little as 36 months,* DMBFINANCIAL.COM, http://www.dmbfinancial.com/ (Last visited Oct. 1, 2013); *Within 24 to 48 months expect to settle your debts through a payment plan you can afford and live with,* NATIONALDEBTRELIEF.COM, http://www.nationaldebtrelief.com/ (Last visited Oct. 1, 2013); "Q. When will I have my debts paid off? A. The average debt settlement program lasts 2-4 years and the speed at which your program is finished depends entirely on how much money you apply to your program." *When will I have my debts paid off?,* ACCREDITEDDEBTRELIEF.COM, http://www.accredited-debtrelief.com/faq/ (Last visited Oct. 1, 2013); "You can resolve Your Debt In As Little As 24-48 Months! On average, our debt settlement program takes most clients 2 to 4 years to complete. However, ProActive Debt's programs allow you control the pace with the amount of money you apply to them. The faster you build up the amount in your settlement fund, the more quickly your debts will clear." *Resolve Your Debt in as little as 24-48 Months,* PROACTIVEDEBT.COM, http://www.pro-activedebt.com/# (Last visited Oct. 1, 2013); "One phone call and you're on your way to a credit card DEBT-FREE life! It's easy! And you pay NO fees until we receive an acceptable settlement offer from your creditor *You're on Your way to a DEBT FREE life!*" VANTAGEACCEPTANCE.COM, http://www.vantageacceptance.com/ (Last visited Oct. 18, 2013); *Reduce Your Total Unsecured Debt,* GOFULLCIRCLENOW.COM, http://www.gofullcirclenow.com/debt-settlement.php (Last visited Oct. 1, 2013).

5 Debt-settlement companies typically require consumers to stop paying their creditors and thus default on their debts. The Government Accountability Office (GAO) investigated abuses in the debt settlement industry using mystery shoppers who called debt settlement companies posing clients. The GAO reported, "Representatives of nearly all the companies we called—17 out of 20—advised us to stop paying our creditors." U.S. Government Accountability Office, GAO-10-593T, *Debt Settlement: Fraudulent, Abusive, and Deceptive Practices Pose Risks to Consumers,* (Apr. 22, 2010), http://www.gao.gov/new.items/d10593t.pdf. Some debt settlement companies disclose this openly on their websites. See, e.g., Stephen Craig, *How Does Debt Settlement Work?* TRIDENT DEBT SOLUTIONS.COM (Aug. 8, 2011), http://tridentdebtsolutions.com/how-does-debt-settlement-work/ ("Rather than paying your creditors directly, you make payments to your attorney, who puts the funds in a trust account until enough has been accumulated to pay off the reduced settlement amounts that your creditors have agreed to accept."); *Debt Settlement FAQ,* PERSELSANDASSOCIATES.COM, http://www.perselsandassociates.com/faq.html (last visited Oct. 1, 2013) ("Your monthly payment will be deposited into a lawyer's trust account instead of being sent to your creditors. When this happens, your accounts will become delinquent. As funds in your trust account grow, the firm's negotiators will begin to contact your creditors to attempt to work out a settlement."); *Frequently Asked Debt Settlement Questions,* DEBTMERICA.COM, http://debtmerica.com/debt-settlement-faq#what-is-debt-settlement (Last visited Oct. 1, 2013) ("If you are current on your payments, it is very difficult, if not impossible to settle your debt. Creditors typically want to see that you are in a hardship situation before they are willing to negotiate. Therefore, you will have to voluntarily stop paying your unsecured debts; allowing them go into delinquency before settlement."); *General Debt Settlement Questions and Answers,* SOLIDROCKDEBTS.COM, http://www.solidrockdebts.com/faq/ (Last visited Oct. 1, 2013).

6 Telemarketing Sales Rule, 16 CFR Part 310, available at http://www.ftc.gov/os/2010/07/R411001finalrule.pdf.

7 Greg Regan, *Options For Consumers In Crisis: An Economic Analysis Of The Debt Settlement Industry,* Hemming Morse LLP, (Feb. 28, 2013), http://americanfaircreditcouncil.org/listing/options_for_consumers_in_crisis.pdf [hereinafter *AFCC report*].

8 Examples include the following AFCC members: Prestige Financial Solutions: "Achieve financial freedom in 12-36 months!," available at http://www.prestigefinancialsolutions.com/debt-options.php; Level Thirty Three Financial: "Be Debt Free in 12-48 Months," available at http://www.levelthirtythree.com/; DMB Financial: "DMB Financial's typical client has seen over 50% of their unsecured debt negotiated away and is debt free in as little as 36 months.* For many, DMB's debt

settlement services are a viable alternative to bankruptcy, credit counseling, and credit card and debt consolidation," available at http://www.dmbfinancial.com/; National Debt Relief: "Within 24 to 48 months of working with us, you can expect to settle your debts through a payment plan that you can afford and live with," available at http://www.nationaldebt-relief.com/; Accredited Debt Relief: "Q. When will I have my debts paid off? A. The average debt settlement program lasts 2-4 years and the speed at which your program is finished depends entirely on how much money you apply to your program," available at http://www.accrediteddebtrelief.com/faq/; Proactive Debt Relief: "Resolve Your Debt In As Little As 24-48 Months! On average, our debt settlement program takes most clients 2 to 4 years to complete. However, ProActive Debt's programs allow you control the pace with the amount of money you apply to them. The faster you build up the amount in your settlement fund, the more quickly your debts will clear," available at http://www.proactivedebt.com/; Vantage Acceptance, Inc.: "One phone call and you're on your way to a credit card DEBT-FREE life! It's easy! And you pay NO fees until we receive an acceptable settlement offer from your creditors!" available at http://www.vantageacceptance.com/; Full Circle Debt Relief: "Reduce Your Total Unsecured Debt," available at http://www.gofullcirclenow.com/debt-settlement.php.

