**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
UNITED STATES OF AMERICA      :      Case No. 13 Cr. 327 (PGG)
           v.                 :

MICHAEL LEVITIS,           :
              Defendant.      :
-------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHAEL LEVITIS'S**
**MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)**

**WILLKIE FARR & GALLAGHER LLP**
Casey E. Donnelly
Alexa L. Davis
787 Seventh Avenue
New York, New York 10019
T: (212) 728-8000

*Attorneys for Defendant Michael Levitis*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

FACTUAL BACKGROUND ................................................................................................. 1

I.      Mr. Levitis's Conviction, Incarceration, And Request For Compassionate Release .......... 1

II.     Mr. Levitis's Medical Condition ................................................................................. 3

III.    COVID-19 Is Especially Dangerous For Individuals With Kidney Disease. .................... 4

IV.     Incarcerated Individuals Are At Increased Risk of Contracting COVID-19. .................... 6

VII.    COVID-19 Is Quickly Infiltrating FCI Cumberland. ..................................................... 9

VIII.   Mr. Levitis's Reentry Plan. ....................................................................................... 11

ARGUMENT ..................................................................................................................... 12

I.      This Court Is Authorized To Grant Compassionate Release To Mr. Levitis ..................... 12

II.     Exposure To COVID-19 Represents A Previously Unforeseen Extraordinary And
        Compelling Reason To Release Mr. Levitis. ................................................................. 13

        A.      Federal Courts Are Releasing Prisoners Across The Country. ............................... 13

III.    All Other Applicable Factors Weigh In Favor Of Mr. Levitis's Release. ......................... 15

        A.      Mr. Levitis Is Not A Danger To The Public Or Any Individual ............................ 15

        B.      The Relevant 3553(a) Factors Weigh In Favor Of Release. ................................. 15

CONCLUSION .................................................................................................................. 18

## **TABLE OF AUTHORITIES**

**Cases**                                                                                        **Page(s)**

*United States v. Amarrah*,
    No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020) ..........................................14

*United States v. Campagna*,
    No. 16-cr-78, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) .....................................14, 15

*United States v. Cassidy*,
    No. 17-CR-116S, 2020 WL 2465078 (W.D.N.Y. May 13, 2020)...................................16

*United States v. Colvin*,
    No. 19-cr-179, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) ................................................7

*United States v. Dawson*,
    No. 18-40085, 2020 WL 1812270 (D. Kan. Apr. 9, 2020)................................................14

*United States v. Delgado*,
    No. 3:18-CR-17-(VAB)-1, 2020 WL 2464685 (D. Conn. Apr. 30, 2020) .......................14

*United States v. El-Hanafi*,
    No. 10-cr-162, 2020 WL 2538384 (S.D.N.Y. May 19, 2020)..........................................16

*United States v. Field*,
    No. 18-CR-426 (JPO), 2020 U.S. Dist. LEXIS 78112 (S.D.N.Y. May 4, 2020)..15, 16, 17

*United States v. Gakhal*,
    No. 15 CR 470-1, 2020 WL 3529904 (N.D. Ill. June 30, 2020) ......................................10

*United States v. Gorai*,
    No. 2:18-cr-00220, 2020 WL 1975372 (D. Nev. Apr. 24, 2020) .....................................15

*United States v. Jepsen*,
    No. 3:19-cv-00073, 2020 WL 1640232 (D. Conn. Apr. 1, 2020) ....................................14

*United States v. Kataev*,
    No. 16 Cr. 763-05 (LGS), 2020 WL 1862685 (S.D.N.Y. Apr. 14, 2020) ..................15, 16

*United States v. McCarthy*,
    No. 3:17-cr-0230, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) .......................................14

*United States v. Muniz,*
    No. 09 Cr. 199, 2020 WL 1540325 (S.D. Tex. Mar. 30, 2020).......................................14

*United States v. Park*,
    No. 16-cr-473, 2020 WL 1970603 (S.D.N.Y. Apr. 24, 2020).............................................7

*United States v. Pena*,
 No. 15-CR-551 (AJN), 2020 WL 2301199 (S.D.N.Y. May 8, 2020)..........................14, 17

*United States v. Rodriguez*,
 No. 2:03-CR-00271, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020) ......................................14

*United States v. Sawicz*,
 No. 08-CR-287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020)......................14, 16

*United States v. Skelos*,
 No. 15-CR-317 (KMW), 2020 WL 1847558 (S.D.N.Y. Apr. 12, 2020)............................7

*United States v. Stephens*,
 No. 15-cr-95-AJN, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020)...................................14

*United States v. Torres*,
 No. 87-CR-593 (SHS), 2020 WL 2815003 (S.D.N.Y. June 1, 2020)...............................13

*United States v. Williams*,
 No. 3:17-CR-121-(VAB)-1,  2020 WL 1974372 (D. Conn. Apr. 24, 2020) ....................14

*United States v. Williams-Bethea*,
 No. 18-CR-78 (AJN), 2020 WL 2848098 (S.D.N.Y. June 2, 2020)................................17

*United States v. Zukerman*,
 No. 16 CR. 194 (AT), 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) ............. 6, 7, 12, 16-17

**Statutes, Rules and Regulations**

18 U.S.C. § 3553(a) ............................................................................................................12, 15

18 U.S.C. § 3582(c)(1)(A)...................................................................................................12, 13

U.S.S.G. § 1B1.13.......................................................................................................................12

Defendant Michael Levitis respectfully moves this Court, pursuant to 18 U.S.C.