9 Debt settlement companies settle primarily credit card debts, but will also accept medical and private student loan debts. They do not accept or settle secured debt (such as car loans or mortgage loans), insured or federally-guaranteed student loans, utility bills, tax obligations or payday loans.

10 Examples from the websites of AFCC member firms include the following: "By simply paying the minimum payments each and every month, as much as 85% of your payments are going to interest and it may take you 25 years or more to pay off your debt in full!" *Settle Your Debt and Gain Peace of Mind,* PACIFICDEBTMANAGEMENT.COM, http://www.paci-ficdebtmanagement.com/debt-solutions/ (Last visited Oct. 1, 2013); "It's true: making your minimum payments keeps you looking 'decent' on paper. You avoid late fees and you aren't reported to the credit bureaus as 'delinquent,' nor do you have to worry about your credit score being lowered. So what's the catch? Interest. You pay a very, very heavy price for making only your minimum payments. Minimum payments are how credit card companies make serious money from you. When you make only the minimum payment, a significant portion of your payment goes towards your interest or finance charges. If you are struggling to make ends meet and only paying the minimum on your accounts, it may feel like your balances never come down. Fees and interest accumulate quickly and you'll be paying way more than you originally owed. Not to mention, it could literally take you decades to pay off. If your debts are being reduced at a very slow pace, it may be time to seek another alternative." *Minimum Payments, Is it Worth the Wait,* FREEDOMDEBTRELIEF.COM, http://www.freedomdebtrelief.com/min-payment-option (Last visited Oct. 1, 2013). US Financial Options: "Debt Settlement programs empower clients to over-come their debt burden in a timeframe that is much shorter than if a client were to continue paying off their creditors at minimum payment amounts. With only a fraction of minimum monthly payments going towards principal, a debtor is faced with the unrelenting future of paying off their debts for perhaps decades to come. However, through Debt Settlement, a client has the ability to repay their debts at a discount in a much shorter timeframe." *Avoid Having to Claim Bankruptcy,* U.S.FINANCIALOPTIONS.COM, http://usfinancialoptions.com/program-benefits/ (Last visited Oct. 1, 2013); "Paying the minimum payment on variable interest rate credit cards is a tough battle. To just maintain the balance without going deeper into debt, one must typically pay more than the minimum required payment. If you only make your minimum payments, it can take upwards of 25-35 years and thousands of dollars in interest to pay off the entire balance. This is obviously the most expensive option that takes the longest amount of time to complete." *Where are My Options to Get Out of Debt?,* CLEARONEADVANTAGE.COM, http://clearoneadvantage.com/debt-relief-details/ (Last visited Oct. 1, 2013). "Are you tired of spending your hard earned money on endless debt that never seems to go away? Do you find yourself needing to charge monthly necessities, such as gasoline, groceries and utilities on your credit cards?  If you are one of millions struggling to make only the minimum payment on your credit cards and have no additional cash flow at the end of the month, or if you answered 'yes' to one or more of the above, then we can provide a customized resolution for you." *Change Your Financial Future Today,* AMERICADR.COM, http://www.americadr.com/ (Last visited Oct. 1, 2013); Yellow Brick Financial: "Yellow Brick's Debt Reduction Program is appropriate for consumers who are in over their heads with credit card debt and feel like they are spinning their wheels making minimum payments." *Affordable Financial Solutions,* YELLOWBRICKFINANCIAL.COM, http://www.yellowbrickfinancial.com/Debt-Settlement-FAQ.aspx (Last visited Oct. 1,2013); "Many people struggle to make their minimum monthly payments and this option could take over 30 years to pay back the debt you owe, costs thousands of dollars in interest alone, and could require you to potentially pay back over three-times what you now owe on these balances. This may be the least timely, most costly, and most economically disadvantageous way to get out of your unsecured debt," *Debt Relief Programs and Options,* DEBTMERICA.COM,  http://www.debtmerica.com/your-debt-options (Last visited Oct. 1, 2013).

11 See *supra* note 5.

12 AFCC report, *supra* note 7 at 6.

13 See, e.g., an answer from the CFPB on how long negative information remains on credit reports, available at http://www.consumerfinance.gov/askcfpb/323/how-long-does-negative-information-remain-on-my-credit-report.html.

14 See, e.g., *Credit Missteps—How Their Effect on FICO Scores Vary,* FICO.COM, http://www.myfico.com/crediteducation/

questions/credit_problem_comparison.aspx (Last visited Nov. 8, 2013) which shows that a 30-day delinquency can cause a consumer with a FICO score of 780 to fall to 670-690, and a consumer with a FICO score of 680 to fall to 600-620. Likewise, a reported settlement of a debt has varying impacts to a consumer's credit score given their previous standing.

15 See *supra* note 13.

16 AFCC report, *supra* note 7, at 8 and 15.

17 See, for example, a settlement letter posted on a debt settlement company's website at http://clearoneadvantage.com/testimonials/debt-settlement-letters.php.

18 If fees are calculated as a share of the debt at time of enrollment rather than a percentage of savings, consumers could be charged a fee that is more than the savings realized, for example when the enrolled debt grows over time and is then reduced by only a nominal amount.

19 AFCC report, *supra* note 7, at 10.

20 These include Arkansas, Hawaii, Louisiana, New Jersey, and Wyoming.

21 For example, Illinois and Maine cap fees at 15% of savings from debt settlement; in Connecticut the cap is 10% of savings.