§ 3582(c)(1)(A)(i), for an order modifying his sentence to time served in light of the

"extraordinary and compelling reasons" presented by the COVID-19 pandemic and the risk that

Mr. Levitis will experience serious illness, perhaps death, if infected by COVID-19, given Mr.

Levitis's declining kidneys and his family history of fatal kidney disease.  In the alternative, Mr.

Levitis respectfully requests an order modifying his sentence to allow him to serve the remainder

of his sentence in home confinement.

## FACTUAL BACKGROUND

**I.**      **Mr. Levitis's Conviction, Incarceration, And Request For Compassionate Release.**

On April 8, 2014, Mr. Levitis pleaded guilty to one count of conspiracy to commit mail

and wire fraud, in violation of 18 U.S.C. § 371, and one count of conspiracy to commit wire

fraud, in violation of 18 U.S.C. § 371.[1]  The charges against Mr. Levitis stemmed from his

operation of a fraudulent debt consolidation company, Mission Settlement Agency.[2]  Mr. Levitis

was sentenced to 108 months in prison and began his sentence on February 23, 2015, meaning

that he has already spent five and a half years in prison.[3]

Mr. Levitis began serving his sentence at FCI Otisville and was transferred to his current

location at the satellite camp at FCI Cumberland in October 2019.  While Mr. Levitis has been

incarcerated, he has earned time credits for good behavior, and is currently enrolled in a

---

[1] *See* Plea Hearing Transcript, *United States v. Mission Settlement Agency, et. al*, No. 13-cr-327 (S.D.N.Y. Apr. 8, 2014), ECF No. 102 at 10:2-13, 29:15-22.

[2] *See* Sentencing Transcript, *United States v. Mission Settlement Agency, et. al*, No. 13-cr-327 (S.D.N.Y. Nov. 19, 2014) ECF No. 164 at 53:14-54:20.

[3] *See* Judgment, *United States v. Mission Settlement Agency, et. al*, No. 13-cr-327 (S.D.N.Y. Nov. 24, 2014), ECF No. 146 at 1-2.

Residential Drug Abuse Program (RDAP) that comes with a one year reduction in sentence.[4]
According to the Bureau of Prisons ("BOP") Inmate Locator website, as well as Mr. Levitis's
Individualized Reentry Plan, Mr. Levitis's release date is currently projected for December 2,
2021 – less than 17 months from now.[5]  Mr. Levitis has already served approximately 60% of his
original sentence and 80% of his currently projected sentence.[6]

On April 7, 2020, Mr. Levitis sent an email message to the warden of FCI Cumberland,
J.R. Bell ("Warden Bell"), asking to be considered as a candidate for release to home
confinement given the COVID-19 pandemic.  Mr. Levitis also submitted a request for release to
home confinement to his case manager on May 5, 2020, which was denied on the same day.  On
May 6, 2020, Mr. Levitis submitted an administrative request for compassionate release—via a
BP-9 form—to Warden Bell, citing the extraordinary and compelling circumstances caused by
the COVID-19 pandemic as well as his increased vulnerability due to his genetic predisposition
to kidney disease as well as his own troubling blood test results.  On May 15, 2020, Warden Bell
denied Mr. Levitis's request.[7]

Mr. Levitis's crime was non-violent and his release would pose no danger to the public.
Indeed, BOP itself has signaled that Mr. Levitis does not present any threat to the community, as
he has been granted furloughs on two different occasions:  (1) in April 2019, Mr. Levitis was
granted a 15 hour pass to return to his home to celebrate a Jewish holiday with his family; and

---

[4] Mr. Levitis expects that he would graduate from the program by September 2020.

[5] See Exhibit A (Michael Levitis Individualized Reentry Plan) at 1; see also Federal Bureau of Prisons Inmate
Locator, available at https://www.bop.gov/inmateloc/ (last visited July 14, 2020).

[6] Mr. Levitis has also indicated that his case manager will soon apply for Mr. Levitis for early transfer to a halfway
house, which could result in Mr. Levitis leaving FCI Cumberland in December 2020.  If that is the case, Mr. Levitis
only has a few months remaining of his prison sentence.

[7] See Exhibit B (Response to Request for Administrative Remedy, signed by Warden Bell on May 15, 2020).

(2) in October 2019, Mr. Levitis was granted a furlough of 7 hours in order for his mother to transport him from FCI Otisville to FCI Cumberland.  The good time credits earned by Mr. Levitis during the five and a half years he has spent incarcerated also support the conclusion that his release does not raise any public safety concerns.