22 For example, the Attorney General of New York has successfully sued debt settlement companies under New York's consumer protection statutes. *See, e.g., People v. Credit Solutions of America, Inc.,* No. 401225/09, 2012 NY Slip O.p 31170(U) (N.Y.Sup. Apr. 12, 2012), at http://www.murthalawfirm.com/wp-content/uploads/2012/05/csa.pdf (Decision and Order granting Plaintiff's Motion for Summary Judgment). Several other states brought similar claims against the same defendant. Complaint at 7, ¶ 21, *Florida v. Credit Solutions of America, Inc.,* No. 8:2009cv02331( Fla. Cir. Ct.) (noting that as of the date of the filing of the Florida complaint, Credit Services of America had been sued by the Attorneys General of Texas, New York, Missouri, and Illinois). The Attorney General of Vermont has likewise sued debt settlement companies for violations of the state Consumer Fraud Act's prohibitions on unfair and deceptive consumer acts and practices, see, e.g., Assurance of Discontinuance, *In re Debt Settlement America, Inc* (Jan. 27, 2010) (No.56-1-10-WNCV), at http://www.atg.state.vt.us/assets/files/Debt%20Settlement%20America%20AOD%202010-1-27.pdf.

23 See proceedings from the FTC meetings at http://www.ftc.gov/bcp/workshops/debtsettlement/index.shtm and http://www.ftc.gov/bcp/rulemaking/tsr/tsr-debtrelief/. See also U.S. Government Accountability Office, GAO-10-593T, *Debt Settlement: Fraudulent, Abusive, and Deceptive Practices Pose Risks to Consumers* (Apr. 22, 2010), http://www.gao.gov/new.items/d10593t.pdf.

24 Before the CFPB can supervise debt settlement companies, it first must determine by rule which firms are considered to be "larger participants" of that market. To date, this rulemaking has not taken place.

25 For a more detailed discussion of potential loopholes, see Michael Mallow & Michael Thurman, *In Search of Exceptions to the FTC's Amended Telemarketing Sales Rule- Don't Put Your Neck in a Loophole!* LOEB.COM, (August 2010), http://www.loeb.com/exceptionstoftcsamendedtelemarketingsalesrule/. See also Steve Rhode, *"Credit Counseling Group Makes Presentation to the FTC about Cracking Down on Bad Actor Debt Settlement,* GETOUTOFDEBT.ORG, (Dec. 22, 2010), http://getoutofdebt.org/24571/credit-counseling-group-makes-presentation-to-ftc-about-cracking-down-on-bad-actor-debt-settlement-companies.

26 The FTC has made clear that attorneys are not exempted from the Rule as a matter of course. See, e.g., the Telemarketing Sales Rule at 48468 ("Based on the record in this proceeding, the Commission has concluded that an exemption from the amended rule for attorneys engaged in the telemarketing of debt relief services is not warranted").

27 *See, e.g., People v. Legal Helpers Debt Resolution, LLC* (Ill. Cir. Ct. 7th Jud. Cir., filed Mar. 2, 2011); *West Virginia v. Morgan Drexen, Inc.* (Civ. Action No. 11-C-829, filed May 20, 2011) and *Consumer Financial Protection Bureau v. Morgan Drexen, Inc.* (U.S. District Court Central District of California, filed August 20, 2013). For more details on the attorney model of debt settlement generally, see Caryn Becker and Ellen Harnick, *Debt Settlement Firms Adopt "Attorney Model" to Evade State & Federal Rules,* Center for Responsible Lending (Nov. 5, 2013), http://www.responsiblelending.org/other-consumer-loans/debt-settlement/research-analysis/The-Rise-of-the-Attorney-Advance-Fee-Debt-Settlement-Model-FINAL-11-7-13.pdf

28 AFCC report, *supra* note 7.

29 AFCC report, *supra* note 7, at 7.

30 AFCC report, *supra* note 7, at 8.

31 AFCC report, *supra* note 7, at 19.

32 AFCC report, *supra* note 7, at 10 and 15.

33 AFCC report, *supra* note 7, at 19.

34 Many debt settlement companies do not disclose the fee charged on their website. One exception to this is Debtmerica, which notes "[t]he total fees for our programs range from 20% to 24% of the enrolled debt balances that are settled," http://debtmerica.com/debt-settlement-faq#what-are-your-fees (last visited Nov. 13, 2013). In addition, the General Counsel for Century Negotiations, a large debt settlement company and AFCC member, noted a 25% fee was an appropriate fee. Gary Haber, *Bill's Cap on Debt-Settlement Fees Still Considered High,* Baltimore Business Journal, Apr. 1, 2011, http://www.maryland-consumers.org/LinkClick.aspx?fileticket=jU_Pf4b1WVI%3D&tabid=61

35 For example, a $1,000 debt that has 10% of accretion by the time of settlement would have an accretion cost of $100. In contrast, a $10,000 debt with that same 10% accretion rate would have an accretion cost of $1,000.

36 *InsideARM Debt Settlement Survey: How Creditors and Collectors Utilize the Debt Settlement Industry to Increase Collections,* INSIDEARM.COM, (Jan. 2013), http://www.insidearm.com/freemiums/debt-settlement-survey-round-ii-how-creditors-and-collectors-increase-collections/

37 These are the approximate fees based on a fee schedule from Global Client Solutions, Inc., a large national account management company used by debt settlement companies and their clients. According to a decision by the Washington Supreme Court, as of 2009, the company's charged a $9.00 account set up fee, a monthly service fee of $9.85, and fees for certain transactions, such as a $15 wire transfer charge, *See Carlsen v. Global Client Solutions,* 171 Wash.2d 486, 492 (2011).

38 Information about the tax treatment of canceled debt, IRS.GOV, http://www.irs.gov/publications/p4681/ch01.html (last visited Oct. 1, 2013).