## II.    Mr. Levitis's Medical Condition.

Both the maternal and paternal sides of Mr. Levitis's family have suffered from kidney disease for generations.  Mr. Levitis's maternal grandmother died at the age of 57 from kidney problems.[8]  Mr. Levitis's paternal uncle currently has end stage kidney disease, for which he is on dialysis.[9]  Mr. Levitis's father has also been diagnosed with chronic kidney disease,[10] and is currently awaiting a kidney transplant.  Individuals with a family history of kidney disorders are at an increased risk of developing kidney disease.[11]  Furthermore, recent blood tests performed in November 2019, December 2019, and January 2020 at FCI Cumberland indicate that Mr. Levitis's kidneys are declining and that he is already suffering from chronic kidney disease; his creatinine levels are significantly elevated[12]—which generally indicates decreased kidney function[13]—and appear to be rising progressively higher.  The blood tests also show that Mr.

---

[8] *See* Exhibit C (Translation of Death Certificate of Fania Solomonovna, dated May 21, 1981, listing cause of death as "Nephrolithiasis" (kidney stone disease)).

[9] *See* Exhibit D (Letter from Dr. Kaushal Nanavati, MD, dated February 18, 2020, stating that his patient Yefim Levitis has end stage kidney disease and is on dialysis).

[10] *See* Exhibit E (NYU Langone Health Summary for Boris Sapozhnikov, dated April 15, 2020, listing diagnosis of "CKD (chronic kidney disease) stage 4").

[11] *See* Cleveland Clinic, *Creatinine Clearance Test*, https://my.clevelandclinic.org/health/diagnostics/16380-creatinine-clearance-test (last visited July 14, 2020).

[12] *See* Exhibit F (Michael Levitis Blood Test Results).  As stated on the test result pages, the healthy range for creatinine level is 0.60-1.30; Mr. Levitis's November 2019 test results show a creatinine level of 1.44, his December 2019 test results show a creatinine level of 1.46, and his January 2020 test results show a creatinine level of 1.54; all three results are marked with an "H" symbol, indicating that these levels are "high," as per the legend on the bottom of the test result pages.

[13] *See* National Kidney Foundation, *Understanding Your Lab Values*, https://www.kidney.org/atoz/content/understanding-your-lab-values (last visited July 14, 2020) ("Creatinine is a

Levitis's estimated glomerular filtration rate ("eGFR"), which is described as "the best test to measure [one's] level of kidney function and determine [one's] stage of kidney disease,"[14] was at a level for each of the three tests that, according to a note on the results page, "suggests a chronic kidney disease if found over a 3 month period,"[15] and the level was progressively worse with each test.[16]

### III.   COVID-19 Is Especially Dangerous For Individuals With Kidney Disease.

On March 11, 2020, the World Health Organization ("WHO") officially classified the spread of COVID-19, the disease caused by the novel coronavirus, as a pandemic.[17]  In the months since this announcement, COVID-19 has continued to spread at an alarming, ever-increasing rate. As of July 14, 2020, almost 13 million people have been infected globally and over 570,000 people have died.[18]  In the United States, more than 3.2 million people have been infected and more than 134,000 people have died.[19]

The Centers for Disease Control and Prevention ("CDC") has identified several risk factors for severe illness from COVID-19, one of which is kidney disease; the CDC has reported

---

waste product in your blood that comes from muscle activity. It is normally removed from your blood by your kidneys, but when kidney function slows down, the creatinine level rises.")

[14] National Kidney Foundation, *Estimated Glomerular Filtration Rate (eGFR)*, https://www.kidney.org/atoz/content/gfr#:~:text=eGFR%20%2D%20Estimated%20glomerular%20filtration%20rate,age%2C%20body%20size%20and%20gender. (last visited July 14, 2020).

[15] *See* Exhibit F (Michael Levitis Blood Test Results), showing eGFR rates of 54, 53, and 50 for the November 2019, December 2019, and January 2020 blood tests, and stating that "[a] calculated GFR <60 suggests a chronic kidney disease if found over a 3 month period."

[16] *Id.*

[17] World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[18] World Health Organization, *Coronavirus disease (COVID 19) Situation Report – 176* (July 14, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200714-covid-19-sitrep-176.pdf?sfvrsn=d01ce263_2

[19] *Id.*

that kidney disease is associated with "increased illness severity and adverse outcomes" for those who contract COVID-19.[20]  Researchers have found that chronic kidney disease "seems to be associated with enhanced risk of severe COVID-19 infection" and that individuals with chronic kidney disease "should hence be advised to take extra precaution to minimize risk exposure to the virus."[21]  One particular study of 701 patients with COVID-19 found that kidney disease was associated with a higher in-hospital mortality rate.[22]  Furthermore, kidney health issues are of particular concern with respect to COVID-19 because studies have shown that the disease often causes significant kidney injury to those who contract it.[23]  One study conducted in a large New York medical system found that 36.6% of the patients treated for COVID-19 developed acute injury, and 15% required dialysis.[24]

As the daily news makes clear, the United States is nowhere near the end of this first wave of coronavirus[25]— just yesterday, the country again shattered its single-day record for new

---

[20] *See* Centers for Disease Control & Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited July 14, 2020) (stating that chronic kidney disease is "associated with increased illness severity and adverse outcomes"); Harvard Medical School, *If you are at higher risk*, https://www.health.harvard.edu/diseases-and-conditions/if-you-are-at-higher-risk (last visited July 14, 2020) (listing "chronic kidney disease" as one of the seven conditions to which the "strongest evidence supporting increased risk of serious COVID-19 illness" applies).