39 Reviews of debt settlement companies, for example, "sonya [sic] of Youngstown OH" wrote, "I joined this program in 2009 to try and resolve our debt—we went in with $12,000 in debt and came out with $27,000 in debt. Two accounts were settled (which we had to pay IRS fees on as income and we were actually having our wages garnished for a few of these creditors.)," *Freedom Debt Relief Consumer Reviews and Complaints,* Comment to Debt Settlement Companies, CONSUMERAFFAIRS.COM ,http://www.consumeraffairs.com/debt_counsel/freedom_debt_relief.html (last visited on Sept. 26, 2013). See also Herb Weisbaum, *Surprise! Forgiven Debt May Be Taxable Income,* "any creditor or debt collector who agrees to reduce the balance you owe by $600 or more is required to report that to the IRS. They file a form 1099-C and send you a copy. People tend to miss this because they didn't see any cash from the debt settlement. This puts you at risk of being audited or hit with penalties and interest" (internal quotation omitted), TODAY.COM, (Mar. 15, 2013), http://www.today.com/money/surprise-forgiven-debt-may-be-taxable-income-1C8884337. See also Connie Prater, *1099-C surprise: IRS tax follows canceled debt,* "According to the IRS, the number of 1099-C debt cancelation forms filed by creditors and debt collectors more than tripled between 2003 and 2010," CREDITCARDS.COM (Jan. 10, 2013),  http://www.creditcards.com/credit-card-news/forgiven-debt-1099C-income-tax-3513.php

40 Such costs could include attorney's fees, court costs, out-of-pocket expenses, and lost income.

41 Letter from The Association of Settlement Companies (TASC) to the Federal Trade Commission, 10 (Oct. 26, 2009), http://www.ftc.gov/os/comments/tsrdebtrelief/543670-00202.pdf

42 U.S. Government Accountability Office, GAO-10-593T, *Debt Settlement: Fraudulent, Abusive, and Deceptive Practices Pose Risks to Consumers* (Apr. 22, 2010), http://www.gao.gov/new.items/d10593t.pdf

43 The Association of the Bar of the City of New York, *Profiteering From Financial Distress: An Examination of the Debt Settlement Industry,* NYCBAR.ORG, 62-63 (May 2012),  http://www2.nycbar.org/pdf/report/uploads/DebtSettlementWhitePaperCivilCtConsumerAffairsReportFINAL5.11.12.pdf

44 For example, about 40% of debts enrolled from 2006-2008 were settled. The remaining debts are largely no longer active, and thus this settlement rate is not expected to increase further for debts in these vintages. Debts enrolled in 2011 (after the advance fee ban took effect) have settlement rates of between 35%-40%, with an additional 20%-25% remaining active that could potentially settle in the future. AFCC report, *supra* note 7, at 9-10.

45 See Table 4.3, AFCC report, *supra* note 7 at 8.

46 Information for all licensed providers that submit reports to the Attorney General's office in that year. *Colorado 2011 Annual Report of Debt Mgmt. Services,* COLOROADOATTORNEYGENERAL.GOV, http://www.coloradoattorneygeneral.gov/sites/default/files/uploads/Annual%20Report%20-%202011.pdf

47 *Inside ARM Debt Settlement Survey: How Creditors and Collectors Utilize the Debt Settlement Industry to Increase Collections,* INSIDEARM.COM, (Jan. 2013), http://www.insidearm.com/freemiums/debt-settlement-survey-round-ii-how-creditors-and-collectors-increase-collections/

48 The same survey a year prior found that very few credit card companies would work with debt settlement companies, but higher rates of collection agencies would engage. This volatility across years may reflect a different set of respondents and small samples of certain creditor types rather than signaling specific trends. *See InsideARM Debt Settlement Survey: How Creditors and Collectors Utilize the Debt Settlement Industry to Increase Collections,* INSIDEARM.COM, (Oct. 2011), http://www.insidearm.com/freemiums/debt-settlement-industry-collections/

49 Examples of some characteristics of credit card hardship plans are outlined at http://www.needhelppayingbills.com/html/credit_card_hardship_programs.html#List and http://www.creditcards.com/credit-card-news/credit-card-hardship-program-debt-problems-1273.php

50 If a consumer directly negotiates a principal reduction with her creditor of at least $600, she may be subject to tax liability, just as she might be if a debt settlement firm does so on her behalf.

51 See, e.g., the reporting of some near and full completion rates of debt management plans here: http://getoutofdebt.org/7233/the-truth-about-the-failure-rates-and-completion-rates-of-credit-counseling-debt-settlement-and-bankruptcy

52 Fees associated with debt management plans are often limited by state law.

53 To qualify for Chapter 7 bankruptcy, the consumer must demonstrate either that her income is at or below the median income in her state or that her disposable income—that is, her actual income less necessary living expenses—is below certain thresholds.

54 See "Bankruptcy FAQ" from the National Association of Bankruptcy Trustees, available at National Association of Bankruptcy Trustees, *Bankruptcy FAQ,* NABT.COM, http://www.nabt.com/faq.cfm (Last visited Oct. 1, 2013).

55 Angela Littwin, "The Affordability Paradox: How Consumer Bankruptcy's Greatest Weakness May Account for its Surprising Success," 52 Wm. & Mary L. Rev. 1933, 1973 (2011) analyzes data from the 2007 Consumer Bankruptcy Project which found that Chapter 7 filings reached successful completion in 97.5% of cases.

56 Of the two-thirds of Chapter 13 filers who do not discharge their debts, 27% convert to a Chapter 7 filing. Thus, 33% of Chapter 13 filers receive a discharge directly and an additional 18% (27% of 66%) receive a discharge after their conversion to Chapter 7. *Katherine Porter, The Pretend Solution: An Empirical Study of Bankruptcy Outcomes, 90 Tex. L. Rev. 112 (2011).*

57 Lois Lupica, Am. Bankr.Inst., *The Consumer Bankruptcy Fee Study: Final Report,* ABIWORLD.ORG (December 2011), http://www.abiworld.org/Fee_Study/CFSFinalReport_Final_Dec7.pdf. The mean total cost for a Chapter 7 bankruptcy with assets was $1,414.