[21] Brandon Michael Henry and Giuseppe Lippi, *Chronic kidney disease is associated with severe coronavirus disease 2019 (COVID-19) infection*, International Urology and Nephrology (Mar. 28, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7103107/#

[22] Cheng Y, Luo R, Wang K, et al., *Kidney disease is associated with in-hospital death of patients with COVID-19*, Kidney Int. 2020 (Mar. 19, 2020), https://www.kidney-international.org/article/S0085-2538(20)30251-9/fulltext

[23] Julie Steenhuysen, *Kidney injury seen in more than a third of hospitalized COVID-19 patients: U.S. study*, Reuters (May 14, 2020), https://www.reuters.com/article/us-health-coronavirus-kidney/kidney-injury-seen-in-more-than-a-third-of-hospitalized-covid-19-patients-u-s-study-idUSKBN22Q0U7

[24] *See id.*

[25] Christina Maxouris and Amir Vera, *US is still 'knee-deep' in the first wave of the coronavirus pandemic, Fauci says*, CNN (July 7, 2020), https://www.cnn.com/2020/07/06/health/us-coronavirus-monday/index.html

cases, the 11th time in the past month that the record has been broken[26]— and infectious disease experts are "almost certain" that "[c]oronavirus will surge again when summer ends."[27] Furthermore, the director of the CDC has warned that a second wave of the coronavirus in the winter will be far more dire than the current wave because it is likely to coincide with the start of flu season.[28] Even without a second wave, the virus will persist as a threat to public health until a vaccine is developed and made available to the public, which could take well over a year, if not significantly longer.[29] It is clear that the danger posed by coronavirus is far from over and may, in fact, continue increasing substantially in the coming months.

## IV.   Incarcerated Individuals Are At Increased Risk of Contracting COVID-19.

Incarcerated individuals are much more vulnerable to the spread of COVID-19 than the general population and, as this court and others have found, "[p]risons are ill-equipped to prevent the spread of COVID-19." *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *4 (S.D.N.Y. Apr. 3, 2020) (citation omitted). Prisons have long been a concern with respect to containing the spread of coronavirus because correctional facilities are "often overcrowded, unsanitary places where social distancing is impractical, bathrooms and day rooms are shared by hundreds of inmates, and access to cleaning supplies is tightly controlled."[30] The

---

[26] *U.S. Shatters Its Record of New Coronavirus Infections as India's Caseload Hits a Million*, New York Times (July 16, 2020), https://www.nytimes.com/2020/07/16/world/coronavirus-updates.html#link-42f72bbe

[27] Scottie Andrew, *What We Mean by a 'Second Peak' of Coronavirus*, CNN (May 27, 2020), https://www.cnn.com/2020/05/27/health/second-peak-coronavirus-explained-trnd/index.html

[28] Lena H. Sun, *CDC director warns second wave of coronavirus is likely to be even more devastating*, The Washington Post (Apr. 21, 2020), https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/

[29] *See* Noah Higgins-Dunn, *White House Advisor Fauci Says Coronavirus Vaccine Trial is on Target and Will Be 'Ultimate Game Changer,'* CNBC (Apr. 1, 2020), https://www.cnbc.com/2020/04/01/white-house-advisor-fauci-says-coronavirus-vaccine-trial-is-on-target-and-will-be-ultimate-game-changer.html.

[30] Timothy Williams, Libby Seline and Rebecca Griesbach, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, New York Times (June 16, 2020), https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html; *see also* "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-

CDC has acknowledged that correctional and detention facilities present "unique challenges for control of [COVID-19] transmission," since they include custody, housing, education, recreation, healthcare, food service, and workplace components integrated in a single physical setting.[31] The CDC has enumerated the avenues whereby the coronavirus may be introduced into a correctional facility, including the daily ingress and egress of staff, the transfer of inmates between facilities or to court appearances and medical appointments, visits from family members and legal representatives, and the admission of new inmates.[32]  The practices that have been widely encouraged to slow the spread of the virus, such as social distancing, are virtually impossible to carry out inside of prisons – a fact that courts have frequently cited in granting compassionate release requests during the pandemic.[33]  Indeed, as early as March 27, 2020, a time when the pandemic in the United States seemed far more controllable than it has proved to be, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities

---

President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (Mar. 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

[31] CDC, *Coronavirus Disease 2019 (COVID-19), Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (last visited July 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

[32] *Id.*

[33] *See, e.g., United States v. Park*,  No. 16-cr-473, 2020 WL 1970603, at *2 (S.D.N.Y. Apr. 24, 2020) ("The nature of prisons – crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products – put those incarcerated inside a facility with an outbreak at heightened risk."); *United States v. Skelos*, No. 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020) ("Jails and prison are powder kegs for infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment."); *Zukerman*, 2020 WL 1659880, at *5 ("Given that inmates … live in close quarters, social distancing is impracticable if not impossible, making it difficult for [the defendant] to protect himself from the spread of this dangerous and highly contagious virus"); *United States v. Colvin*, No. 3:19-cr-179, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (noting defendant's multiple health conditions and inability to socially distance in prison and concluding that "[i]n light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home").

to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly and medically vulnerable inmates who have already served a majority of their sentence.[34]