58 See. e.g., U.S. Bankruptcy Court for  the Middle District of North Carolina, In the Matter of Chapter 13 Cases, Order Regarding Attorneys' Fees (Jan. 3, 2013) (raising to $3,700 the presumptive base attorneys' fee for Chapter 13 cases filed on or after January 1, 2013), available at http://www.ncmb.uscourts.gov/sites/default/files/general-ordes/Order%20Regarding%20Attorney%27s%20fees_0.pdf.

59 See, e.g., Maxine Sweet, *Ask Experian: Bankruptcy.* EXPERIAN.COM, http://www.experian.com/credit-advice/topic-bankruptcy.html(Last visited Oct. 1, 2013).

60 For example, given AFCC's estimate that most debt settlement clients are legally insolvent, it is likely that a significant proportion qualify for Chapter 7. Nevertheless, debt settlement companies' informational materials emphasize the difficulty of filing for Chapter 7 and focus on the challenges associated with Chapter 13. See, e.g., Debtmerica Relief: "As of October 2005, congressional legislation made filing for bankruptcy more difficult and burdensome. A Chapter 13 bankruptcy could result in higher monthly payments and may last longer than an alternative debt resolution program," *Debt Relief Programs and Options,* DEBTMERICA.COM, http://www.debtmerica.com/your-debt-options (Last visited Oct. 1, 2013); Prestige Financial Solutions: "Under the old rules, people who filed under Chapter 13 had to devote all of their disposable income—what they had left after paying their actual living expenses—to their repayment plan. The new law adds a wrinkle to this equation: Although Chapter 13 filers still have to hand over all of their disposable income, they have to calculate their disposable income using allowed expense amounts dictated by the IRS—not their actual expenses—if their income is higher than the median in their state (see "Restricted Eligibility for Chapter 7," above). These expenses are often lower than actual costs. What's worse, these allowed expense amounts must be subtracted not from the filer's actual earnings each month, but from the filer's average income during the six months before filing. This means that debtors may be required to pay a much larger

amount of "disposable income" into their plan than they actually have to spare every month—which, in turn, means that many more Chapter 13 plans will fail…. Under the old rules, most filers could choose the type of bankruptcy that seemed best for them—and most chose Chapter 7 over Chapter 13. The new law will prohibit some filers with higher incomes from using Chapter 7," *New Bankruptcy Law,* PRESTIGEFINANCIALSOLUTIONS.COM, http://www.prestigefinancialsolutions. com/bankruptcy.php (Last visited Oct. 1, 2013); US Financial Options: "Get out of debt on better terms than bankruptcy— If a person opts to use the bankruptcy route, they will be under the rule of a bankruptcy court and will be given specific payment amounts and date that they must adhere to. Thus, a person who files is unable to get out of debt in a manner that they can dictate. Debt Settlement incorporates a more client-friendly alternative and is an involved process where the client is included in the decisions and has the final authorization to agree or decline a settlement offer," *Avoid Having to Claim Bankruptcy,* U.S.FINANCIALOPTIONS.COM, http://usfinancialoptions.com/program-benefits/ (Last visited Oct. 1, 2013); see also, advice given on Bills.com website (owned by Freedom Financial Network, which also performs debt settlement), whose article, "Tips and Advice to Manage Credit Card Debt Effectively" states: "Bankruptcy should be your last choice for getting out of debt because it will damage your credit for 7-10 years and, depending on which type of bankruptcy you file for, you could be forced to give up some of your assets or assigned a long-term payment plan. There have also been legal changes put in place by congress that makes if more challenging to qualify for a Chapter 7 Bankruptcy, forcing many people to file for a Chapter 13 Bankruptcy which is really a repayment plan," *Credit Card Debt Help and Advice to Reduce Debt Fast,* BILLS. COM, http://www.bills.com/credit-card-debt/ (Last visited Oct. 1. 2013).

## APPENDIX

Data used for calculating change in consumer financial position

*Note: all figures rounded to nearest dollar*

### Table A: Consumer's debts at enrollment

| | |
|---|---|
| Total debt enrolled post advance fee ban (AFCC report) | $1,700,000,000 |
| Average number of debts enrolled per consumer (AFCC report) | 6 |
| Total consumers enrolled post advance fee ban (AFCC report) | 56,000 |
| Average total debt enrolled per consumer | $30,357 |
| Average size of each debt enrolled per consumer | $5,060 |

### Table B: Overall accretion (AFCC study) and estimated accretion on each of 6 accounts

| Debt # | Debt balance at enrollment | Estimated accretion | Debt balance with accretion |
|---|---|---|---|
| 1 | $5,060 | 10% | $5,565 |
| 2 | $5,060 | 15% | $5,818 |
| 3 | $5,060 | 20% | $6,071 |
| 4 | $5,060 | 20% | $6,071 |
| 5 | $5,060 | 25% | $6,324 |
| 6 (or any debt unsettled after 36 months) | $5,060 | 30% | $6,577 |
| **TOTAL** | **$30,357** | **20%** | **$36,429** |

### Table C: Settlement amounts due to creditor and fee owed to debt settler, per debt settled

| Debt # | Debt balance at enrollment | Debt balance at settlement (from Table B) | Amount due to creditor (AFCC report states that debt settles at 48% of current debt balance) | Cumulative amount owed to creditor(s) | Fee owed to debt settler (assumes fee of 22.5% of debt balance at enrollment) | Cumulative fees owed to debt settler |
|---|---|---|---|---|---|---|
| 1 | $5,060 | $5,565 | $2,671 | $2,671 | $1,138 | $1,138 |
| 2 | $5,060 | $5,818 | $2,793 | $5,464 | $1,138 | $2,277 |
| 3 | $5,060 | $6,071 | $2,914 | $8.379 | $1,138 | $3,415 |
| 4 | $5,060 | $6,071 | $2,914 | $11,293 | $1,138 | $4,554 |
| 5 | $5,060 | $6,324 | $3,036 | $14,329 | $1,138 | $5,692 |
| 6 | $5,060 | $6,577 | $3,157 | $17,486 | $1,138 | $6,830 |