The heightened vulnerability of inmates is evident from recent research showing that inmates are 5.5 times more likely to contract COVID-19 than the general population, and 3 times more likely to die from it.[35]  As of July 14, 2020, BOP's website states that 3,366 federal inmates and 257 BOP staff have confirmed positive test results for COVID-19 nationwide, and 5,181 inmates and 629 staff have recovered from COVID-19.[36]  There have been 95 federal inmate deaths and 1 staff member death attributed to COVID-19.[37]  However, the *New York Times* has reported that the number of prison inmates known to be infected is much higher than stated on the BOP website, and the real figure was more than 68,000 as of mid-June.[38]  The *New York Times* also reported that prison deaths tied to the coronavirus had risen by 73 percent between mid-May and mid-June.  The situation inside the nation's jails and prisons has become "the stuff of nightmares" due to the COVID-19 pandemic, which has "turned detention facilities into a playground for the virus and a death trap for inmates – many of whom, because of age or pre-existing conditions, are at elevated risk for complications."[39]  The nation's top five COVID-19

---

[34] *See* Open Letter to President Trump, dated March 27, 2020, *available at* https://fairandjustprosecution.org/wp-content/uploads/2020/04/Letter-to-Trump-from-DOJ-and-Judges-FINAL.pdf

[35] Justin Carissimo, *Inmates are 5 times more likely to get coronavirus than the general population, study says*, CBS News (July 11, 2020), https://www.cbsnews.com/news/coronavirus-prison-inmates-more-likely-to-get-infected-study-says/?ftag=CNM-00-10aab7e&linkId=93578138

[36] *See* Fed. Bur. of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited July 14, 2020).

[37] *Id.*

[38] *See* Williams, Seline and Griesbach, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, *supra* note 30.

[39] *Opinion: The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars*, New York Times (June 25, 2020), https://www.nytimes.com/2020/06/25/opinion/coronavirus-prisons-compassionate-release.html.   It is also worth noting that incarcerated people tend to have poorer health than the general population, and even in normal circumstances, medical care in correctional facilities is often limited.  *See* U.S. Dep't of Justice, Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12* (Oct. 4, 2016),

"hot spots" are all correctional facilities.[40]  These infections have occurred despite the safety

measures that the BOP has put in place to combat the spread of coronavirus.[41]

**VII.    COVID-19 Is Quickly Infiltrating FCI Cumberland.**

FCI Cumberland and its adjacent satellite camp have not been spared from the

coronavirus pandemic that continues to ravage the country, and the conditions at these facilities

put prisoners at an increased risk for contracting COVID-19.  As of July 14, 2020, BOP's

website states that 6 inmates and 2 staff members at FCI Cumberland have contracted and

subsequently recovered from the disease, and that one staff member has tested positive and not

yet recovered.[42]  Mr. Levitis has indicated that the staff member who recently tested positive was

a case manager who was in close contact with hundreds of inmates and other staff members, and

therefore that there may be others at FCI Cumberland who have been infected.  Furthermore, the

actual number of COVID-19 cases at FCI Cumberland is likely to be higher than the figures

reported on the BOP website, since testing inside prisons has been extremely limited.[43]  The

BOP website currently states that only 50 inmates at FCI Cumberland have been tested for

COVID-19 (of which 5 inmates tested positive, i.e., 10% of the inmates tested), although FCI

Cumberland and the satellite company house nearly 1,100 inmates in total.[44]  At least one federal

---

https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe."  *See* "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," *supra* note 30.

[40] *Opinion: The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars*, *supra* note 39.

[41] Fed. Bur. of Prisons, *COVID-19 Action Plan* (last visited July 14, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp

[42] *See* Fed. Bur. of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/  (last visited July 14, 2020).

[43] *See* Williams, Seline and Griesbach, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, *supra* note 30.

[44] *See* Fed. Bur. of Prisons, *FCI Cumberland*,  https://www.bop.gov/locations/institutions/cum/ (last visited July 14, 2020)

court has recently found that the environment of the camp at FCI Cumberland is sufficiently dangerous for a defendant with underlying health issues to necessitate granting compassionate release. *See United States v. Gakhal*, No. 15 CR 470-1, 2020 WL 3529904, at *1 (N.D. Ill. June 30, 2020).

Indeed, the conditions at FCI Cumberland and the camp are so insufficient to stem the spread of coronavirus that the Maryland Congressional Delegation felt compelled to write an open letter to Attorney General William Barr urging the Department of Justice to institute additional policies to protect incarcerated individuals and correctional employees.[45]   The letter stated:

> "In Maryland, we have received troubling reports about conditions for prison guards, health staff, and incarcerated individuals at the medium-security FCI Cumberland in Western Maryland, in addition to the minimum security satellite camp.   These facilities hold roughly 1,200 incarcerated individuals.   The reports highlight staff shortages; inadequate personal protective equipment (PPE) and medical services for guard, staff, and incarcerated individuals; and a failure to follow Centers for Disease Control (CDC) guidelines for containing the virus. … The continuing spread among incarcerated individuals puts them, the staff, and the medical personnel assigned to the correctional facilities at risk.   The only proven methods of slowing the spread of COVID-19 to date – social distancing, washing hands, and sanitary spaces – face significant hurdles where populations are concentrated, such as correctional facilities.   Prisons often confine large groups of medically vulnerable and elderly incarcerated individuals together, and face a large movement of daily worker populations entering the facility and then going back home to their communities.   Indeed, studies have shown that the virus spreads more aggressively behind bars, at roughly eight times the rate it does in the general community."