**Table D: Tax liability assessed on principal reduction**

| Debt # | Debt reduction (difference between debt balance at enrollment and amount due to creditor—see Table C above) | Cumulative debt reduction | Cumulative tax liability at 15% rate |
|---|---|---|---|
| 1 | $2,388 | $2,388 | $358 |
| 2 | $2,267 | $4,655 | $698 |
| 3 | $2,145 | $6,800 | $1,020 |
| 4 | $2,145 | $8,945 | $1,342 |
| 5 | $2,024 | $10,969 | $1,645 |
| 6 | $1,902 | $12,871 | $1,931 |

**Table 3: Change in Financial Position 36 Months After Enrollment**

The data for this table is calculated as follows:

Row A, Total debt enrolled: The starting balance at enrollment in the debt settlement program, $30,357.

Row B, Total due to creditor on unsettled debts: The cumulative amount of settlements owed to creditors, given the number of debts settled. See table C above.

Row C, Total debt settlement fees due: The cumulative fee owed to the debt settler, as a result of settlement agreements reached. See table C above.

Row D, Original balance of total unsettled debt remaining: The total debt that has not been settled, not taking into account any accretion, or growth in balance, from the time of enrollment. This is calculated by multiplying the number of unsettled debts by $5,060 (the amount of each unsettled debt at the time of enrollment). For example, a consumer who is unable to settle 3 of 6 debts has a balance of $15,179, which is $5,060*3 (all numbers rounded).

Row E, Accretion on unsettled debt, over 36 months: The accretion on unsettled debts from the time of enrollment until 36 months later. As shown in table B above, each debt that remains unsettled at month 36 experiences an accretion rate of 30%, resulting in a debt of $5,060 at the time of enrollment increasing to $6,577—a total of $1,518. Thus, total accretion is calculated by multiplying the number of unsettled debts by $1,518. For example, a consumer who is unable to settle 3 of 6 debts has accretion of $4,554 on those debts, which is $1,518*3.

Row F, Total debt balance plus costs: The sum of Rows B, C, D, and E.

Change in financial position 36 months after enrollment: The difference between the initial $30,357 debt balance at enrollment (Row A) and Row F.

**Table 4: Impacts of Additional Factors Such as Tax Liability and Dedicated Account Fees**

Row A, Change in financial position 36 months after enrollment: This is from Table 3.

Row B, Cumulative debt reduction: See calculation in table D above. Note that principal reduction calculation may be conservative, since it is calculated by taking the difference between the debt balance at enrollment (rather than the debt balance at the time of settlement) and the amount due to creditor.

Row C, Potential tax liability: See calculation in table D above.

Row D, Dedicated account fees if enrolled 36 months: This assumes only a $9 set-up fee and a $10 monthly maintenance fee are assessed (9 + (10*36) = $369).

Row 4, Revised change in financial position, taking these costs into account: Subtracts Rows C and D from Row A.

## NOTES

A Roll of the Dice: Debt Settlement Still a Risky Strategy for Debt-Burdened Households

## About the Center for Responsible Lending

The Center for Responsible Lending is a nonprofit, nonpartisan research and policy organization dedicated to protecting homeownership and family wealth by working to eliminate abusive financial practices. CRL is affiliated with Self-Help, one of the nation's largest community development financial institutions.

Visit our website at **www.responsiblelending.org.**

**North Carolina**
302 West Main Street
Durham, NC 27701
Ph (919) 313-8500
Fax (919) 313-8595

**California**
1330 Broadway
Suite 604
Oakland, CA 94612
Ph (510) 379-5500
Fax (510) 893-9300

**District of Columbia**
910 17th Street NW
Suite 500
Washington, DC 20006
Ph (202) 349-1850
Fax (202) 289-9009

Copyright © 2014 by Center for Responsible Lending

# EXHIBIT "D"



**mission**
SETTLEMENT AGENCY
PROTECTING YOUR FINANCES
DEBT SETTLEMENT SERVICES
**Head-Quarters**
292 Madison Avenue, 22nd Fl
New York,, NY 10017
T: 212-679-0750   F 212-679-0755

———— **BRANCH** ————
Phone: **917-692-1403**
Fax:    **718-412-3271**
E-mail: svolozhinets@yahoo.com
Office: **Brooklyn, NY 11229**

Applicant:

Welcome to the Mission Debt Settlement Agency family, where client satisfaction is our top priority. We are glad you have decided to join the many others in our family that are in pursuit of becoming debt free. With our guidance this goal will become easy to obtain.

Included in this package are several items that must be returned immediately in order for us to start the process towards the ultimate goal of your debt freedom. Please make sure to fill out sign as requested below and fax to (718-412-3271

- ✓ **Client Service Agreement** – Signature required ( **pages 2 & 3** )
- ✓ **Limited Power of Attorney** – Signature required ( **page 4** )
- ✓ **Note World Servicing Center Agreement** – Fill out and sign ( **page 5 & 6** )
- ✓ **Financial Hardship Letter** – Describe the situation that has caused you to fall behind/or future hardship ( **page 7** )
- ✓ **Creditor Information** - You may send in copies of your most recent statements or use the Creditor Listing Form provided ( **page 8** )
- ✓ **Automatic Withdrawal Form for your First Payment** - Fill out and sign ( **page 9** )

Please confirm the following contact information is correct. Fill in any blank sections, correct any errors and send this page back to us along with pages 2 - 9.