The situation at FCI Cumberland is exactly as the Maryland Congressional Delegation described: Mr. Levitis and his fellow inmates have no access to hand sanitizer and are completely

---

[45] *See* Letter from the Maryland Congressional Delegation to Attorney General Barr (May 4, 2020), *available at* https://www.cardin.senate.gov/imo/media/doc/MD%20Delegation%20Letter%20to%20DOJ%20on%20Federal%20Prisons.pdf.

unable to practice social distancing.  Mr. Levitis's living space is in a room with 32 other inmates, with whom Mr. Levitis shares showers, sinks, toilets, classrooms, and common areas.  The inmates also line up in close proximity for meals and medications.  Furthermore, Mr. Levitis has noted that there are inmates who work outside of the satellite camp—including at the medium security prison and at the prison training center, both of which necessitate interactions with many people outside of the camp—and increase the risk of exposure to coronavirus and transmitting it widely.  Mr. Levitis has also reported that no testing for COVID-19 is performed at FCI Cumberland (except for temperature checks) unless that particular inmate is scheduled to return home in the near future.

## VIII.   <u>Mr. Levitis's Reentry Plan.</u>

Should Mr. Levitis's sentence be reduced to time served or should he be permitted to serve the remainder of his sentence in home confinement, Mr. Levitis has verifiable living and employment arrangements that will ensure his safety and the safety of those around him.  Mr. Levitis will live with his two children and ex-wife at his former residence in Brooklyn, New York, where he can practice social distancing and will have the ability to quarantine in a bedroom with a connecting bathroom.  Mr. Levitis has also indicated that he has been offered two job opportunities, one at a real estate management company in Brooklyn and another in a law office in Queens.  Mr. Levitis also plans to continue his alcohol treatment therapy, wishes to enroll in programs for the re-integration of former inmates into society, and intends to volunteer with the Fortune Society.  While he has been incarcerated, Mr. Levitis has also taken a number of courses—such as Accounting Principles and Public Speaking, as well as participation in an Informational Job Fair—that will assist in his reintegration into his community.[46]

---

[46] *See* Exhibit A (Michael Levitis Individualized Reentry Plan).

## ARGUMENT

Section 3582(c)(1)(A) of Title 18 of the United States Code provides that, upon the motion of a defendant, and once the defendant has exhausted all administrative remedies with BOP or after 30 days have elapsed since the warden's receipt of the defendant's request for modification, a court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). In doing so, a court may "impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." *Id.* In the policy statement U.S.S.G. § 1B1.13, the United States Sentencing Commission (the "U.S.S.C.") has clarified that a court may order early release if, after considering the factors set forth in 18 U.S.C. § 3553(a), the court determines that: (i) extraordinary and compelling reasons warrant the reduction; (ii) the defendant is not a danger to the safety of any other person or to the community; and (iii) the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13.

## I.     **This Court Is Authorized To Grant Compassionate Release To Mr. Levitis.**

Under 18 U.S.C. § 3582(c)(1)(A)(i), a court may reduce the prison term of a defendant's sentence, upon a finding of extraordinary and compelling circumstances, if the defendant has exhausted all administrative remedies with BOP or 30 days have elapsed since the warden received the defendant's request for a modification of the terms of his sentence. Once 30 days have passed, the statute's exhaustion requirement is fulfilled. A defendant whose request for compassionate release is denied has exhausted his administrative remedies. *See* 18 U.S.C. § 3582(c)(1)(A); *see also Zukerman*, 2020 WL 1659880, at *2-3 (explaining the exhaustion requirement of § 3582(c)(1)(A)).

As described above, on April 7, 2020, Mr. Levitis sent an email message to Warden Bell asking to be considered as a candidate for release to home confinement.  Mr. Levitis subsequently submitted an administrative request for compassionate release to the warden on May 6, 2020.  On May 15, 2020, Warden Bell denied Mr. Levitis's request.  More than 30 days have elapsed since Warden Bell received, and denied, the request.  Mr. Levitis has therefore taken the necessary steps to exhaust his remedies.

## II.     Exposure To COVID-19 Represents A Previously Unforeseen Extraordinary And Compelling Reason To Release Mr. Levitis.

The devastating spread of the coronavirus throughout the country and around the world and the unique vulnerability of inmates, combined with Mr. Levitis's poor kidney health, put Mr. Levitis at a heightened risk of contracting the virus and suffering from severe illness, permanent kidney damage, and even death.  These extraordinary and compelling circumstances warrant a sentence reduction and immediate release, or in the alternative, an order allowing Mr. Levitis to serve the remainder of his term in home confinement, where he will not be at such high risk of serious illness or death, and will not pose a threat to the community.