**Applicant Name:** _Peter Kulikov-Mishulovin_

**Co-Applicant Name:** _Elena Janoff_

**Address:** █████████ **City:** ████ **State:** ███ **Zip:** ██████

**Home Phone:** ██████████ **Work:** **Mobile:** ███████

**Email Address:**

1

# Client Service Agreement

This Agreement is made and effective, _12/29_, 2011 by _____, (hereinafter referred to as "Client") and between MISSION Debt Settlement, Inc. (hereinafter referred to as "Mission") its employees, agents, assigns, and affiliated Service Providers, law firms, attorneys and its employees.

In consideration of the conditions contained, the parties do hereby agree as follows:

1. **Subject Matter of Agreement:** Client hereby retains and employs MISSION to assist in resolving debts owed to the following creditors: See attached "Creditor Listing Form". Client agrees that MISSION may employ a Service Provider to perform the tasks mentioned in this paragraph on behalf of client including the following: to audit certain consumer protection laws, including but not limited to the Fair Credit Billing Act: the Fair Debt Collection Practices Act: the Fair Credit Reporting Act: and the various Rules of Professional Conduct. MISSION and/or Service Provider shall negotiate with third parties on behalf of Client in order to cause said third parties to settle certain contract disputes relating to the total amount allegedly due and payable under the contract. This representation does not include defense of claims and allegations raised by third parties against Client.

2. **Engagement:** Client hereby engages, and grants MISSION, its employees, agents, assigns, and affiliated Service Providers, law firms, attorneys and its employees, the exclusive right to negotiate with the Client's creditors, and to settle creditors' claims. Any and all Service Providers shall not, however, have the right to bind Client to any settlement without Client's written consent except if the settlement is for fifty five (55%) or less. MISSION and Service Providers do not, and will not furnish any accounting advice or services. All information regarding Client's financial condition is the sole responsibility of the Client. Client agrees to indemnify and hold MISSION, Service Provider and its principals, officers, directors and employees harmless from any liability incurred by Service Provider based on false or misleading information provided by Client.

3. **Debts to Be Settled:** Client has provided MISSION a list totaling _9_ creditors. Client confirms all accounts enrolled to be negotiated by Service Provider are unsecured debts totaling approximately $ _34,405_. Client agrees to hold MISSION and Service Provider harmless if Client lists any secured debts. The total amount of creditors enrolled must match the creditor listing form and statements.

4. **Monthly Deposits:** Client has agreed to make monthly deposits of $ _575.00_ for the purpose of settling the unsecured debts in approximately _36_ months. ___All fees disclosed in this agreement have been included in the payment terms provided in this paragraph.___

5. **Fees:** Client agrees to pay an administration fee equal to 18% of the total debt placed with MISSION. Said administration fee shall be collected from the Client's monthly payments within the first year. It is understood that this fee has been fully earned by Service Provider and is non refundable. Client agrees that the first three payments shall be applied toward the administration fee. Client agrees that if Service Provider settles any of Client's Debt for under 37% of the balance, Service Provider is entitled to the difference of the settled amount independent of the 18%. It is further understood and agreed that a non refundable monthly fee of $49.00 will automatically be charged against and paid from monthly installments.

6. **Impact on Credit Rating:** Client understands that the purpose of Service Provider's program is to settle the client's debt at a discount to the creditor's demand, and that Service Provider does not disburse funds to Client's creditors until acceptable settlements have been arranged. Client further understands that non-payment of monthly minimum payments may be reported by the creditors to the major credit reporting bureaus and such non-payments may have a negative impact on clients' credit score. Client's accumulation of funds for the settlement of debts does not prevent creditors from taking legal action to collect on debts.

**Applicant Initials:** _P. K. M_    **Date:** _12.29.11_

**Co-Applicant Initials:** _E. J._    **Date:** _12.29.11_

2

7. **Legal Disputes:**   In the event of any litigation arising out of or relating to this Agreement, all parties including Client, MISSION and Service Provider agree to resolve the dispute with neutral binding arbitration according to the laws of the state of New York. Venue for all arbitrations shall be in Kings County, New York. This Agreement represents the entire Agreement by and between the parties. All prior oral agreements or written understandings are deemed merged herein. This Agreement may not be amended except by a written document signed by each of the parties hereto.

8. **Legal Representation:**   Service Provider does not offer or provide any legal or tax advice. However, the Service Provider may at its sole discretion appoint an attorney to represent the Client if the Service Provider deems so to be beneficial in order to achieve a settlement. Such an attorney will be provided free of charge to the client. Client shall execute a separate Retainer and a Limited Power of Attorney with such an Attorney. In the event Client withdraws from the program with the Service Provider, or becomes delinquent in their monthly payment pursuant to this Contract, any/all legal representation of Client by an Attorney shall terminate.

9. **FDCPA Claims:**   If the Service Provider deems it to be beneficial for the Client to pursue claims against collection agencies and/or attorneys for their alleged unfair and/or harassing acts the Service Provider may at its sole discretion appoint an attorney to represent the Client to sue such a collection agencies and/or attorney. Such an attorney will be provided on a contingency fee basis to the client. Client shall execute a separate Retainer with such an Attorney. In the event Client withdraws from the program with the Service Provider, or becomes delinquent in their monthly payment pursuant to this Contract, any/all legal representation of Client by an Attorney shall terminate.

10. **Money Back Guarantee:**   In the event Service Provider is unsuccessful in settling a particular customer debt account Service Provider shall refund to the customer the administration fee it received from the customer for that account provided that the following conditions are met: customer completes the term of the whole program; customer was current in all of its payments to Service Provider and/or its escrow agent. Service Provider makes a guarantee that it will attempt to negotiate with the clients' creditors as funds become available however Service Provider makes no guarantee as to the outcome of said attempts to negotiate with clients' creditors. Service Provider representations about the outcome of any matter are its best professional estimates only, and are limited by its knowledge at the time they are expressed.