### A.     Federal Courts Are Releasing Prisoners Across The Country.

It has become clear to the nation's courts that "the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals" and that, "[r]ealistically, the best—perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible."  *United States v. Torres*, No. 87-CR-593 (SHS), 2020 WL 2815003, at *11 (S.D.N.Y. June 1, 2020) (citations omitted). Accordingly, an overwhelming number of courts in the Second Circuit have granted compassionate release to inmates with a range of underlying health conditions, under the logic of

which Mr. Levitis should also be released.  *See, e.g., United States v. Pena*, No. 15-CR-551

(AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) (releasing defendant who had served

two-thirds of his 84-month sentence because of the risk of severe medical consequences, due to

his hypertension, if he contracted COVID-19); *United States v. Sawicz*, No. 08-CR-287 (ARR),

2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (in a case where the defendant had

hypertension, "agree[ing] with the defendant that the risk of serious illness or death that he faces

in prison constitutes an extraordinary and compelling reason militating in favor of his release");

*United States v. Campagna*, No. 16-cr-78, 2020 WL 1489829, *3 (S.D.N.Y. Mar. 27, 2020)

(approving compassionate release for defendant where his "compromised immune system, taken

in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling

reason to modify [d]efendant's sentence").[47]  Courts outside of the Second Circuit have similarly

been granting myriad compassionate release requests as the pandemic rages on.[48]

---

[47] *See also United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *United States v. Jepsen*, No. 3:19-cv-00073, 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) (granting compassionate release to defendant who "is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19"); *United States v. Williams*, 3:17-CR-121-(VAB)-1, 2020 WL 1974372, at *4 (D. Conn. Apr. 24, 2020) (granting compassionate release to a defendant with asthma, hypertension, a history of kidney issues, and other medical conditions); *United States v. Delgado*, No. 3:18-CR-17-(VAB)-1, 2020 WL 2464685, at *6 (D. Conn. Apr. 30, 2020) (granting compassion release to defendant whose "obesity and sleep apnea place him at greater risk from COVID-19," and "is unable to properly guard against infection while incarcerated" because, despite "BOP's efforts to manage the coronavirus pandemic … COVID-19 cases continue to spread in BOP facilities"); *United States v. McCarthy*, No. 3:17-cr-0230, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (granting compassionate release and waiving exhaustion requirement for defendant at serious risk from COVID-19).

[48] *See also United States v. Rodriguez*, No. 2:03-CR-00271, 2020 WL 1627331, at *1, *7 (E.D. Pa. Apr. 1, 2020) (granting compassionate release where defendant was "in the higher risk category for developing more serious disease" if exposed to COVID-19 and noting that prisons are "tinderboxes for infectious disease"); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (releasing defendant who had "a medical condition (obesity) that the CDC recognizes puts him at an increased risk of developing serious illness if he were to become infected with COVID-19" and was a "low-risk, non-violent offender with a history of good behavior while incarcerated"); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *4, *6 (E.D. Mich. May 7, 2020) (releasing inmate with diabetes, hypertension, and asthma, stating: "The Court sentenced Defendant to 60 months in prison; it did not sentence him to death or to incarceration that carries a significant risk of death."); *United States v. Muniz,* No. 09 Cr. 199, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020) (releasing defendant with diabetes, renal disease, and hypertension, which made him "particularly vulnerable to severe illness from COVID-19"); *United*

III.   **All Other Applicable Factors Weigh In Favor Of Mr. Levitis's Release.**

    A.   Mr. Levitis Is Not A Danger To The Public Or Any Individual.

Under the relevant policy statement, a court may only order a sentencing reduction if it finds that the defendant is not a danger to the community. *Campagna*, 2020 WL 1489829, at *2 (summarizing U.S.S.G. § 1B1.13). Courts have found this factor met where the defendant is "convicted of a nonviolent economic crime, and his prior criminal history does not indicate that he is a danger to the community." *United States v. Kataev*, No. 16 Cr. 763-05 (LGS), 2020 WL 1862685, at *3 (S.D.N.Y. Apr. 14, 2020); *see also United States v. Field*, No. 18-CR-426 (JPO), 2020 U.S. Dist. LEXIS 78112, at *4-5 (S.D.N.Y. May 4, 2020).

In this case, Mr. Levitis's fraud crimes did not involve violence or threaten any individuals. Mr. Levitis will pose no danger to the community if released. BOP clearly feels that Mr. Levitis does not pose any danger and is deserving of trust, as they have granted him furloughs on two different occasions in the past year and a half. BOP would not have granted Mr. Levitis the "privilege" of furloughs if they believed he was at all a risk to public safety.[49]

    B.   The Relevant 3553(a) Factors Weigh In Favor Of Release.

Courts, in examining the 18 U.S.C. § 3553(a) factors, "must consider what is 'sufficient, but not greater than necessary, to comply with the purposes of [sentencing].'" *Sawicz*, 2020 WL 1815851, at *3 (quoting the statute). The 18 U.S.C. § 3553(a) factors courts have found relevant in deciding a motion for compassionate release include "the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the

---

*States v. Gorai*, No. 2:18-cr-00220, 2020 WL 1975372, at *3 (D. Nev. Apr. 24, 2020) (releasing 34-year-old defendant with asthma as the only listed medical condition, due to risks posed by COVID-19 pandemic).