11. **Termination:**   The Service Provider may withdraw from representing Client if Client fails to promptly pay the Service Provider's fees, if Client misrepresents or fails to disclose any material facts, provide request documents or information, if Client acts contrary to the Service Provider's suggested program, if Client does not return the Service Provider's phone calls, or otherwise fails to perform in an acceptable manner which could impair the Service Provider's performance under this agreement. If Client chooses to terminate the program before the completion or upon violation of Client's duties set forth in this Agreement, Service Provider is entitled to the remaining amount of monthly fees due according to this agreement or a $399.00 termination fee, whichever one is greater plus all fees that MISSION has already collected from the client. Such fees shall be deemed to be earned. Client shall have the right to terminate the Service Provider's services at any time, effective on thirty (30) day's written notice.

12. **Right of Cancellation:**   In the event Service Provider's salesperson made a presentation about Service Provider's services at the Client's home or workplace, the Client may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which the Client signed the contract. See attached notice of cancellation form for an explanation of this right.

13. **Authorization To Communicate:**   Client hereby gives MISSION, Service Provider and its agents authorization to communicate to execute all documents connected with the subject matter of the agreement.

14. **Final Agreement:**   This agreement includes the entire understanding and agreement between Client and MISSION on the subject matter hereof. Only a written addendum, signed by both Client and MISSION may modify this agreement.

15. **First Payment Date:**   Client agrees that the first payment date may be drafted up to 10 business days of the date agreed and signed in the contract. Client understands that MISSION will not be responsible for any charges that the customer will incur if payments is drafted during the 10 business days and funds were not available. All future drafts will be on the date stipulated for the client as signed in the agreement

16. **Client Acknowledgement:**   This agreement contains a preliminary calculation of the individual debt accounts and total debt amount. It is subject to change based on additional information and calculations. This agreement should not be constructed as a final binding dollar amount until the file is processed and approved by the Mission underwriting department.

Enrollment Counselor: Susan

Date Enrolled:

Applicant Name:  *Peter Kulikov-Mishulovin*

Co-Applicant Name:  *ELENA JANOFF*

Applicant Signature: *P.Kulikov-Mish*  Applicant Signature: *Elena Janoff*

*12.29.11*                                            *12.29.11*

Date                                            Date

In the event this contract is being executed in the Client's home or workplace: YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.

3

## Limited Power of Attorney

I / We _____ and _____(hereafter referred to as Principal(s)), do hereby make, constitute, and appoint **MISSION Debt Settlement, Inc.** (its employees, agents, affiliated law firms, attorneys, attorney's employees and/or assigns, hereafter referred to as **MISSION**), as my true and lawful representatives-in-fact for me/us and in my/our name and for my/our use and benefit for the following limited purpose and with the following powers and none other:

**1.** To enter into any and all transactions, to proactively intervene, intercede, negotiate, mediate, or arbitrate the settlement of any and all of my creditor suits, suits, judgments, liens and all disputes for purposes of effecting a reasonable settlement. **MISSION** is to perform all required steps in order to appropriately exercise the authority granted to it under this Limited Power of Attorney.

**2.** The Principal(s) hereby authorize all future communications from any and all creditors, creditor or collection attorneys, collection agents, credit bureaus, government agencies or any other third parties (hereinafter referred to as "Recipient") to be directed to **MISSION** in accordance with section 805(b) of The Fair Debt Collection Practices Act or other appropriate federal or state statutes.

**3.** The Recipient of an original, copy, photocopy, or facsimile of this document in any form whatsoever is specifically instructed by the Principal(s) to direct all future communications to **MISSION** as stated above, and in accordance with section 805(c) of The Fair Debt Collection Practices Act or other appropriate federal or state statutes.

**4.** This limited power of attorney is effective upon signing by the Principal(s) and specifically authorizes **MISSION** to disclose, talk, and otherwise communicate, convey documents to, and to otherwise provide to the Recipient any and all items and information concerning any payable, debt, account, lien, suit, or judgment for which the Principal(s) are allegedly responsible, whether disputed or admitted.

**5.** The recipient of this Limited Power of Attorney (whether provided as an original copy, photocopy, or facsimile) is hereby specifically instructed by the undersigned Principal(s) to contact **MISSION** as set forth below. Further, as a creditor or third party agent of a creditor under the general laws of the Fair Debt Collections Practice Act, the Fair Credit Reporting Act, or other appropriate state statutes you are required to work with **MISSION**, and refusal or failure to do so will constitute a refusal to work with me/us. If said recipient does refuse to work with **MISSION**, said recipient does so at their own risk.

Be it further known and understood that I/we will consider the failure of any creditor or third party agent including but not limited to a member of any state bar association or a collection agent to recognize this limited power of attorney to be an intentional and knowing interference with my/our prospective contractual advantage, which I/we may choose to legally remedy available by law.

### MISSION Debt Settlement, Inc.
292 Madison Avenue, 22nd Floor
New York, N.Y 10017
Phone: 212-679-0750

Principal's Social Security #: ███████████

Principal's Date of Birth: 10, 05. 56

Co- Principal's Social Security #: ███████████

Co- Principal's Date of Birth: 06, 24.53

Principal's Signature: _Elena TanW_   Co- Principal's Signature: _Elena TanW_
P. Kulikov - Mishulovi
12. 29.11                                         12. 29.11
Date                                                    Date

4

## Financial Hardship Letter

Lost my job

**Applicant Name:** (Please Print)

**Signature:** Elena Ianff

**Date:** 12. 29. 11