[49] U.S. Dep't of Justice, Office of the Inspector General, *Audit of the Federal Bureau of Prisons' Furlough Program*, at 4 (Sept. 2010), https://oig.justice.gov/reports/BOP/a1044.pdf (stating that "[a] furlough is a privilege granted to an inmate under certain prescribed conditions, such as when the inmate only has a certain amount of time remaining on the inmate's sentence and *when the inmate has been designated as low risk*." (emphasis added.)

seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes by the defendant; and the need to avoid unwarranted sentencing disparities." *United States v. Cassidy*, No. 17-CR-116S, 2020 WL 2465078, at *8 (W.D.N.Y. May 13, 2020).  This Court should determine whether the factors "outweigh the extraordinary and compelling reasons warranting compassionate release." *Sawicz*, 2020 WL 1815851, at *3 (citation omitted).  Taken together, those factors weigh in favor of Mr. Levitis's release.

As discussed above, Mr. Levitis was convicted of a non-violent, economic crime, for which he has agreed to pay restitution and has already served the majority of his sentence.  *See Kataev*, 2020 WL 1862685, at *3 (discussing defendant's non-violent history as a factor weighing in favor of release under Section 3553); *Field*, 2020 U.S. Dist. LEXIS 78112, at *5 (the court did not "believe that the goals of specific deterrence and protecting the public require further imprisonment, as Defendant poses a low risk of recidivism or violence").  Without detracting from the seriousness of Mr. Levitis's crime, courts have found that even a conviction for a "serious offense" does not "justify keeping the defendant in prison amidst an outbreak of a potentially deadly virus to which he is particularly vulnerable." *Sawicz*, 2020 WL 1815851, at *3 (finding that the factors did not outweigh the extraordinary and compelling reasons for release of a defendant who was found guilty of possession of child pornography); *see also United States v. El-Hanafi*, No. 10-cr-162, 2020 WL 2538384, at *5 (S.D.N.Y. May 19, 2020) (finding that, although the defendant's terrorism-related offense was "exceptionally serious," his early release was justified due to his vulnerability to COVID-19, and noting that "Defendant's previously imposed sentence is no longer just punishment where there is a real risk that it could be transformed into a death sentence."); *Zukerman*, 2020 WL 1659880, at *6 (granting immediate

compassionate release to defendant convicted in multi-million dollar fraud scheme motivated by greed and noting: "The severity of Zukerman's conduct remains unchanged.  What has changed, however, is the environment where Zukerman is serving his sentence.  When the Court sentenced Zukerman, the Court did not intend for that sentence to include incurring a great and unforeseen risk of severe illness or death brought on by a global pandemic." (citation omitted)).

Given Mr. Levitis's health concerns and the nature of his offense, this Court should find, as other courts have, that the "pandemic creates a significant danger of the Court's previously imposed incarceratory sentence being 'greater than necessary' to comply with the purposes of sentencing."  *Field*, 2020 U.S. Dist. LEXIS 78112, at *6; *see also Pena*, 2020 WL 2301199, at *4 (holding that the time the defendant had already served in prison (two-thirds of his 84-month sentence) had "already achieved much of the original sentence's retributive, deterrent, and incapacitative purpose" and that the defendant's "continued detention now poses him imminent danger of serious injury and death—a circumstance that the Court never considered when imposing its sentence.").

In addition, Mr. Levitis has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety.  Upon release, Mr. Levitis will be living with his ex-wife and two children at his former residence in Brooklyn, New York, where he can practice social distancing and will have the ability to quarantine in a bedroom with a connecting bathroom – an environment much less conducive to the spread of COVID-19 than FCI Cumberland.[50]  Mr. Levitis has also indicated that he has been offered two job opportunities, one at a real estate

---

[50] See *United States v. Williams-Bethea*, No. 18-CR-78 (AJN), 2020 WL 2848098, at *5 (S.D.N.Y. June 2, 2020) (releasing the defendant to home confinement and rejecting the government's argument that her release would not decrease her risk of contracting coronavirus, noting that, "in her Queens home, [the defendant] will be able to quarantine, limit interaction with individuals outside her family, and take all other precautions recommended by the Centers for Disease Control. The Government cannot plausibly compare the risks posed by the virus to [the defendant] while she is incarcerated to those while she is in her home, and the Court rejects this argument.")

management company in Brooklyn and another in a law office in Queens.  Mr. Levitis also plans

to continue his alcohol treatment therapy, wishes to enroll in programs for the reintegration of

former inmates into society, and intends to volunteer with the Fortune Society.  Based on all of

the above factors, Mr. Levitis is an excellent candidate for compassionate release, or at the very

least, for a modification of his remaining sentence to home confinement.


## CONCLUSION

For the foregoing reasons, Mr. Levitis respectfully requests that the Court reduce his

sentence to time served under 18 U.S.C. § 3582(c)(1)(A)(i), or alternatively, permit him to serve

the remainder of his sentence under home confinement.


Dated: July 17, 2020
       New York, New York


By:    /s/ Casey E. Donnelly
       WILLKIE FARR & GALLAGHER LLP
       Casey E. Donnelly
       Alexa L. Davis
       787 Seventh Avenue
       New York, New York 10019
       T: (212) 728-8000

       *Attorneys for Defendant Michael Levitis*